UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 2:07-cv-01154-RCJ-LRL |
| ESTATE OF E. WAYNE HAGE et al., | ) ) | **ORDER** |
| Defendants. | ) ) | |

The United States has sued Wayne N. Hage ("Wayne Jr.") both individually and in his capacity as executor of the Estate of E. Wayne Hage ("Wayne Sr."), his father, for the unauthorized grazing of cattle on federal land. Pending before the Court are the Estate's and Wayne Jr.'s separate Motions to Dismiss or Stay (ECF Nos. 185, 201), as well as the United States' Motion for Summary Judgment (ECF No. 186). For the reasons given herein, the Court denies the motions and will allow the case to proceed to trial.

**I.   FACTS**

Wayne Sr. owned and operated the Pine Creek Ranch (the "Ranch") in Nye County, Nevada until his death in June 2006. (First. Am. Compl. ¶ 9). The 7000-acre Ranch was established in 1865, and Wayne Sr. purchased it with his wife Jean in 1978. *Hage v. United States* (*Hage I*), 35 Fed. Cl. 147, 153 (1996). In 1907, Congress created the Toiyabe National Forest, and the U.S. Forest Service ("USFS") issued a grazing permit to the owners of the Ranch,

permitting grazing on federal lands adjacent to the Ranch. *Id.* The Hages received their first ten-year permit on October 30, 1978, which permitted grazing on six allotments: Table Mountain, Meadow Canyon, McKinney, Silver Creek, Monitor Valley East, and Monitor Valley West. *Id.* at 153 & nn.1–2. Due to alleged violations of the scope of the grazing permit in the Table Mountain Allotment, the USFS in 1990 cancelled 25% of the Hages' grazing permit in the area and suspended another 20%. *Id.* at 154–55. The Hages also claimed rights to all the water of Meadow Canyon Creek due to prior appropriation by the original owners of Pine Creek Ranch in 1868, including Meadow Spring and Q Spring, to which the flow of water was diverted by the USFS in 1980 without approval of the State Engineer. *Id.* at 155. Due to an alleged refusal to comply with a livestock removal order, the USFS in 1991 cancelled 38% of the Hages' grazing permit in the Meadow Canyon Allotment and suspended the remainder for five years. *Id.* The Hages also claimed ditch rights of way appurtenant to their lands for watering cattle pursuant to "the Act of 1866." *Id.* at 156.[1] In 1991, the Ninth Circuit reversed the criminal conviction of Wayne Sr. and one of his employees for maintaining such a ditch. *Id.* The Estate was opened in September 2006, and Wayne Jr., the operations manager of the Ranch, was appointed as substitute executor in August 2007. (*Id.* ¶¶ 9, 11).

Benjamin J. Colvin, an officer and/or director of Colvin Cattle Co., Inc., an Oregon corporation doing regular business in Nevada, operates the 40 Bar Ranch in Esmeralda County, Nevada. (*Id.* ¶¶ 10, 12). The present action has been dismissed as against Colvin and Colvin

---

[1]That act (the "Ditch Act") was passed on July 26, 1866:

> *And be it further enacted*, That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed . . . .

Act of July 26, 1866, ch. 262, § 9, 14 Stat. 251, 253.

1  Cattle Co., and their related takings claims have been finally adjudicated by the Court of Federal
2  Claims and the Federal Circuit.

3  On dozens of occasions between January 5, 2004 and April 3, 2008, Bureau of Land
4  Management ("BLM") employees observed cattle bearing brands registered to Wayne Sr. and
5  Colvin grazing on BLM-managed lands without a grazing use authorization. (*See id.*
6  ¶ 14(A)–(NN)). The BLM sent Wayne Sr., Wayne Jr., and Colvin trespass notices several times.
7  (*See id.*). On approximately twenty occasions between July 29, 2004 and August 15, 2007,
8  USFS employees observed cattle bearing brands registered to Wayne Sr. and Colvin grazing on
9  the Meadow Canyon C&H Allotment within the Tonopah Ranger District of the USFS without a
10 grazing use authorization. (*See id.* ¶ 16(A)–(S)).

11 **II.     PROCEDURAL HISTORY**

12       **A.     The CFC Case - Pretrial Rulings (*Hage I*)**

13 In 1991, Wayne Sr. and his wife Jean N. Hage, now also deceased, filed an action in the
14 U.S. Court of Federal Claims (the "CFC Case") due to the United States' cancellation of their
15 grazing permit. *See Hage I*, 35 Fed. Cl. at 156. Wayne Jr. was not a party to the CFC Case. The
16 court granted summary judgment to the United States on the damages claim because the grazing
17 permit was a license, the revocation of which could not give rise to damages, but the court
18 denied summary judgment on the takings claims and the claim for compensation for
19 improvements, because there remained a genuine issue of material fact whether Wayne Sr. had
20 certain water rights, forage rights, and ditch rights of way. *See id.* The court first rejected the
21 United States' argument that it lacked jurisdiction over the takings claim because it lacked
22 jurisdiction to adjudicate water rights, ruling that the Tucker Act in fact required the court to
23 exercise jurisdiction, and that the McCarran Amendment did not affect the result. *See id.* 157–60.
24 The court then rejected the United States' argument that the takings issue was unripe because an
25 adjudication of water rights (the Monitor Valley adjudication) was pending which might affect

1 title to the water. *See id.* at 160–64 (noting that water rights in Nevada vesting before 1905 are 2 unaffected by later-adopted water law and exist independently of stream adjudications, which 3 concern only the scope of such rights).  The court also noted that the ditch rights of way were 4 inherently tied to the water rights, because without the attendant ditch rights of way, the water 5 rights were of no value. *See id.* at 163.

6      After granting summary judgment on the breach of contract claim based on cancellation 7 of the grazing permit, the court addressed the takings claims.  First, the court ruled that the 8 Hages had no property interest in the grazing permit or the federal range land itself. *See id.* at 9 170.  Second, the court denied summary judgment on the takings claim as to the Hages' water 10 rights, ruling that the Ditch Act and Supreme Court precedent clearly established that a private 11 party may have water rights in water on federal land, and that priority is in fact determined by 12 local law. *See id.* at 172.  Third, the court denied summary judgment on the ditch rights of way 13 takings claim, because there remained a question of fact whether the Hages had such rights and 14 whether they had exceeded the permitted scope of maintenance of or changes to the ditches. *See* 15 *id.* at 174.  Fourth, the court denied summary judgment on the forage takings claim because 16 although water rights did not necessarily include grazing rights under the Ditch Act, it was 17 possible that under pre-1907 Nevada law the right to bring cattle to the water and permit them to 18 graze incidentally near the water source—because it is impossible to stop them as a practical 19 matter—were an inextricable part of the water rights themselves if the water had been 20 appropriated for the purpose of watering livestock. *See id.* 174–76.  Finally, the court denied 21 summary judgment on a cattle-impoundment takings claim and a compensation claim under 43 22 U.S.C. § 1752. *See id.* at 176–80.

**B.     The CFC Case - Property Rights Phase Rulings (*Hage III and IV*)[2]**

Two-and-a-half years after *Hage I*, the Court of Federal Claims ruled preliminarily on the claims that had survived summary judgment in 1996. *See Hage v. United States* (*Hage III*), 42 Fed. Cl. 249 (1998). In the meantime, the court had permitted the Hages to amend their complaint to include a claim to the surface estate of 752,000 acres of grazing land on federal allotments. *See id.* at 249. The court ruled that the Hages had shown they had a property interest in the vested water rights and in the ditch rights-of-way and forage rights appurtenant thereto. *See id.* at 250.

**1.     Water Rights**

Three-and-a-half years after *Hage III*, the court ruled that the Hages had water rights in the following bodies of water within the Monitor Valley Allotment, with priority dates between 1866 and 1878: Andrews Creek, Barley Creek, Combination Springs, Meadow Canyon Creek, Mosquito Creek, Pasco Creek, Pine Creek, Smith Creek, and White Sage Ditch. *See Hage v. United States* (*Hage IV*), 51 Fed. Cl. 570, 579 (2002). The court ruled that the Hages had water rights to the following bodies of water within the Ralston Allotment, with priority dates between 1917 and 1981: AEC Well, Airport Well, Baxter Spring, Black Rock Well, Cornell Well, Frazier Spring, Henry's Well, Humphrey Spring, Pine Creek Well, Ray's Well, Rye Patch Channel, Salisbury Well, Silver Creek Well, Snow Bird Spring, Spanish Spring, Stewart Spring, Well No. 2, and Well No. 3. *See id.* at 579–80. The court ruled that the Hages had water rights to the following bodies of water within the McKinney Allotment, with priority dates between 1919 and 1920: Caine Springs, Cedar Corral Springs, Mud Springs, and Perotte Springs.

**2.     Ditch Rights-of-Way**

The court also ruled that Congress via the Ditch Act had expressly deferred to state law

---

[2]*Hage II* concerned motions to intervene by various private and state groups. The court denied the motions but permitted the groups to file amicus briefs.

1 concerning the proper scope of such rights of way, and that the legislative history indicated
2 Congress was fully aware of, and intended to codify via the Ditch Act, the custom in the
3 American West of a fifty-foot right of way on each side of a ditch. *See id.* at 581–82.  The court
4 ruled that the Hages had established ditch rights of way cognizable under the Ditch Act in the
5 following ditches: Andrews Creek Ditch, Barley Creek Ditch, Borrego Ditches, Combination
6 Pipeline, Corcoran Ditch, Meadow Creek Ditch, Pasco or Tucker Ditch, Pine Creek Irrigating
7 Ditch, Spanish Spring Pipeline, and White Sage Irrigation Ditch. *See id.* at 583.  The Hages
8 failed to show that the following ditches were cognizable under the Ditch Act: Baxter Spring
9 Pipeline, Corcoran Pipeline, Desert Entry Ditch, Hot Well Ditch, Mount Jefferson Spring and
10 Pipeline, and Salisbury Well Pipeline. *See id.* at 584.  The court ruled that the USFS had the right
11 to reasonably regulate the use of the ditches but could not deny access to vested water rights for
12 permitted use or diversion to another beneficial use. *See id.*  The court also held the law did not
13 require the owner of a Ditch-Act ditch to seek permission from the USFS to maintain it. *See id.*
14 at 585–86.  The court went on to reaffirm that there was no property interest in a grazing permit
15 that could support a takings claim for its revocation. *See id.* at 586–88.

16         **3.**     **The 752,000-Acre Surface Estate**

17         Finally, although the Hages could possibly have had property rights under Mexican law
18 that the United States would have to respect under the Treaty of Guadalupe Hidalgo, the Hages
19 failed to show that their predecessors-in-interest actually occupied the 752,000 acres to which
20 they claimed a surface estate prior to 1848, so they had no property rights in the surface estate.
21 *See id.* at 588–89.  The Hages also failed to convince the court of their grazing rights in the
22 752,000 area under several Congressional acts.  The court then ordered briefing on the takings
23 stage of the litigation. *Id.* at 592.

24         **C.**     **The CFC Case - Takings Phase Rulings (*Hage V, VI, VII*)**

25         In an unpublished 2003 order, the Court of Federal Claims denied the United States'

motion for partial summary judgment as to the takings claims, noting that the water and ditch rights predated the grazing permit system, and that the lack of a grazing permit did not destroy rights attendant to those rights. (*See* Order, Feb. 5, 2003, ECF No. 182, Ex. 7).  In 2008, the court found that the United States had taken the Hages' water rights without compensation. *Hage v. United States* (*Hage V*), 82 Fed. Cl. 202 (2008).  The court found that the impoundment of the Hages' cattle was not a taking, because the license to graze in the Meadow Canyon area was a revocable license that had been revoked, the Hages had failed to remove the cattle for a year after being warned, and the cattle were sold to cover the costs of impoundment. *See id.* at 209. The court then found that the United States' construction of fences around water in which the Hages had vested water rights amounted to a physical taking during those periods that the Hages had their grazing permit, *see id.* at 211, and that the United States' refusal to permit the Hages to maintain the upstream condition of stream beds or to access Ditch-Act ditches for maintenance and diversion constituted regulatory takings, *see id.* at 211–13.  The court denied the takings claim as to the fifty-foot "foraging" rights appurtenant to the ditches, because the rights were economically worthless in-and-of-themselves, as they were incidental to the ditch rights and could not be separately sold. *See id.* at 213 n.11.  In other words, there is a right to access the ditches to improve them (and presumably for cattle to drink from them, hence the appurtenant foraging rights), but there is no separate claim for the taking of the foraging rights apart from the taking of the water rights themselves.  The court then awarded the Hages approximately $2.9 million for the talking of their water rights under the Fifth Amendment and approximately $1.4 million in statutory compensation for improvements made in connection with the revoked grazing permit. *See id.* at 213–16.

The court denied the United States' motion for partial reconsideration and increased the award of statutory compensation for improvements to approximately $1.5 million. *See Hage v. United States* (*Hage VI*), 90 Fed. Cl. 388, 392 (2009).  The court then awarded interest at 8.25%

1  from the date of the taking and directed the parties to file interest calculations, after which the
2  court awarded a total amount of $14,243,542. *See Hage v. United States* (*Hage VII*), 93 Fed. Cl.
3  709, 709 (2010). The United States appealed the case to the Federal Circuit, and the Hages
4  cross-appealed. According to the Federal Circuit's public website, oral argument has not yet
5  been scheduled.

### D. The Present Case

In 2007, after the Court of Federal Claims' final property rights ruling in *Hage IV*, but before its takings ruling in *Hage V*, the United States sued the Estate, Wayne Jr., and Colvin in this Court on two causes of action: (1) Trespass; and (2) Injunctive Relief. (*See* Compl., Aug. 29, 2007, ECF No. 1). The United States later amended the Complaint to add Colvin Cattle Co. as a Defendant. (*See* First Am. Compl., ECF No. 37). The Court granted a stipulated dismissal as to Colvin and Colvin Cattle Co., leaving only the Estate and Wayne Jr. as Defendants. (*See* Order, Oct. 13, 2009, ECF No. 120). The Estate and Wayne Jr. have separately moved in the alternative to dismiss or stay based on collateral estoppel, and the United States has moved for offensive summary judgment.

## III. LEGAL STANDARDS

### A. Collateral Estoppel and Stay

"Collateral estoppel" or "issue preclusion" is a form of the res judicata doctrine that prevents the relitigation of an issue when: "(1) there was a full and fair opportunity to litigate the identical issue in the prior action; (2) the issue was actually litigated in the prior action; (3) the issue was decided in a final judgment; and (4) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior action . . . ." *Syverson v. IBM*, 472 F.3d 1072, 1078 (9th Cir. 2007) (citations omitted). The Ninth Circuit has adopted the four-factor test suggested in the Restatement (Second) of Judgments to determine if the issue in a second action is the same as the issue litigated to final judgment in the first action:

>    (1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?
>
>    (2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?
>
>    (3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?
>
>    (4) how closely related are the claims involved in the two proceedings?

*Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995) (quoting Restatement (Second) of Judgments § 27 cmt. c), *amended by* 75 F.3d 1391 (9th Cir. 1996) (amending the decision in respects irrelevant to the rule announced).

The Ninth Circuit recognizes the preclusive effect of final judgments pending appeal. *See Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 882 (9th Cir. 2007) (citing *Tripati v. Henman*, 857 F.2d 1366, 1367 (9th Cir. 1988)).  It is appropriate to recognize the preclusive effect of a final judgment on the merits despite a pending appeal, because although the first judgment may be overturned on appeal, the alternative possibility of inconsistent results and wasted judicial resources threatens or destroys the values served by the res judicata doctrine. *See id.* at 882–83 (citing 18A Charles Alan Wright et al., *Federal Practice and Procedure* § 4433[, at 94] (2d ed. 2002)).

A district court may dismiss a claim that depends on a precluded issue. *See Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 249 (9th Cir. 1978).  However, a stay may be more appropriate than outright dismissal where the precluded issue is pending on appeal in another court, because the proponent of the claim in the second action will presumably file it anew if the issue is determined in its favor on appeal in the first action. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").  A district court considering a second action

containing a claim depending on a precluded issue may dismiss the claim and immediately stay the order pending resolution of the appeal in the first action.

### B. Summary Judgment

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

**IV.   ANALYSIS**

Defendants argue that their grazing rights have been adjudicated on the merits in the CFC Case, and that a trespass action, which necessarily depends on their lack of grazing rights, is therefore collaterally estopped. Defendants therefore ask the Court to dismiss the present action or stay it pending the outcome of the appeal and cross-appeal of the CFC Case to the Federal Circuit. Plaintiff responds that its present trespass action is based on allegations that Defendants' cattle grazed in areas that are not at issue in the CFC Case, and that collateral estoppel therefore does not apply because the issues are not the same. Plaintiff also argues that unlike the Estate, Wayne Jr. is not a party to the CFC case.[3]

---

[3] The Estate at least is party to both the CFC Case and the present action. Wayne Jr. is the executor of the Estate. He is also presumably an heir or devisee of Wayne Sr., and the trespass claims against him personally, which arise out of the grazing of cattle on his family's ranch, are therefore closely enough related to the adjudication of the extent of Wayne Sr.'s rights to graze

1    In *Hage IV*, the CFC ruled: (1) Defendants had rights in certain bodies of water, *see* 51
2  Fed. Cl. at 579–80; (2) Defendants had rights in certain ditches and appurtenant foraging rights
3  fifty feet from those ditches, *see id.* at 580–84; (3) ditch rights of way over federal land could be
4  reasonably regulated, but the United States could not use the fact of a cancelled grazing permit to
5  deny access to the ditches, *see id.* at 584; (4) grazing permits are licenses, the cancellation of
6  which does not implicate the Takings Clause, *see id.* at 586–88; (5) no federal act created a
7  surface estate in the 752,000 claimed acres, *see id.* at 588–91; (6) Nevada's 1925 three-mile
8  grazing rule could not create a state right to graze on federal land, *see id.* at 591; and (7)
9  although the Treaty of Guadalupe Hidalgo required the continued recognition of property rights
10 as they existed under Mexican law in 1848, the Hages had not shown that their predecessors-in-
11 interest had occupied any of the land they claimed prior to the 1860s, and the mere roaming of
12 cattle on land was not enough under Mexican law to create a possessory right in the land, *see id.*
13 at 588–89 & n.30 (citing *Sunal v. Hepburn*, 1 Cal. 254 (1850)).  In *Hage V*, the CFC ruled: (1)
14 because the relevant grazing permit had been lawfully revoked, the impoundment of the Hages
15 trespassing cattle was not a taking, *see* 82 Fed. Cl. at 209; (2) nothing resulting purely from the
16 revocation of grazing permits could constitute a taking even if such revocations rendered the
17 land useless for its intended purpose as a ranch, because grazing permits were not cognizable
18 property interests, *see id.* (citing *Colvin Cattle Co. v. United States*, 468 F.3d 803, 808 (Fed. Cir.
19 2006)); (3) the Unites States' refusal to allow the Hages to clear upstream blockages along
20 bodies of water in which they had water rights was a taking, *see id.* at 210–12; (4) placing fences
21 around water sources was a taking of water rights during the time the Hages had grazing permits
22 in the areas where the water was fenced such that the cattle could not access it, *see id.* at 211; (5)
23 preventing access to the Ditch-Act ditches and limiting maintenance of the ditches to hand tools
24 was a taking, *see id.* at 213; and (6) preventing access to the fifty-foot forage rights appurtenant

---

in the disputed areas under *Kamilche* to make issue preclusion applicable.  The United States is a
party in the CFC Case, so it may be collaterally estopped here. *See Syverson*, 472 F.3d at 1078.

to the ditches was not a separately compensable taking, *see id.* at 213 n.11. The United States appealed, and the Hages cross-appealed.

The Court will deny offensive summary judgment and permit the present trespass action to proceed to trial. It is possible that the Federal Circuit will rule the Hages either have some sort of surface estate to graze in the disputed areas, or that their water rights in the disputed areas include the right to graze nearby, preventing trespass claims. The FAC alleges illegal grazing on the Ralston Allotment, the Monitor Allotment, the Montezuma Allotment, and the Meadow Canyon Allotment. (*See* FAC ¶¶ 14, 16). But even assuming the alleged trespasses occurred further than fifty feet from water sources or ditches in which Defendants have appurtenant foraging rights, the Federal Circuit may very well find that Defendants had a right to graze their cattle in these areas.

Moreover, this Court may decide the open question of the extent of the foraging rights, if any. The CFC in *Hage IV* based its finding in dicta that the local custom was to provide a fifty-foot right of way along either side of a ditch upon early House versions of the Ditch Act that specified fifty feet as the limitation based on the House's perception of local custom, *see* 51 Fed. Cl. at 581–82, but the right could in fact be greater. The court noted, for example, that "The Livestock Reservoir Siting Act of 1891 recognized rights-of-way for up to 160 acres." *Id.* at 582 n.16. The final version of the Ditch Act as signed by President Johnson in 1866 had been amended by Senator Stewart of Nevada specifically to remove fixed limitations on the dimensions of ditch rights of way. *See id.* at 582. The language of the Ditch Act as passed specified that the ditch rights of way recognized by the United States would be as defined "by the local customs, laws, and the decisions of courts." *See* Act of July 26, 1866, ch. 262, § 9, 14 Stat. 251, 253. It is possible the Federal Circuit could determine on appeal of the CFC Case—or that this Court could determine during the trial of the present case—that the scope of the Hages' ditch rights of way include the ability to permit cattle to graze within a reasonable distance from water sources and appurtenant ditches while pastured near them, whether accompanied by ranch

hands or not.  The scope of reasonableness under local law and custom with respect to the behavior and supervision of cattle will be a fact-laden determination likely requiring expert testimony from members of the local ranching and regulatory communities.

Even if they cannot show vested grazing rights directly cognizable under the Treaty of Guadalupe Hidalgo—because their predecessors-in-interest did not begin using the Ranch until the 1860s and did not appropriate water for the purpose of watering cattle until sometime thereafter—it appears undisputed that the Hages have water rights vested under the common law in certain areas prior to either the institution of Nevada's statutory appropriation scheme or the federal Taylor Grazing Act ("TGA").  The purpose of the prior appropriation doctrine is to ensure and encourage the beneficial use of scarce water resources in an arid climate, and the scope of the right to use water is inextricably tied to the purpose for which the water was initially appropriated and continuously used thereafter. *See* James H. Davenport, *Nevada Water Law* 58–65 (2003).  The Hages' predecessors-in-interest appropriated certain water for the purpose of watering their livestock, which historically and customarily requires that the livestock come to the water source—whether a hole, well, stream, ditch, or canal—to drink.  When appropriated for the purpose of watering cattle, such cattle's access to the water source is probably an inherent aspect of the water right itself, and the scope of the rights of way recognized under the Ditch Act are controlled by local law and custom.  The right to divert water for a prior appropriated beneficial use is undisputed, and under Nevada law diversion occurs where the cattle drink. *Steptoe Live Stock Co. v. Gulley*, 295 P. 772 (Nev. 1931).  It may indeed have been customary when the relevant water rights vested for cattle to be permitted to graze in the area of the water sources.  Congress may manage its lands via the TGA or other legislation, and it may use a permitting system to do so, but it may not take vested rights without just compensation, and the Hages could not consistent with the Ditch Act be liable for trespass if the grazing upon which the trespass action is based were an activity within the scope of the Hages' vested rights under local law or custom.  All these factual issues remain for trial.  The Court therefore cannot say the

United States is entitled to summary judgment on its trespass action, even if it were to accept as undisputed all of its evidence of the Hages' cattle grazing in certain areas for which they had no permit.

There is no property right in a grazing permit, but the government's obstruction of or reduction of usufructory use in water rights can constitute a taking, *see, e.g.*, *United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950) (affirming a takings award in the Court of Claims based on the diversion of water away from the plaintiff's use via a dam system where the plaintiff had riparian rights under state law), and the institution of a federal grazing permit system does not obviate property rights in grazing under state law, whether those property rights are direct or attendant to water rights. If a government agency could completely prevent a plaintiff's access to water—water in which it is undisputed the plaintiff has a usufructory right under state law that is recognized by Congress under the Ditch Act—merely by cancelling a grazing permit on land that must be traversed for the plaintiff to reach the water and then threatening a trespass action, then it could render water rights under state law worthless for the very use the rights were originally appropriated. The nature of a water right is usufructory, and if access is restricted such that the water cannot be used for its appropriated purpose, the right to use the water has been taken. The theoretical ownership of water that cannot be used, because it cannot be accessed, is worthless. The Ditch Act does not permit such a maneuver.

The Court notes that a private party may have an easement over federal land. *See Michel v. United States*, 65 F.3d 130 (9th Cir. 1995) (Quiet Title Act action for cattle and farm-use easement across federal wildlife refuge). Although the Hages may or may not be able to bring a counterclaim under the Quiet Title Act here—the Court invites them to try—depending on when they acquired knowledge of the United States' adverse claim against their asserted grazing rights or the scope of their water rights, *see id.* at 131–32 (citing 28 U.S.C. § 2409a(g)), there is no reason such an interest cannot at a minimum exist as a shield against the government's own trespass action. A servient owner in Nevada may reasonably regulate the use of an easement, but

it may not do so in such a way as to: "(a) significantly lessen the utility of the easement, (b) increase the burdens on the owner of the easement in its use and enjoyment, or (c) frustrate the purpose for which the easement was created." *St. James Vill., Inc. v. Cunningham*, 210 P.3d 190, 192, 194 (Nev. 2009) (quoting Restatement (Third) of Property § 4.8).

It is possible the Hages have a prescriptive easement over federal land for their cattle to access water in which the Hages have rights precisely for this purpose, and it is possible the maintenance of a trespass action based on the grazing of such cattle within a reasonable distance of the water sources or paths leading from the Ranch to these sources would imply an unreasonable regulation of the easement under *Cunningham*. Unlike in *County of Okanogan v. National Marine Fisheries Service*, 346 F.3d 1081 (9th Cir. 2003), where the plaintiffs' right of access was born of an explicitly revocable contract with the government, *see id.* at 1084, here the right of access is alleged to be a part of the state law right itself that predates the TGA. The *County of Okanogan* court explicitly noted this distinction, as if in anticipation of a case like the present one. *See id.* at 1086 ("The FLPMA provides that '[n]othing in this Act . . . shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act,' and that '[a]ll actions by the Secretary concerned under this Act shall be subject to valid existing rights.' Under this savings clause, the government could not under the FLPMA divest a private party of an existing 'land use right' or other 'valid existing rights,' but as described above, the plaintiffs' rights-of-way were always, by their written terms, revocable at the discretion of the federal government." (citation omitted)). The plaintiffs in *County of Okanogan* could only trace their rights of way to permits issued under a 1901 act that made their revocation discretionary with the Secretary of the Interior. *See id.* at 1085–86. The Hages, by contrast, trace their water rights—and any attendant rights such as an easement to access the water, or to graze nearby—to the 1860s.

The TGA, under which the Hages have had grazing permits in the past, is an alternative source of an ability to graze, but it is not the only source. If the Hages had a preexisting right to

1  graze attendant to and defined by their state law water rights, and cognizable under the Ditch
2  Act, that right did not disappear simply because they later applied for and received grazing
3  permits that were eventually revoked.  The government may issue me a license to pick cherries
4  on my own land.  The fact that I acquiesce in the licensing system for a time for some reason
5  does not mean my right to pick cherries on my own land, which right predates the licensing
6  system, disappears when my license expires.  The TGA itself includes savings clauses similar to
7  that in the FLPMA protecting preexisting rights. *See* 43 U.S.C. §§ 315, 315b.  It is likely that the
8  Hages have an easement for their cattle to access the water or even a right to graze directly in the
9  disputed areas simply by virtue of the water right to the extent it is unavoidable that cattle will
10 do so because of the nature of their behavior. *See Hunter v. United States*, 388 F.2d 148 (9th Cir.
11 1967).  It is neither legally nor factually clear the Hages exceeded their rights in this case.  The
12 trespass claim cannot be decided on summary judgment in favor of Plaintiff.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 186 is DENIED.

IT IS FURTHER ORDERED that the Motions to Dismiss or to Stay (ECF Nos. 185, 201) are DENIED.

IT IS FURTHER ORDERED that the Motion in Limine (ECF No. 215) is DENIED.

IT IS FURTHER ORDERED that Defendants may amend their Answer(s) to plead counterclaims under the Quiet Title Act or *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

IT IS SO ORDERED.

Dated this 16th day of May, 2011.

_____
ROBERT C. JONES
United States District Judge