**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 2:07-cv-01154-RCJ-LRL |
| ESTATE OF E. WAYNE HAGE et al., | ) ) | **ORDER** |
| Defendants. | ) ) | |

The United States has sued Wayne N. Hage ("Wayne Jr.") both individually and in his capacity as executor of the estate of his deceased father, E. Wayne Hage ("Wayne Sr."), for the unauthorized grazing of cattle on federal land. The Court previously denied both Defendants' motion to dismiss and the United States' motion for offensive summary judgment but granted Defendants leave to amend to plead counterclaims. Defendants filed an amended answer and counterclaim (the "Counterclaim"), and the United States has now moved to dismiss it. For the reasons given herein, the Court grants the motion in part and denies it in part.

**I.  FACTS**

Wayne Sr. owned and operated the Pine Creek Ranch (the "Ranch") in Nye County, Nevada until his death in June 2006. (First. Am. Compl. ¶ 9). The 7000-acre Ranch was established in 1865, and Wayne Sr. purchased it with his wife Jean in 1978. *Hage v. United States* (*Hage I*), 35 Fed. Cl. 147, 153 (1996).

In 1907, Congress created the Toiyabe National Forest, and the USFS issued a grazing permit to the then-owners of the Ranch permitting grazing on federal lands adjacent to the Ranch. *Id.* The Hages received their first ten-year permit on October 30, 1978, permitting grazing on six allotments: Table Mountain, Meadow Canyon, McKinney, Silver Creek, Monitor Valley East, and Monitor Valley West. *Id.* at 153 & nn.1–2. Due to alleged violations of the scope of the grazing permit in the Table Mountain Allotment, the USFS in 1990 cancelled 25% of the Hages' grazing permit in the area and suspended another 20%. *Id.* at 154–55. Plaintiffs also claimed rights to all the water of Meadow Canyon Creek due to prior appropriation by the original owners of Pine Creek Ranch in 1868, including Meadow Spring and Q Spring, to which the flow of water was diverted by USFS in 1980 without approval of the State Engineer. *Id.* at 155. Due to an alleged refusal to comply with a removal order, the USFS in 1991 cancelled 38% of the Hages' grazing permit in the Meadow Canyon Allotment and suspended the remainder for five years. *Id.* Plaintiffs also claimed ditch rights-of-way appurtenant to their lands for watering cattle pursuant to an Act of 1866 (the "Ditch Act"). *Id.* at 156. In 1991, the Ninth Circuit reversed the criminal conviction of Wayne Sr. and his employee for maintaining such a ditch. *Id.* Wayne Sr.'s Estate was opened in September 2006, and Wayne Jr., the operations manager of Pine Creek Ranch, was appointed as substitute executor in August 2007. (*Id.* ¶¶ 9, 11).

On dozens of occasions between January 5, 2004 and April 3, 2008, Bureau of Land Management ("BLM") employees observed cattle bearing brands registered to Wayne Sr. and a former co-defendant grazing on BLM-managed lands without a grazing use authorization. (*See id.* ¶ 14(A)–(NN)). The BLM sent Wayne Sr., Wayne Jr., and the former co-defendant trespass notices several times. (*See id.*). On roughly twenty occasions between July 29, 2004 and August 15, 2007, employees of the U.S. Forest Service ("USFS") observed cattle bearing brands registered to Wayne Sr. and the former co-defendant grazing on the Meadow Canyon C&H Allotment within the Tonopah Ranger District of the USFS without a grazing use authorization.

(*See id.* ¶ 16(A)–(S)).

## II. PROCEDURAL HISTORY

### A. The CFC Case - Pretrial Rulings (*Hage I*)

In 1991, Wayne Sr. and his wife, Jean N. Hage, now also deceased, filed an action in the U.S. Court of Federal Claims (the "CFC Case") due to the United States' cancellation of their grazing permit. *See Hage I*, 35 Fed. Cl. at 156 (1996). Wayne Jr. was not a party to the CFC Case. The court granted summary judgment to the United States on the damages claim, because the grazing permit was a license, the revocation of which could not give rise to damages, but the court denied summary judgment on the takings claims and the claim for compensation for improvements, because there remained a genuine issue of material fact whether Wayne Sr. had certain water rights, forage rights, and ditch rights-of-way. *See id.* The court first rejected the United States' argument that the court lacked jurisdiction over the takings claim because it lacked jurisdiction to adjudicate water rights, ruling that the Tucker Act in fact required the court to exercise jurisdiction, and that the McCarran Amendment did not affect the result. *See id.* 157–60. The court then rejected the United States' argument that the takings issue was unripe because an adjudication of water rights (the Monitor Valley adjudication) was pending and might affect title to the water. *See id.* at 160–64 (noting that water rights in Nevada vesting before 1905 are unaffected by later-adopted water law and that water rights in Nevada exist independently of stream adjudications, which concern only the scope of such rights). The court also noted that the ditch rights-of-way were inherently tied to the water rights, because without the attendant ditch rights-of-way, the water rights were of no value. *See id.* at 163.

After granting summary judgment on the breach-of-contract claim based on cancellation of the grazing permit, the court addressed the takings claims. First, the court ruled that the Hages had no property interest in the grazing permit or the federal range-land itself. *See id.* at 170. Second, the court denied summary judgment on the takings claim as to the Hages' water

1 rights, ruling that the Ditch Act and Supreme Court precedent clearly established that a private
2 party may have water rights in water on federal land, and that priority is in fact determined by
3 local law. *See id.* at 172.  Third, the court denied summary judgment on the ditch rights-of-way
4 takings claim, because there remained a question of fact whether the Hages had such rights and
5 whether they had exceeded the permitted scope of maintenance or changes to the ditches. *See id.*
6 at 174.  Fourth, the court denied summary judgment on the forage takings claim, because
7 although water rights do not necessarily include grazing rights under the Act, it was possible that
8 under pre-1907 Nevada law the right to bring cattle to the water and permit them to graze
9 incidentally near the water source—because it is practically impossible to stop them—were an
10 inextricable part of the water rights themselves. *See id.* 174–76.  Finally, the court denied
11 summary judgment on a cattle-impoundment takings claim and a compensation claim under 43
12 U.S.C. § 1752. *See id.* at 176–80.

**B.     The CFC Case - Property Rights Phase Rulings (*Hage III and IV*)[1]**

Two-and-a-half years later, the Court of Federal Claims ruled preliminarily on the claims that had survived summary judgment in 1996. *See Hage v. United States* (*Hage III*), 42 Fed. Cl. 249 (1998).  In the meantime, the court had permitted the Hages to amend their complaint to include a claim to the surface estate of 752,000 acres of grazing land on federal allotments. *See id.* at 249.  The court ruled that the Hages had shown they had a property interest in the vested water rights and the ditch rights-of-way and forage rights appurtenant thereto. *See id.* at 250.

**1.     Water Rights**

Three-and-a-half years later, the court ruled that the Hages had water rights in the following bodies of water within the Monitor Valley Allotments, with priority dates between 1866 and 1878: Andrews Creek, Barley Creek, Combination Springs, Meadow Canyon Creek,

---

[1]*Hage II* concerned motions to intervene by various private and state groups.  The court denied the motions, but permitted the groups to file friend-of-the-court briefs.

Mosquito Creek, Pasco Creek, Pine Creek, Smith Creek, and White Sage Ditch. *See Hage v. United States* (*Hage IV*), 51 Fed. Cl. 570, 579 (2002). The court ruled that the Hages had water rights to the following bodies of water within the Ralston Allotments, with priority dates between 1917 and 1981: AEC Well, Airport Well, Baxter Spring, Black Rock Well, Cornell Well, Frazier Spring, Henry's Well, Humphrey Spring, Pine Creek Well, Ray's Well, Rye Patch Channel, Salisbury Well, Silver Creek Well, Snow Bird Spring, Spanish Spring, Stewart Spring, Well No. 2, and Well No. 3. *See id.* at 579–80. The court ruled that the Hages had water rights to the following bodies of water within the McKinney Allotment, with priority dates between 1919 and 1920: Caine Springs, Cedar Corral Springs, Mud Springs, and Perotte Springs.

### 2. Ditch Rights-of-Way

The court also ruled that Congress via the Ditch Act had expressly deferred to state law concerning the proper scope of such rights of way, and that the legislative history indicated Congress was fully aware of, and intended to codify via the Ditch Act, the custom in the American West of a fifty-foot right of way on each side of a ditch. *See id.* at 581–82. The court ruled that the Hages had established ditch rights-of-way under the Ditch Act in the following ditches: Andrews Creek Ditch, Barley Creek Ditch, Borrego Ditches, Combination Pipeline, Corcoran Ditch, Meadow Creek Ditch, Pasco or Tucker Ditch, Pine Creek Irrigating Ditch, Spanish Spring Pipeline, and White Sage Irrigation Ditch. *See id.* at 583. The Hages failed to show that the following ditches were Ditch Act ditches: Baxter Spring Pipeline, Corcoran Pipeline, Desert Entry Ditch, Hot Well Ditch, Mount Jefferson Spring and Pipeline, and Salisbury Well Pipeline. *See id.* at 584. The court ruled that the USFS had the right to reasonably regulate the use of the ditches but could not deny access to vested water rights for permitted use or diversion to another beneficial use. *See id.* The court also held the law did not require the owner of a Ditch Act ditch to seek permission from the USFS to maintain it. *See id.* at 585–86. The court went on to reaffirm that there was no property interest in a grazing permit

1  that could support a takings claim for its revocation. *See id.* at 586–88.

### 3. The 752,000-Acre Surface Estate

Finally, although the Hages could possibly have had property rights under Mexican law that the United States would have to respect under the Treaty of Guadalupe Hidlago, the Hages failed to show that their predecessors-in-interest actually occupied the 752,000 acres to which they claimed a surface estate prior to 1848, so they had no property rights in the surface estate. *See id.* at 588–89.[2] The Hages also failed to convince the court of their grazing rights in the 752,000 area under several Congressional acts. The court then ordered briefing on the takings stage of the litigation. *Id.* at 592.

### C. The CFC Case - Takings Phase Rulings (*Hage V, VI, VII*)

In an unpublished 2003 order, the Court of Federal Claims denied the United States' motion for partial summary judgment as to the takings claims, noting that the water and ditch rights predated the grazing permit system, and that the lack of a grazing permit did not destroy rights attendant to those rights. (*See* Order, Feb. 5, 2003, ECF No. 182, Ex. 7). In 2008, the court found that the United States had taken the Hages' water rights without compensation. *Hage v. United States* (*Hage V*), 82 Fed. Cl. 202 (2008). The court found that the impoundment of the Hages' cattle was not a taking, because the license to graze in the Meadow Canyon area was a revocable license that had been revoked, the Hages had failed to remove the cattle for a year after being warned, and the cattle were sold to cover the costs of impoundment. *See id.* at 209. The court then found that the United States' construction of fences around water in which the Hages had vested water rights amounted to a physical taking during those periods that the Hages had their grazing permit, *see id.* at 211, and that the United States' refusal to permit the Hages to maintain the upstream condition of stream beds or to access Ditch Act ditches for maintenance

---

[2]The failure to make such a showing was inevitable, because Nevada's first permanent, non-Indian settlement was Mormon Station (located near the present-day village of Genoa) in 1851. Prior to 1851, the area was seen only by those emigrating to California.

and diversion constituted regulatory takings, *see id.* at 211–13.  The court denied the taking claim as to the fifty-foot "foraging" rights appurtenant to the ditches, because those rights were economically worthless in and of themselves, as they were incidental to the ditch rights and could not be separately sold. *See id.* at 213 n.11.  In other words, the court found there is a right to access the ditches to improve them (and presumably for cattle to drink from them, hence the appurtenant foraging rights), but there is no separate claim for the taking of the foraging rights apart from the taking of the ditch rights themselves.  The court then awarded the Hages approximately $2.9 million for the talking of their water rights under the Fifth Amendment and approximately $1.4 million in statutory compensation for improvements made in connection with the revoked grazing permit. *See id.* at 213–16.

The court denied the United States' motion for partial reconsideration and in fact increased the award of statutory compensation for improvements to approximately $1.5 million. *See Hage v. United States* (*Hage VI*), 90 Fed. Cl. 388, 392 (2009).  The court then awarded interest at 8.25% from the date of the taking and directed the parties to file interest calculations, after which the court awarded the Hages a total of $14,243,542. *See Hage v. United States* (*Hage VII*), 93 Fed. Cl. 709, 709 (2010).  The United States appealed the case to the Federal Circuit, and the Hages cross-appealed.  That appeal is in the late briefing stage, the Federal Circuit having on July 19, 2011 granted the United States' motion for an extension of time to file its response to the Hages' appeal and its reply in support of its own appeal.

### D.     The Present Case

In 2007, after the Court of Federal Claims' final property rights ruling in *Hage IV*, but before its takings ruling in *Hage V*, the United States sued the Estate, Wayne Jr., and a former co-defendant in this Court on two causes of action: (1) Trespass; and (2) Injunctive Relief. (*See* Compl., Aug. 29, 2007, ECF No. 1).  The United States later amended the Complaint to add another former co-defendant. (*See* First Am. Compl., ECF No. 37).  The Court granted a

stipulated dismissal as to the two former co-defendants, leaving only the Estate and Wayne Jr. as Defendants. (*See* Order, Oct. 13, 2009, ECF No. 120). Defendants moved in the alternative to dismiss or stay based on collateral estoppel, and the United States moved for offensive summary judgment. The Court denied the motions and granted Defendants leave to add counterclaims. Defendants have now filed counterclaims for: (1) Declaratory Relief under the Administrative Procedures Act ("APA") and/or the Quiet Title Act ("QTA"); (2) Injunctive Relief; and (3) "Offset." As the United States notes, the second and third nominal counterclaims are measures of relief or theories potentially affecting an eventual judgment, not separate causes of action. There is in essence a single counterclaim for declaratory relief under the APA and QTA.

## III. LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). A formulaic recitation of a cause of action

with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a violation is plausible, not just possible. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion. However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted). Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Moreover, under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

**IV. ANALYSIS**

The United States notes that although Defendants have listed the QTA under their claim for declaratory judgment, they have alleged that "the Quiet Title Act does not apply" and only mention the QTA at all to avoid waiving any arguments thereunder should the United States later assert arguments under the QTA. (*See* First Am. Answer & Countercl. ¶ 42(A), May 27, 2011, ECF No. 240). The United States makes clear that it agrees with Defendants that the QTA does not apply to this action. The Counterclaim therefore rests purely on the claim for declaratory relief under the APA.

The United States argues that Defendants have failed to plead the existence of any "final

agency action," as is required to bring suit under 5 U.S.C. § 704, and that even if there had been reviewable final agency action here, the issues have either already been decided by the Court of Federal Claims or are time-barred under 28 U.S.C. § 2401.

> Agency action is final if a minimum of two conditions are met: "[f]irst, the action must mark the consummation of the agency's decision making process . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."

*Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198–99 (9th Cir. 1998) (citing *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1196 (9th Cir. 1997) (quoting *Bennett v. Spear*, 520 U.S. 154 (1997))) (internal quotation marks omitted) (alteration in original). The United States argues that Defendants only complain of "harassment" through trespass notices, and that neither the BLM nor any other agency has taken final agency action based on those notices, such as issuing fines and the like, but rather has brought the present trespass action to obtain the exact judicial determination that Defendants demand via the Counterclaim. The United States notes that it could have impounded cattle or sent bills that could be sent to the Department of the Treasury for collection if unpaid, but that it has done neither. The United States also notes that trespass notices are exactly the kind of "tentative or interlocutory" actions that are not reviewable under § 704, because the next step—if the agency chose to take it rather that prosecute the present trespass action—would be to issue a final trespass decision under 43 C.F.R. § 4150.3 or to impound the allegedly trespassing livestock under § 4150.4. It has not done so, but has merely sent trespass notices.

The United States, however, fails to note that it has taken "final agency action" by filing the present lawsuit. *See AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001) (Ginsburg, C.J.) ("Under the circumstances of this case, there clearly would be final agency action if the Commission filed a lawsuit against AT&T."). Certainly the decision to hale Defendants into court for a judicial determination of the trespass claim signals the end of the agency's

deliberation and a final decision "from which legal consequences will flow." Agency action can be said to be "tentative or interlocutory" only if the agency hasn't made up its mind to force a particular outcome but is still deliberating through adjudicative or rule-making procedures. The United States attempts to characterize the present situation as tentative or interlocutory simply because it filed the present lawsuit before issuing a fine or impounding cattle via other administrative procedures. But the agency has made a final determination just the same for the purposes of jurisdiction under § 704. It has voluntarily ceased agency proceedings and forced the present judicial determination by filing suit. The agency has therefore "made up its mind" what the result should be and is no longer engaging in interlocutory or tentative decision-making.

Defendants may therefore ask the court to declare their rights under the Declaratory Judgment Act. *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). Defendants seek a declaration of their rights to graze their cattle on certain lands as incidental to their water rights. The affirmative Counterclaim for declaratory judgment is not purely redundant with the defense against the trespass claim, because a declaratory judgment in Defendants' favor would not only obviate the present trespass action, but would also preclude future fines and impoundments, just as a declaration in *AT&T* (had the EEOC created jurisdiction by filing suit) would have determined not only the claims of the two individual complainants, but also the broader issue of whether AT&T's policies violated the Pregnancy Discrimination Act of 1979 as a general matter. *See AT&T*, 270 F.3d at 974–75. The Court finds that Defendants have sufficiently alleged final agency action to invoke the Court's jurisdiction under the APA and will not dismiss the Counterclaim for a declaratory judgment.

Next, the United States argues that Defendants' Counterclaim attempts to obtain a

1  declaration of the rights of non-parties.  Defendants are Wayne Jr. and Wayne Sr.'s estate (the
2  "Estate").  Wayne Jr. is also the administrator of the Estate.  If either Wayne Jr. or the Estate
3  allege that they possess water rights, with other rights allegedly attendant to them, then there is
4  standing for a claim to adjudicate these rights.  There is standing by the fact that the United
5  States has accused these Defendants of trespass.  If the United States believes Defendants have
6  no standing to assert property rights obviating the alleged trespasses at issue in this case, then the
7  United States has apparently sued the wrong parties from the beginning.  Of course Defendants
8  have no standing to assert the rights of "persons with whom [Defendants] has or had pasturage
9  agreements," as the United States notes, but Defendants do not attempt to base their standing
10 purely on the fact that the United States has allegedly harassed such persons.  Defendants, like
11 most litigants, pad their pleadings with some extraneous information, but this does not detract
12 from Defendants' standing to assert their own interests in grazing cattle near the water in which
13 they claim rights.  The Court finds that the Hages have continuously pressed these issues in the
14 CFC Case since 1991, well within the six-year statute of limitations under 28 U.S.C. § 2401.

      Finally, the Court had intended to certify the following questions to the Nevada Supreme Court:

> 1. To what extent, if any, does a person with common law water rights for the purpose of watering livestock have an easement to bring such livestock onto the land of another to make use of the water rights?
>
> 2. When a person has common law water rights for watering livestock, to what extent, if any, does the person thereby have the right for the livestock to graze or "forage" near the water source and en route to the water source?

Certifying these questions would authoritatively resolve the most contentious issues in this litigation once and for all and would both facilitate the bench trial and reduce the possibility of error.[3]  However, the parties were not receptive to certification at oral argument.

---

[3] The Arizona Supreme Court appears has answered the questions. *See Hancock v. State*, 254 P. 225, 229 (Ariz. 1927) ("It may be true that it would be more convenient in approaching some watering place where appellant has vested rights that he be allowed to graze his sheep, but this is

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 241) is GRANTED in part and DENIED in part. Defendants' counterclaims are dismissed, except the counterclaim for declaratory judgment under the APA.

IT IS FURTHER ORDERED that in order to help clarify the facts at trial, the Court preliminarily orders the following standardization of map products and markings. All maps used at trial shall be 1:50,000 scale, U.S. Geological Survey ("USGS") topographical maps. Maps shall be laminated with contact paper or other permanent lamination material, i.e., not loose acetate overlays. The parties shall bring thin-point permanent markers, tissue, and eraser markers or acetone (nail polish remover) to trial. To the extent practicable, adjacent map sheets shall be conjoined before lamination to create a seamless map of the entire relevant land area.

The following markings shall be made on the maps before trial. The boundaries of the Pine Creek Ranch and any other land owned in fee simple by Defendants shall be marked in black, and the boundaries shall be labeled in black as "Pine Creek Ranch" or otherwise, as applicable. The boundaries of federal land shall be marked in red, and the boundaries shall be labeled in black with the name of the area and the agency charged with its administration, e.g., "Table Mountain Allotment - BLM." Water sources in which the Court of Federal Claims has found Defendants have water rights, *see Hage v. United States* (*Hage IV*), 51 Fed. Cl. 570 (2002), shall be traced or marked with an "X" in blue, as appropriate, and labeled in black with the name and type of the water source, e.g., "Airport Well, Body of Water" or "Barley Creek Ditch, Ditch." Places where the government alleges to have observed Defendants' livestock grazing unlawfully shall be marked with an "X" in purple and annotated in black in the

---

not necessary to the enjoyment of a water right. He might, for instance, transport the sheep to and from the water by means of motor trucks or wagons, a thing which nowise violates the law. The fact that such a course would be inconvenient or expensive does not affect the validity of the [state criminal trespass] statute."). The Nevada Supreme Court may have a different view.

1  following format: "MM/DD/YYYY, #, ¶," where "MM/DD/YYYY" is the date, "#" is the
2  number of animals observed, and "¶" is the corresponding paragraph(s) of the Complaint. The
3  parties are encouraged to stipulate to a single map product insofar as practicable before trial to
4  avoid the need for the use of conflicting maps.
5       IT IS SO ORDERED.
6  Dated this 9th day of August, 2011.

_____
ROBERT C. JONES
United States District Judge