1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                        **DISTRICT OF NEVADA**

8
UNITED STATES OF AMERICA,                    )
9                                            )
              Plaintiff,                     )
10                                           )        2:07-cv-01154-RCJ-VCF
       vs.                                   )
11                                           )        **FINDINGS OF FACT,**
ESTATE OF E. WAYNE HAGE et al.,              )        **CONCLUSIONS OF LAW, AND**
12                                           )        **INJUNCTION**
              Defendants.                    )
13    _____          )

14

15        The decision following reads like a book.  It tells the story of the bench trial in this case

16 from beginning to end and contains many of the tentative findings and conclusions reached along

17 the way, as supported by particular witness testimony and evidence received during the trial.  The

18 format is intentional.  The impatient reader may be tempted to jump to the summary findings and

19 conclusions at the end, but in so doing will be deprived of the analytical and evidentiary threat

20 patiently perceived and conceived by the Court during the course of the trial.

21        This case arises out of alleged unauthorized grazing of private cattle on federal land.

22 From March 27 to June 6, 2012, the Court held a bench trial on Plaintiff United States of

23 America's (the "Government") Complaint for trespass against Defendants Wayne N. Hage

24 ("Hage") in his individual capacity and Hage in his capacity as administrator of the Estate of E.

25

Wayne Hage (the "Estate")[1], as well as the Estate's Counterclaim for declaratory judgment. The Court has read and considered the post-trial briefings it solicited.

## I.      PROCEDURAL HISTORY

### A.      The Takings Case

The present case is a civil trespass action by the Government against Wayne N. Hage ("Wayne Jr.") and the Estate of E. Wayne Hage ("Wayne Sr."). However, the Court will, for the benefit of the reader, summarize the long history of another case (the "CFC Case") litigated in the Court of Federal Claims, the U.S. Court of Appeals for the Federal Circuit, and, pending a decision on a petition for writ of certiorari, potentially the U.S. Supreme Court.

### 1.      The CFC Case - Pretrial Rulings (*Hage I*)

In 1991, Wayne Sr. and his wife Jean N. Hage, now also deceased, filed an action in the Court of Federal Claims due to the United States' cancellation of their grazing permit. *See Hage I*, 35 Fed. Cl. 147, 156 (Ct. Cl. 1996). Wayne Jr. was not a party to the CFC Case. The court granted summary judgment to the United States on the damages claim because the grazing permit was a license, the revocation of which could not give rise to damages, but the court denied summary judgment on the takings claims and the claim for compensation for improvements, because there remained a genuine issue of material fact whether Wayne Sr. had certain water rights, forage rights, and ditch rights of way. *See id.* The court first rejected the United States' argument that it lacked jurisdiction over the takings claim because it lacked jurisdiction to adjudicate water rights, ruling that the Tucker Act in fact required the court to exercise jurisdiction, and that the McCarran Amendment did not affect the result. *See id.* 157–60. The court then rejected the United States' argument that the takings issue was unripe because an adjudication of water rights (the Monitor Valley adjudication) was pending which might affect

---

[1]Cattle formerly belonging to E. Wayne Hage will be identified throughout this Order as belonging to "the Estate."

1   title to the water. *See id.* at 160–64 (noting that water rights in Nevada vesting before 1905 are

2   unaffected by later-adopted water law and exist independently of stream adjudications, which

3   concern only the scope of such rights).  The court also noted that the ditch rights of way were

4   inherently tied to the water rights, because without the attendant ditch rights of way, the water

5   rights were of no value. *See id.* at 163.

6         After granting summary judgment on the breach of contract claim based on cancellation

7   of the grazing permit, the court addressed the takings claims.  First, the court ruled that the Hages

8   had no property interest in the grazing permit or the federal range land itself. *See id.* at 170.

9   Second, the court denied summary judgment on the takings claim as to the Hages' water rights,

10   ruling that the Ditch Act and Supreme Court precedent clearly established that a private party

11   may have water rights in water on federal land, and that priority is in fact determined by local

12   law. *See id.* at 172.  Third, the court denied summary judgment on the ditch rights of way takings

13   claim, because there remained a question of fact whether the Hages had such rights and whether

14   they had exceeded the permitted scope of maintenance of or changes to the ditches. *See id.* at

15   174.  Fourth, the court denied summary judgment on the forage takings claim because although

16   water rights did not necessarily include grazing rights under the Ditch Act, it was possible that

17   under pre-1907 Nevada law the right to bring cattle to the water and permit them to graze

18   incidentally near the water source—because it is impossible to stop them as a practical

19   matter—were an inextricable part of the water rights themselves if the water had been

20   appropriated for the purpose of watering livestock. *See id.* 174–76.  Finally, the court denied

21   summary judgment on a cattle-impoundment takings claim and a compensation claim under 43

22   U.S.C. § 1752. *See id.* at 176–80.

23   ///

24

25

1        **2.      The CFC Case - Property Rights Phase Rulings (*Hage III and IV*)[2]**

2        Two-and-a-half years after *Hage I*, the Court of Federal Claims ruled preliminarily on the

3   claims that had survived summary judgment in 1996. *See Hage v. United States* (*Hage III*), 42

4   Fed. Cl. 249 (1998).  In the meantime, the court had permitted the Hages to amend their

5   complaint to include a claim to the surface estate of 752,000 acres of grazing land on federal

6   allotments. *See id.* at 249.  The court ruled that the Hages had shown they had a property interest

7   in the vested water rights and in the ditch rights-of-way and forage rights appurtenant thereto. *See*

8   *id.* at 250.

9        **a.      Water Rights**

10       Three-and-a-half years after *Hage III*, the court ruled that the Hages had water rights in

11  the following bodies of water within the Monitor Valley Allotment, with priority dates between

12  1866 and 1878: Andrews Creek, Barley Creek, Combination Springs, Meadow Canyon Creek,

13  Mosquito Creek, Pasco Creek, Pine Creek, Smith Creek, and White Sage Ditch. *See Hage v.*

14  *United States* (*Hage IV*), 51 Fed. Cl. 570, 579 (2002).  The court ruled that the Hages had water

15  rights to the following bodies of water within the Ralston Allotment, with priority dates between

16  1917 and 1981: AEC Well, Airport Well, Baxter Spring, Black Rock Well, Cornell Well, Frazier

17  Spring, Henry's Well, Humphrey Spring, Pine Creek Well, Ray's Well, Rye Patch Channel,

18  Salisbury Well, Silver Creek Well, Snow Bird Spring, Spanish Spring, Stewart Spring, Well No.

19  2, and Well No. 3. *See id.* at 579–80.  The court ruled that the Hages had water rights to the

20  following bodies of water within the McKinney Allotment, with priority dates between 1919 and

21  1920: Caine Springs, Cedar Corral Springs, Mud Springs, and Perotte Springs.

22       **b.      Ditch Rights-of-Way**

23       The court also ruled that Congress via the Ditch Act had expressly deferred to state law

24

25  [2]*Hage II* concerned motions to intervene by various private and state groups.  The court denied the motions but permitted the groups to file amicus briefs.

1    concerning the proper scope of such rights of way, and that the legislative history indicated

2    Congress was fully aware of, and intended to codify via the Ditch Act, the custom in the

3    American West of a fifty-foot right of way on each side of a ditch. *See id.* at 581–82.  The court

4    ruled that the Hages had established ditch rights of way cognizable under the Ditch Act in the

5    following ditches: Andrews Creek Ditch, Barley Creek Ditch, Borrego Ditches, Combination

6    Pipeline, Corcoran Ditch, Meadow Creek Ditch, Pasco or Tucker Ditch, Pine Creek Irrigating

7    Ditch, Spanish Spring Pipeline, and White Sage Irrigation Ditch. *See id.* at 583.  The Hages

8    failed to show that the following ditches were cognizable under the Ditch Act: Baxter Spring

9    Pipeline, Corcoran Pipeline, Desert Entry Ditch, Hot Well Ditch, Mount Jefferson Spring and

10   Pipeline, and Salisbury Well Pipeline. *See id.* at 584.  The court ruled that the USFS had the right

11   to reasonably regulate the use of the ditches but could not deny access to vested water rights for

12   permitted use or diversion to another beneficial use. *See id.*  The court also held the law did not

13   require the owner of a Ditch-Act ditch to seek permission from the USFS to maintain it. *See id.* at

14   585–86.  The court went on to reaffirm that there was no property interest in a grazing permit that

15   could support a takings claim for its revocation. *See id.* at 586–88.

16          c.      **The 752,000-Acre Surface Estate**

17          Finally, although the Hages could possibly have had property rights under Mexican law

18   that the United States would have to respect under the Treaty of Guadalupe Hidalgo, the Hages

19   failed to show that their predecessors-in-interest actually occupied the 752,000 acres to which

20   they claimed a surface estate prior to 1848, so they had no property rights in the surface estate.

21   *See id.* at 588–89.  The Hages also failed to convince the court of their grazing rights in the

22   752,000 area under several Congressional acts.  The court then ordered briefing on the takings

23   stage of the litigation. *Id.* at 592.

24          3.      **The CFC Case - Takings Phase Rulings (*Hage V, VI, VII*)**

25          In an unpublished 2003 order, the Court of Federal Claims denied the United States'

1  motion for partial summary judgment as to the takings claims, noting that the water and ditch

2  rights predated the grazing permit system, and that the lack of a grazing permit did not destroy

3  rights attendant to those rights. (*See* Order, Feb. 5, 2003, ECF No. 182, Ex. 7).  In 2008, the court

4  found that the United States had taken the Hages' water rights without compensation. *Hage v.*

5  *United States* (*Hage V*), 82 Fed. Cl. 202 (2008).  The court found that the impoundment of the

6  Hages' cattle was not a taking, because the license to graze in the Meadow Canyon area was a

7  revocable license that had been revoked, the Hages had failed to remove the cattle for a year after

8  being warned, and the cattle were sold to cover the costs of impoundment. *See id.* at 209.  The

9  court then found that the United States' construction of fences around water in which the Hages

10  had vested water rights amounted to a physical taking during those periods that the Hages had

11  their grazing permit, *see id.* at 211, and that the United States' refusal to permit the Hages to

12  maintain the upstream condition of stream beds or to access Ditch-Act ditches for maintenance

13  and diversion constituted regulatory takings, *see id.* at 211–13.  The court denied the takings

14  claim as to the fifty-foot "foraging" rights appurtenant to the ditches, because the rights were

15  economically worthless in-and-of-themselves, as they were incidental to the ditch rights and

16  could not be separately sold. *See id.* at 213 n.11.  In other words, there is a right to access the

17  ditches to improve them (and presumably for cattle to drink from them, hence the appurtenant

18  foraging rights), but there is no separate claim for the taking of the foraging rights apart from the

19  taking of the water rights themselves.  The court then awarded the Hages approximately $2.9

20  million for the talking of their water rights under the Fifth Amendment and approximately $1.4

21  million in statutory compensation for improvements made in connection with the revoked

22  grazing permit. *See id.* at 213–16.

23         The court denied the United States' motion for partial reconsideration and increased the

24  award of statutory compensation for improvements to approximately $1.5 million. *See Hage v.*

25  *United States* (*Hage VI*), 90 Fed. Cl. 388, 392 (2009).  The court then awarded interest at 8.25%

1  from the date of the taking and directed the parties to file interest calculations, after which the

2  court awarded a total amount of $14,243,542. *See Hage v. United States* (*Hage VII*), 93 Fed. Cl.

3  709, 709 (2010).

4     **4.     The Federal Circuit Decision (*Hage VIII*)**

5        The United States appealed the case to the Federal Circuit, and the Hages cross-appealed.

6  The Federal Circuit reversed the lower court, ruling that the regulatory takings claim as to ditch

7  access was not ripe because although the evidence tended to show it would be futile for the

8  Hages to apply for grazing permits, the Hages had not applied for permits to maintain their

9  ditches, and the evidence did not tend to show that applications for permits to maintain the

10  ditches would be futile. *See Estate of E. Wayne Hage v. Unites States*, 687 F.3d 1281, 1287–88

11  (Fed. Cir. 2012).  The court also ruled that although it was correct that "the government could not

12  prevent [the Hages] from accessing water to which they owned rights without just

13  compensation," the Hages had not alleged that the fences they complained of obstructed water

14  from reaching their land. *See id.* at 1290.[3]  Finally, the court ruled that the claim for

15  compensation for making range improvements was not ripe, because they had not sought a

16  determination by the Secretary of the value of its improvements. *See id.* at 1290–91.  The

17  damages claim was vacated.  Many issues surrounding the grazing and water rights at issue are

18  therefore open for this Court's initial ruling if relevant to the present case—and many such issues

19  are relevant as defenses to the trespass claims—because the law of the case in the CFC Case has

20  been vacated, except to the extent that certain claims were ruled not to have been ripe.

21  _____

22  [3]The court noted that a taking could occur even though the fences did not prevent water in which
    the Hages had rights from reaching their land, so long as access to the water source was blocked.

23  *See id.*  For example, one may have rights in water on another's land even if that water never
    reaches the rights-holder's own land.  If a takings (or conversion) claim would be frustrated
    simply because an obstruction did not prevent the water from reaching the rights-holder's land

24  (because the water had never reached the rights-holder's own land), then the Takings Clause
    would often be vitiated in the water rights context, because water rights are not the same as the

25  right to possess land.  Water rights consist of the right to use (and access for use) water from a
    certain source, regardless of whether one has any estate in the land itself.

**B.     The Present Proceedings**

On August 29, 2007, the Government sued the Estate, Hage, and Benjamin J. Colvin d.b.a. Colvin Cattle Co. ("Colvin") in this Court for trespass, requesting both damages and an injunction. (*See* Compl., Aug. 29, 2007, ECF No. 1).  The Government alleged by date, location, and brand thirty-nine instances of Defendants' cattle grazing without a permit on Bureau of Land Management ("BLM") and United States Forest Service ("USFS") lands between January 5, 2004 and August 23, 2007. (*See id.* ¶¶ 13, 15).

Defendants moved to dismiss, and the Government filed the First Amended Complaint ("FAC").  The FAC named as Defendants Hage, both individually and in his capacity as executor of the Estate, and Benjamin J. Colvin, both individually and as an officer of Colvin. (*See* First Am. Compl., Apr. 10, 2008, ECF No. 37).  The FAC alleged by date, location, and brand forty-four instances of trespassing on BLM and USFS lands between January 5, 2004 and April 3, 2008. (*See id.* ¶¶ 14, 16).  Defendants answered the FAC and moved to dismiss it.  Colvin filed a counterclaim, which the Government answered.  The Estate moved for summary judgment but withdrew that motion.  The Court denied Defendants' motions to dismiss.  The Government voluntarily dismissed its claims against Colvin.  The Government then moved for offensive summary judgment against the remaining Defendants, and the Court denied both that motion and Defendants' further motions to dismiss or stay the case.  The Court granted the Estate's motion to plead a Counterclaim.  The Estate pled a Counterclaim for declaratory relief under the APA and the Quiet Title Act, injunctive relief, and "offset."  The Government moved to dismiss the Counterclaim, and the Court granted the motion in part.  The issues tried were the Government's claims for trespass and the Estate's counterclaim for declaratory judgment.  The Government asked for damages, and all parties requested certain injunctive relief under their respective claims.

///

1    II.    **TRIAL TESTIMONY**

2        The Court will summarize for the record the most important and relevant portions of each

3    witness's testimony.  Where appropriate, the Court will briefly address legal issues implicated by

4    certain testimony in footnotes.

5        **1.    Day 1 - March 27, 2012**

6        On Day 1, the Government presented three witnesses: (1) David McMorran, a USFS

7    contractor serving as the Resource Information Manager for the Humboldt-Toiyabe National

8    Forest; (2) David Morlan, Chief of the Geographic Sciences Branch of the BLM; and (3)

9    Kenneth Visser, a Rangeland Management Specialist from the BLM Nevada State Office.

10       **a.    Mr. McMorran**

11       Mr. McMorran testified on direct examination that he created the map products to be used

12   by the Government at trial.  He noted that the parties had agreed on all aspects of the map

13   annotations except: (1) BLM and USFS boundaries; (2) water sources in which Defendants had

14   rights; and (3) whether to include roads and trails.  The 1:63,360 (1 inch = 1 mile) maps

15   ("overview maps") did not include written annotations of BLM and USFS observations of

16   Defendants' cattle allegedly engaged in unauthorized grazing by number and date, although the

17   1:24,000 maps ("tile maps") included such annotations.  The overview maps included colored,

18   cow-shaped icons indicating observations of cattle engaged in unauthorized grazing.  The color

19   of the small diamond behind a cow-shaped icon indicated the distance form the nearest water

20   source in which Defendants had stock watering rights, and a colored circle around the cow-

21   shaped icon corresponded to the number of cattle observed, with the color of the circle indicating

22   the year in which the observation was made.[4]  The Court admitted the maps, except for the

23   observation markings, because evidence of observations of unauthorized grazing would require

24   _____

25   [4]It became apparent during the testimony that Mr. McMorran was partially color blind, describing
     orange circles as "red" and green circles as "yellow," but accurately describing blue circles as
     "blue."

testimony of a witness with direct knowledge of the observation.  Mr. McMorran then testified as to a summary exhibit, Exhibit 593, which listed observations of unauthorized grazing by tile map number.  The Court refused to admit Exhibit 593, because there had been no direct testimony as to the underlying information, i.e., the observations.  The Court admitted Exhibit 4—a list of water sources and priority dates according to the Nevada State Engineer's database—for the purpose of explaining how the maps were created, but not for the truth of the details of the water rights.  The Court admitted the tile maps for the same limited purpose.

On cross examination, Mr. McMorran testified that he had not personally witnessed any trespass, and that "undocumented" water rights on the tile maps indicated that he had found no record with the State Engineer.

On redirect examination, Mr. McMorran noted that all streams with claims of water rights by Defendants were on the maps he prepared.

b.      Mr. Morlan

Mr. Morlan testified on direct examination mainly about maps and the Treaty of Guadalupe-Hidalgo (the "TGH").  He testified that apart from having a grazing permit on federal land, he was aware that there also existed certain easements for private owners to drive livestock. The Court sustained as irrelevant objections to the Government's questions concerning whether the recognition of a private right of one party could affect the ability of other parties to obtain rights or privileges in the same property.[5]  Mr. Morlan testified that he had never heard of "forage" or grazing rights on federal land apart from the grazing privileges granted via grazing

---

[5]In other words, the Government's line of questioning was designed to show that if one livestock owner had stock watering or grazing rights in a particular body of water or piece of land, that other putative users could not use the same water source or land, or at least could not use it to the same extent they could if the first user had no rights.  This was not only irrelevant to whether Defendants in this case do or do not have certain stock watering or grazing rights, the answer the Government apparently sought to elicit is a truism.  Of course another putative user of water or land will be disappointed if a first user has a priority of use.  That is the nature of a right.  Rights are absolute or relative priorities of ownership or use.  Other persons will naturally have their desires to use the same property frustrated by the assertion of another's right in the property.

1   permits under the Taylor Grazing Act of 1934 (the "TGA").

2        On cross examination, Mr. Morlan testified that neither he nor his organization had ever

3   surveyed for water rights or rights of way such as easements by prescription or necessity, and that

4   he would only ever become aware of a claim to an easement if someone brought it to his

5   attention.  He testified that if asked to perform a title search on a parcel of federal land, he would

6   only search the chain of title and would not search for easements.  He noted that he was not a

7   legal expert and was reading the TGH as a layman.  He noted that pre-TGA rights are recognized

8   in the TGA itself.

9        On redirect examination, Mr. Morlan explained that Exhibit 671 was a spreadsheet, based

10   on both county and federal records and maps, that traced the chain of title of every parcel of the

11   7067.63 fee simple acres of land constituting Defendants' noncontiguous ranch in the Monitor

12   Valley, the Pine Creek Ranch (the "Ranch"), and that the earliest patent dated to December 16,

13   1874, which was a transfer form the United States to the State of Nevada pursuant to the

14   Enabling Act.

15       **c.**    **Mr. Visser**

16        On direct examination, Mr. Visser testified that he was one of four Rangeland

17   Management Specialists in the Portland, Oregon office of the BLM, with his concentration in

18   Nevada.  He testified that there were six grazing "districts" in Nevada under the TGA, and that

19   these districts were further divided into "units," and then "allotments."  Grazing permits were

20   issued by allotment.  The present case concerned the Ralston and Monitor Allotments, which

21   were in grazing district N6, the Battle Mountain District.  Mr. Visser testified that § 315b of the

22   TGA provided that the permitting system was not to impair existing water or grazing rights, but

23   that the issuance of a permit under the TGA did not in-and-of-itself create any right to graze or

24   any other interest in the land.  Mr. Visser testified that one could apply for a grazing permit based

25   upon ownership of land- or water-based rights, i.e., ownership of adjacent land or water rights in

water sources on adjacent land or the federal land itself.  Mr. Visser testified that the fines for unauthorized grazing were provided in 43 C.F.R. § 4150.3.  Those rates were based on a grazing fee formula with no relationship to the cost of maintaining the land.  The Court initially denied admission of Exhibit 1140, which consisted of tables for rates of fines, and indicated that the claims in the present case would probably have to rely on state trespass law to show damages, as the Government had not identified any federal trespass statute either in the FAC or when called upon to do so at trial.[6]  The Court then admitted Exhibit 1140 as a basis for alleging fees for violations, but not as a part of the damages for a trespass claim.  Mr. Visser then noted that normally the BLM issued a notice to appear before a U.S. Magistrate Judge and that a citation for trespass, i.e., unauthorized grazing, had no discreet dollar amount attached to it.  Mr. Visser testified that in this case, no such notice to appear was issued, and he didn't know why.

### 2.    Day 2 - March 28, 2012

On Day 2, Mr. Visser completed his testimony, and the Government called one additional witness: Sarah Peterson, Head of the Soil, Water, Air & Riparian Programs for the Nevada State Office of the BLM.

### a.    Mr. Visser

On cross examination, Mr. Visser noted that for a period of time before Congress passed

---

[6]The Amended Complaint ("AC") invokes federal jurisdiction under 28 U.S.C. §§ 1331 and 1345. (*See* Am. Compl. ¶ 3, Apr. 10, 2008, ECF No. 37).  Section 1331 is the general federal-question statute, and § 1345 provides for jurisdiction over any case where the United States is a Plaintiff.  The CFR permits suit against an unauthorized grazer who has no permit to graze at all under certain conditions. *See* 43 C.F.R. § 4170.1-1(c) (2011) ("Whenever a nonpermittee or nonlessee violates § 4140.1(b) of this title and has not made satisfactory settlement under § 4150.3 of this title the authorized officer shall refer the matter to proper authorities for appropriate legal action by the United States against the violator.").  Section 4140.1(b) prohibits permitting livestock to graze on or otherwise trespass on BLM land without a grazing permit. *See id.* § 4140.1(b).  Section 4150.3 provides that an authorized officer may calculate the damages for unauthorized grazing. *See id.* § 4150.3.  Sections 4160.1–4160.4 provide administrative remedies.  Particularly, § 4160.3 provides for the entry of "[f]inal decisions" by an authorized officer, *see id.* § 4160.3, which may be appealed, *see id.* § 4160.4.

the TGA, Nevada had its own grazing regulations.  He also noted that the BLM had no authority

to charge a grazing fee as to any grazing rights predating the TGA, because TGA grazing permits

neither created nor extinguished rights.  He also noted that there can be private water rights on,

and easements over, public land.

On redirect examination, Mr. Visser noted that local consideration driving the BLM's

permitting process had to do with the BLM's opinions about whether certain kinds of livestock

were better suited to graze the vegetation on certain parcels of land.

### b.    Ms. Peterson

On direct examination, Ms. Peterson indicated that she had some expertise in water law

and the prosecution of water rights with the State Engineer.  When Defendants challenged Ms.

Peterson's testimony as an expert on water rights or water rights adjudications due to her not

having been disclosed as an expert witness, the Government indicated that she would testify only

as a layperson, and the Court indicated that it would accept her lay testimony as to what she

found in the State Engineer's database, but not as to any expert opinions.  Ms. Peterson testified

that the State Engineer typically denied applications for water rights on federal land if the

applicant had no grazing permit on the adjacent land from the BLM.  The Court admitted Exhibit

1131 as an example of a letter from the BLM to the State Engineer indicating that a certain

applicant had no grazing permit on a particular piece of land.  The Government proposed to have

Ms. Peterson testify as to the contents of certain public records of the State Engineer indicating

which parties did or did not have water rights in certain areas.  The Court sustained objections to

such testimony under the evidence rules.[7]

_____

[7]The Government insisted that the records were admissible as public records.  The Court does not
deny that the State Engineer's records concerning water rights adjudications are likely public
records.  However, this simply avoids the hearsay rule, *see* Fed. R. Evid. 803(8), and, if a self-
authenticating copy under Rule 902 is produced, also avoids the requirement of an original or
mechanically reproduced copy, *see* Fed. R. Evid. 1005.  But public records do not otherwise fall
outside of the best evidence rule, which provides that unless the document is lost, destroyed,
unobtainable, in the sole possession of an opponent, or concerns only collateral matters, the

Case 2:07-cv-01154-GMN-VCF   Document 415   Filed 05/24/13   Page 14 of 104
On cross examination, Ms. Peterson testified that the numbers she used in her summary tables of numbers of distinct water rights claimed by Defendants would change if she had considered water rights vesting before the State Engineer adjudication system was established in 1905.  Ms. Peterson had used only the State Engineer's database to compile her charts.  She also noted that Decree 5038 noted the existence of a "hard pan" water right, but that such rights were not listed in the State Engineer's records.

### 3.     Day 3 - March 30, 2012

On Day 3, the Government presented two witnesses: (1) Richard Michael Turnipseed, a former Nevada State Engineer; and (2)William Rowley, Professor of History at the University of Nevada - Reno.

### a.     Mr. Turnipseed

On direct examination, Mr. Turnipseed testified as a lay witness.  He testified that the State Engineer water rights adjudication system was implemented in 1903 and 1905.[8]  Rights recognized under the initial adjudication under the 1903 Act or rights that one can show predated the Act but were never adjudicated by the State Engineer under the initial notice and claims procedure pursuant to the 1903 Act are referred to as "vested" rights.  Mr. Turnipseed testified that he had never heard of "hard pan" water rights, i.e., water rights in puddles of water or snow

---

contents of the document may only be proved by production of the original or a mechanically reproduced copy, i.e., a "duplicate," not by oral testimony. *See* Fed. R. Evid. 1001–1004.  The Government did not provide any purported copies of the public records at issue but attempted to have the witness testify directly as to their contents from memory.

[8]In 1903, the Nevada Legislature passed a law creating the Office of the State Engineer, to coordinate with the Secretary of the Interior as to irrigation projects and to conduct an initial adjudication of existing water rights within the state through a notice and claim procedure. *See* 1903 Nev. Stat. 25–27, ch. 4, §§ 8–9.  In 1905, the Nevada Legislature amended the 1903 Act to provide for a system of water rights applications and adjudications following the initial adjudications under the 1903 Act. *See* 1905 Nev. Stat. 348–49, ch. 46, §§ 23–28.  In essence, the State Engineer has had jurisdiction in Nevada to adjudicate water rights as an executive agency since 1903, subject to judicial review.

1   accumulations on flat, "hard pan" areas of a range that are not part of any spring or stream flow.

2   He noted that such water or snow would become part of the water usable by a person with water

3   rights in a given stream if it were to flow into that stream.  Mr. Turnipseed indicated that he

4   knew the late E. Wayne Hage and had camped at Barley Creek and Pine Creek.  He testified that

5   the Ralston Valley was mostly comprised of sage brush, and that the Monitor Valley had some

6   grass, with sage brush in the foothills and timber further up the surrounding ranges.  The Monitor

7   Valley Adjudication had adjudicated the water rights between the peaks of the mountain ranges

8   to the east and west of the Monitor Valley.  Based on beneficial use, some of the Hages' stock

9   watering rights had been recognized thereby.  Mr. Turnipseed indicated that water rights were

10  separate from ownership of the land.  He noted that the Government could not destroy vested

11  water rights.  He noted that a grazing permit could not destroy a water right.  In other words, the

12  Government could temporarily take a water right during a drought, but that it would have to pay

13  for the taking.  Mr. Turnipseed noted that the water rights reserved for the Government itself in

14  the Monitor Valley Adjudication were for the consumptive use of forest rangers while on the

15  range, i.e., for personal washing and cooking.  The Government had not itself applied to the State

16  Engineer for additional water rights in the area since the Monitor Valley Adjudication in 1999.

17  The BLM in the past had attempted to coerce ranchers to give up a portion of their water rights in

18  exchange for the installation of pipelines to divert water for broader access by cattle.  People

19  could have water rights in water located on the land of another, including the public domain.

20      On cross examination, Mr. Turnipseed testified that the 1905 Act itself specified that

21  nothing therein affected vested water rights.  A "priority date" as to water rights meant that the

22  first person to appropriate water for a beneficial use had the right to have his appropriated

23  amount satisfied in its entirety before a junior right holder would receive any water at all.  Any

24  adjudication by the State Engineer of pre-1905 vested rights recognized those rights, but did not

25  create them.  Mr. Turnipseed noted that the State of Nevada had in 1925 instituted a law to

1    regulate grazing on the public domain, nine years before the TGA took effect,[9] and that the State

2    Engineer denied applications to appropriate water for livestock watering if the applicant had no

3    BLM permit to graze in the area.

4        On redirect examination, Mr. Turnipseed noted that the State Engineer did not adjudicate

5    the right to appropriate water from puddles, but that it may adjudicate the right to appropriate

6    water from a dry lake bed or other terrain feature that temporarily but routinely collects water.

7    The "hard pan" area in which Defendants claimed water rights under Decree 5038 was a vast

8    area in the Ralston Allotment that the State Engineer had never adjudicated.

9        **b.    Prof. Rowley**

10       Professor Rowley testified as an expert in Nevada history and the history of rangelands in

11   Nevada.  He noted that there were indigenous peoples in Nevada in 1848, the date of the TGH.

12   The TGH protected the continuing vitality of existing property rights of "Mexicans" living within

13   _____

14   [9]In 1925, the Nevada Legislature directed the State Engineer not to permit the appropriation of
     water by an applicant where an existing stock watering right holder had the right to use enough
15   water from the source to water enough animals such that those animals would graze the entire
     public range in the area. *See* 1925 Nev. Stat. 348–49, ch. 201, § 2.  The law remains in the
16   Nevada Revised Statutes ("NRS"). *See* Nev. Rev. Stat. § 533.495.  However, the Nevada
     Supreme Court has ruled that to whatever extent this statute or others implied grazing rights on
17   the public domain appurtenant to stock watering rights, it has been superseded by the TGA. *See
     Ansolabehere v. Laborde*, 310 P.2d 842, 842 (Nev. 1957) ("We have concluded that those
18   features of the state statute governing the grazing use of the public lands were superseded and
     rendered ineffective by the enactment by Congress of what is known as the Taylor Grazing Act,
19   43 U.S.C.A. § 315 *et seq.*").  Because the Nevada Supreme Court has itself ruled that this state
     statute does not purport to create rights superseding the ability of Congress to withdraw its tacit
20   consent to grazing on the public range, the Court need not examine whether any putative state
     law grazing rights created under the 1925 Act survived via any carve-outs in the TGA or other
21   federal statutes.  Even if the Court were to consider the *Ansolabehere* Court's opinion not as an
     interpretation of state law but as a non-binding opinion on the construction of federal and state
22   laws, that Court was correct.  Congress' tacit consent in the Nineteenth Century to the virtually
     unrestricted grazing of private cattle upon the public domain in the Western states did not create
23   an absolute right to graze, and Congress may withdraw federal lands from the public domain and
     require a permit for grazing thereupon. *See Light v. United States*, 220 U.S. 523, 535–37 (1911)
24   (citing U.S. Const. art. IV, § 3).  Still, the Government may not interfere with one's access to his
     own property—for example, access to water sources in which one has rights—without
25   compensation for a taking. *See Curtin v. Benson*, 222 U.S. 78, 86 (1911).

1    the ceded territory.  Mexico had obtained its independence from Spain in 1821, and the Mexican

2    Constitution of 1824, which was in effect in 1848, treated Indians as "Mexicans."  Although

3    there were no "acculturated Indians" in Nevada in 1848, the Mexican Constitution of 1824

4    treated them as Mexicans.[10]   The Court admitted Prof. Rowley's expert report, Exhibit 1146.

5    Prof. Rowley testified that the Enabling Act of 1864 required the State of Nevada to disclaim any

6    federal lands as its own, and not to tax them.  Prof. Rowley testified about the Clawson Report,[11]

7    which indicated that because some ranchers may have stock watering rights greater than

8    necessary to support the cattle for which they had permission to graze under the TGA, the BLM

9    would have to invent ways to avoid retaliation by these ranchers for denying them additional

10   grazing permits.  Clawson had recognized that these ranchers could legally deny access to the

11   water sources in which they had rights, diminishing the value of other ranchers' BLM-issued

12   grazing permits.  In such a case, the BLM would have to provide water from another source to

13   make the grazing permits they issued valuable.  The Court sustained objections to legal

14   conclusions drawn by Prof. Rowley and admitted his report, except as to any legal conclusions

15   therein.

16   _____

17   [10]The U.S. Supreme Court has noted that the Indians living within the lands of the Mexican
     Cessation in 1848 were considered Mexicans by the Mexican government, though this did not
18   mean that they necessarily became United States citizens under the TGH, as the United States'
     relationship with the Indians at the time was governed by unique historical, political, and legal
19   principles. *See United States v. Sandoval*, 231 U.S. 28, 39 (1913).  Soon after the TGH was
     entered into, the Court affirmed the Mexican government's recognition of Indians as full
20   "Mexicans." *See United States v. Ritchie*, 58 U.S. 525, 540 (1854) ("But as a race, we think it
     impossible to deny, that, under the constitution and laws of the country, no distinction was made
21   as to the rights of citizenship, and the privileges belonging to it, between this [the Indians] and
     the European or Spanish blood.  Equality between them, as we have seen, has been repeatedly
22   affirmed in the most solemn acts of the government.").  Whether the U.S. Supreme Court's
     unwillingness to treat the Indians living within the ceded territory at the time of the Cessation as
23   U.S. citizens, despite the Court's clear recognition that these same Indians were considered
     Mexican citizens by the Mexican government, means that the transfer of Indian property to a
24   non-Indian within the ceded territory after 1848 gives rise to the protections of the Treaty as if a
     non-Indian Mexican had made the same transfer, is a difficult question in light of *Sandoval*.
25

     [11]Marion Clawson was the first Director of the BLM.

On cross examination, Prof. Rowley testified that he had visited some ranches as a youth but had visited none of the disputed areas in preparation for the present case. He testified that prior to the TGA, cattlemen customarily put their cattle on the open range unsupervised to graze and water.

### 4.   Day 4 - April 6, 2012

On Day 4, the Government presented three witnesses: (1) Gerald Smith, a retired Battle Mountain District Office Manager for the BLM; (2) Ms. Diane Weaver, a former Humboldt-Toiyabe National Forest Rangeland Management Specialist for the USFS and current District Ranger in Idaho; and (3) Steven Williams, the Austin and Tonopah District Ranger for the USFS. Before taking the testimony of witnesses, the Court indicated that it would consider the following two books, not as evidence or as authority, but as secondary reference materials to the extent they may contain valuable citations to or explanations of authoritative law, i.e., to the same extent the Court would consider law review articles on the relevant issues: (1) William D. Rowley, U.S. Forest Service Grazing and Rangelands - A History (Tex. A&M Univ. Press (1985)); and (2) E. Wayne Hage, Storm Over Rangelands - Private Rights in Federal Lands (Free Enterprise Press, 3rd ed. 1994). The Court invited further suggestions by the parties as to secondary reference materials.

### a.   Gerald Smith

On direct examination, Mr. Smith testified that he had worked in various capacities for the BLM in Nevada since 1976. Mr. Smith testified that the Battle Mountain Grazing District (NV6) was established on February 9, 1951, and that it was the last district in the United States to be created under the TGA. (*See* Gov't's Ex. 53). The Court admitted Exhibit 53. The Court refused to admit several exhibits offered for the purpose of estoppel, i.e., that Defendants' predecessors-in-interest by consenting to the establishment of the grazing district had forfeited any grazing or "forage" rights they may have previously possessed. The Court noted that such an

agreement would do nothing to destroy vested rights, e.g., rights in the use of water or grass.  The Court admitted Exhibit 1217 as evidence that customary use of each applicant was considered in granting or denying grazing permits.  At one point, the Estate indicated that it was asserting only a "forage" right attendant to stock watering rights, and not any free-standing grazing right in derogation of the Government's ability to regulate grazing on federal lands.  The Court admitted Exhibit 55, the minutes of another advisory board meeting.  Mr. Smith testified that no rancher from the Pine Creek Ranch had applied for a water-based preference to graze, but noted that failure to submit such an application did not mean the rancher had no stock watering rights in the area.  A rancher, with or without water rights in the area, could base an application to graze upon ownership of adjacent land as opposed to ownership of water rights on the federal land itself, and some chose this method of application.  Defendants' predecessors-in-interest to the Pine Creek Ranch had been issued "interim licenses" to graze.  The Arcularius brothers had consolidated the present Pine Creek Ranch by acquiring various lands.  E. Wayne Hage purchased the Pine Creek Ranch from the Arcularius brothers.  The Arcularius brothers' applications for grazing permits had been based upon the ownership of adjacent land, as opposed to the ownership of water rights on the federal land.  The Court admitted a "case history" consisting of Exhibits 666, 669, 56, 64, 70, 75, and 76.  These documents indicate the preferences and active privileges[12] for grazing as to the Arcularius brothers in the 1950s.  Mr. Smith noted that a new purchaser of base property had ninety days to file his deed with the BLM in order to transfer the grazing permit.

On cross examination, Mr. Smith testified that he had no knowledge of any protest by Mr. Arcularius as to the creation of the grazing district or the advisory board's recommendations, but that he could not testify definitively that Mr. Arcularius had made no such objections.  He

---

[12]It appears that the terms "preference" and "priority" indicate the full extent of a grazing permit based upon the applicant's needs as represented in an grazing application, to the extent approved.  "Active privileges" appears to represent the percentage of a preference that may currently be used, which may be less than 100% due to non-use, drought, or other reasons.

1    testified that there existed range line agreements between ranchers predating the TGA, but that he

2    was not aware of any pertaining to the present case.  He testified that the "short form" application

3    signed by E. Wayne Hage was signed on the same day (June 14, 1978) as the "long form"

4    application.  The short form application indicated that it superseded the long form application.

5    Mr. Smith could not identify the initials next to that statement, though it was clear E. Wayne

6    Hage had signed the form itself at the bottom.  Both the short and long forms were applications

7    for annual permits.  Mr. Smith testified that the Pine Creek Ranch permits expired in the early

8    1990s.  Upon expiration, the government typically takes no action, but rather issues another

9    permit.  New regulations effective in 1995 indicated that permit holders would have to accept a

10   new permit with new terms and conditions upon expiration.  E. Wayne Hage was offered such a

11   permit, but he returned it indicating that it was subject to his pending takings case in the Court of

12   Federal Claims (the "CFC Case").[13]  Upon receipt, the BLM determined that it would not accept

13   the permit agreement with the additional condition added. (*See* Gov't's Ex. 1237).  In response,

14   the BLM sent E. Wayne Hage a letter indicating not only that he would have to accept the permit

15   as written without adding any additional conditions, but that it was denying him the permit

16   outright, though he had the right to appeal.  Mr. Smith indicated that the granting of a permit did

17   not extinguish any preexisting rights to his knowledge.  Mr. Smith had no direct knowledge of

18   the historical and customary use of the range at the time Mr. Arcularius applied for a grazing

19   permit, but he was familiar with what he had read in the Arcularius case file.  He had no

20   knowledge of the historical and customary use of the range in 1930, i.e., immediately before the

21   passage of the TGA, or between 1864 (the year Nevada became a state) and 1900.  Mr. Smith

22   testified that a transferee of a grazing permit would be bound by the conditions of the transferor's

23   permit.  He testified that the allegations of trespass in the present case did not exceed the active

24   grazing privileges previously granted to E. Wayne Hage before the later denial of the renewal

25   _____

[13]Mr. Smith also testified in that case.

1    permit.  In other words, had E. Wayne Hage's renewal grazing permit application in the 1990s

2    been accepted, there would have been no basis for a trespass action in the present case.  Mr.

3    Smith noted that the ranchers in the area ultimately voted to accept the imposition of a grazing

4    district because the only other option would be to lease the land under § 15 of the TGA, not

5    because they actively desired a federally regulated grazing district over open grazing or

6    regulation under Chapter 533 of the NRS.

7          On redirect examination, Mr. Smith testified that Exhibit 1237, a letter from the BLM to

8    E. Wayne Hage, noted that the BLM had received a letter from E. Wayne Hage's attorneys

9    indicating that he would not protest the denial of a renewal permit but would pursue remedies

10   elsewhere.  He noted that he had personally reviewed the letter before causing his subordinate to

11   mail it.  The Court admitted Exhibit 1237.

12         On re-cross examination, Mr. Smith admitted that E. Wayne Hage did in fact return the

13   renewal application with some additional language, i.e., an annotation referring to the CFC Case.

14   The Court asked why neither party presented a copy of that response and noted that the letter

15   from the BLM incorrectly indicated that it had never received any response from E. Wayne Hage,

16   but only from his attorneys.  Counsel for the Estate noted that he had a copy of the returned

17   application as an exhibit but had not expected to present it during Mr. Smith's testimony.  He

18   then presented Defendants' Exhibit 1999, the letter from E. Wayne Hage's attorneys to the BLM.

19   The top of the letter from those attorneys explicitly labeled the letter as a "protest," contrary to

20   the BLM's assertion in its decision letter that E. Wayne Hage had declined to protest.  The Court

21   admitted the exhibit.

22         **b.    Diane Weaver**

23         Before calling this witness, counsel for the Government noted that it had recreated one of

24   the tile maps to correct an omission.  The old map was Exhibit 23, and the new version was

25   Exhibit 23a, which the Court admitted without objection.

1    On direct examination, Ms. Weaver testified that she had spent a significant amount of

2    time during her career defending USFS livestock grazing policies against both ranchers and

3    environmentalists.  Approximately 50–75% of her time as a USFS employee had been spent on

4    grazing issues.  Ms. Weaver testified that she had a bachelor's degree in rangeland management.

5    She testified that she had lived on a ranch for three years in California and that she assisted local

6    ranchers in Idaho with ranching operations, such as cattle branding.  She explained that the USFS

7    used the term "head months" ("HM") to measure grazing, whereas the BLM used the term,

8    "animal unit months" ("AUM").  Ms. Weaver indicated that she was not aware of any exceptions

9    to the permit requirement for grazing on USFS land for persons with stock watering rights on the

10   land.  She indicated that the Organic Act of 1897 was the genesis of the federal regulation of

11   grazing on federal land.  She testified that the Granger–Thye Act of 1954 ("GTA") was the

12   USFS's equivalent of the TGA.  Ms. Weaver testified that 36 C.F.R. §§ 222.1, 222.3, 222.50,

13   and 222.51 governed grazing permits, that § 261 governed prohibited grazing, and that Exhibit

14   41 was a USFS manual concerning grazing on USFS land.  She noted that the manual required

15   grazing permit applicants to have "base property," meaning land adjacent to or near the USFS

16   land owner that is used by the applicant for ranching operations.  Grazing fees under the manual

17   were to be based on the fair market value of the use and were to be equitable to the Government

18   and the users.  The Court admitted the manual for the purpose of showing USFS policies, but not

19   as evidence of any binding law.  Ms. Weaver testified that under 16 U.S.C. § 551, the local USFS

20   office had no discretion in grazing fees but rather received "interim directives" from the USFS

21   headquarters in Washington, D.C. indicating the rates, which were calculated pursuant to 16

22   U.S.C. § 551.  She testified that currently, the minimum rate was $1.35 per HM and somewhat

23   more for excess or unauthorized grazing.[14]  Ms. Weaver testified that upon the discovery of

24   _____

25   [14]This amount is reflected in 36 C.F.R. § 222.51(b).  That section contains a complex formula for
calculating the fee rates, with $1.35 per HM as the floor.  The authorization for such a calculation
is in 43 U.S.C. § 1905, although the authorization terminated on December 31, 1985 by the

1    unauthorized grazing, the USFS would notify the owner to remove the cattle and might in some

2    cases send officers to the land to remove the cattle.  She had never experienced a conflict where

3    two permittees had grazing rights in the same area where only one permittee had a water right in

4    the area.  She had in the past required ranchers to transport their own water to their cattle where

5    there was no water in the area, but she had never purported to command a permittee with water

6    rights in the area to permit another user to make use of that water.  Ms. Weaver testified that the

7    USFS recognized state law control over water rights on USFS land, but she had never heard of

8    the USFS recognizing grazing or foraging rights on USFS land.  She testified that she routinely

9    _____

10   statute's own terms.  President Reagan purported to extend this authority in 1986.  *See* E.O.
     12548 (Feb. 14, 1986, 51 Fed. Reg. 5985).  The vitality of this executive order must rely upon

11   some other statute.  Congress may delegate rule-making authority to the executive branch, so
     long as it orders the executive to follow, and the executive does indeed follow, an "intelligible

12   principle" in promulgating regulations thereunder, *see, e.g.*, *Rwy. Labor Executives' Ass'n v.
     Skinner*, 934 F.2d 1096, 1100 (9th Cir. 1991) (citing *Mistretta v. United States*, 488 U.S. 361,

13   372 (1989)), but § 1905's delegation of the power to charge grazing fees to any executive agency
     terminated in 1986 by its own terms.  Therefore, any regulation promulgated pursuant to this

14   statutory delegation of power after that date falls without the intelligible principles mandated by
     Congress.  Congress expressly intended the fees authorized to be charged under § 1905 to be

15   "experimental," and therefore ordered the Secretaries of the Interior and of Agriculture to report
     to Congress no later than December 31, 1985 concerning the results of the experiment and

16   recommendations for future grazing fees.  *See* 43 U.S.C. § 1908(b).

17           In a supplemental briefing, the Government argued that § 1905 was not the genesis of the
     BLM's or USFS's power to charge grazing fees, but was meant only to specify precisely how

18   much they should charge.  In other words, the ability to charge for grazing predated § 1905, and
     when that statute lapsed the BLM and USFS became free to charge fees at their discretion under

19   previous statutes, that is, until President Reagan ordered them to charge fees in accordance with
     former § 1905 via E.O. 12548.  The Court agrees.  The National Forest Organic Act of 1897 and

20   later amendments thereto, *see, e.g.*, 16 U.S.C. §§ 472, 551, gave the Secretary of Agriculture the
     power to regulate grazing on national forests, including the ability to charge fees related to

21   "protect[ing forests] from depredations and from harmful uses." *United States v. Grimaud*, 220
     U.S. 506, 521–22 (1911).  The Taylor Grazing Act of 1934 gives the Secretary of the Interior

22   similar authority on BLM land. *See Pub. Lands Council v. Babbitt*, 529 U.S. 728, 733 (2000)
     (citing 43 U.S.C. § 315b).  Section 1905, then, was simply a temporary, experimental

23   Congressional mandate that the Secretaries use particular formulas for charging fees.  When that
     statute expired in 1986, the previous authorizations to charge grazing fees remained, and the

24   Secretaries were free to charge within their discretion once again until President Reagan ordered
     that they use the formula mandated under former § 1905 and related regulations, which order was

25   within the President's constitutional authority and duty to "take Care that the Laws be faithfully
     executed." U.S. Const. art. II, § 3.

1   conducted livestock inspections to count livestock by brand and GPS location.  If cattle were

2   found in unauthorized areas, a phone call solved the problem 99% of the time, because it was

3   usually the case that ranchers had allowed cattle to wander into unauthorized areas inadvertently.

4   Ms. Weaver identified the Meadow Canyon C&H Allotment on one of the overview maps.  She

5   had observed unauthorized livestock on the Meadow Canyon C&H Allotment on August 8 and 9,

6   2004.[15]  She and her colleagues, Lucas Phillips and Chandler Mundy, took photographs and notes

7   and wrote a report, (see Gov't's Ex. 353), upon returning to the office.  She authenticated the

8   August 20, 2004 report as a business record and a public record, which included photographs of

9   the alleged trespass.  The Court admitted Exhibit 353 as to photographs she took and information

10   of which she had personal knowledge but noted that it was essentially the same thing as a police

11   report and so did not meet the business record or public record hearsay exceptions generally.  The

12   report indicates cattle grazing on August 8 and 9, 2004.  Ms. Weaver described the photograph

13   on page two of the report indicating cattle grazing approximately 300 feet from the nearest water

14   source on August 8, 2004.  Only the alleged grazing on August 9, 2004 is relevant, however,

15   because the FAC does not allege violations on August 8, but only on August 9.  The report, with

16   photographs, indicates grazing of eighteen of the Estate's cattle and eleven of Hage's, based upon

17   branding, some of which were more than fifty feet from Antone Creek in Antone Canyon, though

18   the cattle congregated within fifty feet of the creek upon Ms. Weaver's approach.  She also

19   witnessed one cow belonging to the Estate in Corcoran Canyon on the BLM side of the fence, but

20   she did not testify as to the distance from any water source.  Counsel for the Government noted

21   that under the Monitor Valley Adjudication, the State Engineer had adjudicated Defendants'

22   stock watering rights in the Monitor Valley but did not specifically identify Antone Creek,

23   leaving some ambiguity as to whether the State Engineer intended to recognize stock watering

24   ───────────────

25   [15]This observation corresponds to paragraph 16(E) of the FAC, which alleges twenty-six of the
    Estate's cows engaged in unauthorized grazing on the Meadow Canyon C&H Allotment, as well
    as eleven of Hage's.

1    rights of Defendants in Antone Creek.  Utilization cages in the area indicated 60–80% usage of

2    the grass.  The entire report pertains to observations made within the area for which E. Wayne

3    Hage had a prior grazing permit.  Ms. Weaver indicated the alleged trespass on Tile Map #1, Ex.

4    23a.  She circled the already annotated trespass locations and initialed them.

5            On cross examination, Ms. Weaver testified that there was no GPS information in her

6    report.  She noted that she did not know how the GPS readings taken by her colleagues were

7    transferred to the maps.  She indicated that she had no special training or experience in

8    estimating distances visually.  She testified that she estimated grass usage in an area by visually

9    comparing the forage in a utilization cage to that surrounding the cage in the open area.  She had

10   no way of knowing which animals had grazed in the area if she hadn't witnessed them grazing,

11   however.  She noted that utilization cages were usually moved every spring.  She testified that

12   she was present at a government impoundment of E. Wayne Hage's cattle in 1991.  Ms. Weaver

13   noted that although she was not aware of the USFS ever recognizing a forage right, she was

14   aware that the CFC had recognized such a right.  She had been deposed in the CFC Case and had

15   testified in one of the trials.  Ms. Weaver noted that she took the photo dated August 8, 2004 in

16   her report, Exhibit 353, Bates No. US010301.03.[16]  She testified that there could be a spring near

17   where some of the cattle near the top of the photograph were, but she didn't know.  She also

18   noted that there was a creek near the bottom of the photograph were the rest of the cattle were.

19   She noted that she did not identify any brands on the cattle in that photograph.  Ms. Weaver

20   noted that she took the photo dated August 9, 2004 in her report, Exhibit 353, Bates No.

21   US010301.04.  She estimated that the cattle in the photograph were approximately 30–50 feet

22   from Antone Creek, but no more than 75 feet.  She did not know who, if anyone, had rights to the

23   water in Antone Creek.  She testified that she was not familiar with the details of the Hages'

24

25   [16]This is the document relating to the comment in the report that the cattle were 300 feet from any
     water source.

1   water rights in the area, but knew there had been an adjudication concerning their rights.  She

2   noted that she could not tell what kind of animals or whose had eaten the forage in an area (for

3   example, in the areas where she had taken pictures of forage utilization) by observing only the

4   forage itself, but that she inferred it had been local domestic cattle, because there were no local

5   wild grass-eating animals.  She noted that she did not check for multiple brands on a given

6   animal after observing the first brand.  She noted that the observations plotted on Exhibit 23a had

7   appeared to have been shifted somewhat to the right or "West"[17] as compared to her

8   observations.  There was a discrepancy of some distance that she could not accurately estimate.

9           On redirect examination, Ms. Weaver testified that the map attached to her report was

10  produced using GPS locations plotted by the observers.  She did not indicate whether the GPS

11  locations her colleagues marked were taken while standing directly within the groupings of

12  cattle, whether they were taken from the location from where the photographs of the cattle were

13  taken, or, if the latter, whether the locations had been adjusted using a compass and range

14  estimation before being plotted on the map in her report.

15          On re-cross examination, Ms. Weaver testified that she did not know how the

16  Government had created the Exhibit 23a overview map or what data they used.

17          **c.      Steven Williams**

18          On direct examination, Mr. Williams testified that he had a lot of experience with

19  topographic maps and GPS equipment.  He had experience with ranching, having grown up on a

20  ranch himself in Utah.  As a range technician, he had performed allotment inspections, i.e.,

21  checking whether permittees' cattle were within the proper ranges.  Later, as a range

22  conservationist, his duties consisted of many of the same duties, but he also met with permittees

23  to discuss their annual grazing plans and assist them in applying for permits and preparing

24  _____

25  [17]North was at the top of the map, so right was in fact to the east.  If the newly plotted points had
    been shifted to the right, that would mean the cattle were actually further to the left or west of the
    newly plotted points, i.e., closer to Antone Creek.

billings for grazing.  He spent approximately 20% of his time as District Ranger on grazing

issues.  All of the USFS allotments at issue in the present case were within the Tonapah Ranger

District, of which he was the District Ranger.  President Theodore Roosevelt had withdrawn the

Austin and Tonopah Ranger District from the public domain on April 15, 1907.  Exhibit 39 was

the President's proclamation of the Monitor National Forest (the Monitor Mountain Range to the

east of the Monitor Valley).  Exhibit 40 was the President's proclamation of the Toquima

National Forest (the mountain range to the west of the Monitor Valley).  On December 10, 1910,

President Taft had proclaimed that the area encompassing those two forests would be known as

the Toiyabe National Forest.  Via Exhibit 36, dated May 4, 1914, President Wilson had modified

the boundaries of the Toiyabe National Forest.  Exhibit 37 is a graphical representation of those

modifications.  The Court admitted Exhibits 36–40.  Mr. Williams indicated he was familiar with

many of the creeks in the area.  The Court admitted Exhibits 1220 and 1221 as official USFS

maps of the Meadow Canyon C&H and Table Mountain Allotments, respectively.  Mr. Williams

was not aware of forage rights appurtenant to stock watering rights.  He was aware of easements

across USFS land, however.

**5.    Day 5 - April 9, 2012**

On Day 5, Mr. Williams completed his testimony.  Before Mr. Williams's testimony,

however, the Court announced a preliminary conclusion of law.  The Court noted that under

Chapter 11 of the Bankruptcy Code, a bankruptcy court could reduce the principal owed on debt

secured by real property to the actual market value of the property without effecting a Fifth

Amendment taking.  The Court noted that a bankruptcy court could under the Bankruptcy Code

also permit a debtor to propose and use the "indubitable equivalent" of the collateral for a loan in

place of payments currently due on the loan in order to prevent a Fifth Amendment taking while

still permitting the debtor to avoid payments otherwise due and increase its current cash flow.

The Court then analogized the relevant provisions of the Bankruptcy Code to the construction of

the TGH and the TGA. Under the TGH, the Government was bound to respect existing property rights of "Mexicans" living withing the ceded territories, which under the Mexican Constitution of 1824 included Indians then living in the ceded territories. The Government then issued patents to some of the land within the ceded territories. The Mining Act of 1866 (which includes the Ditch Act) and the TGA both included carve-outs for respecting preexisting property rights on these lands. The Government had to balance the interests of local ranchers and miners who wanted to use resources on public lands against the public's interest in managing the resources on those lands to avoid the uncontrolled depletion of resources. The TGA established a system of preferences, and therefore no constitutional taking, because the preference system did not affect the existence of any property rights in the public domain but was in fact designed to protect those existing rights. *See Red Canyon Sheep Co. v. Ickes*, 98 F.2d 308, 313–14 (D.C. Cir. 1938). The TGA bases preferences upon the ownership of nearby land or the holding of water rights in the area, which was the basis for grazing rights under pre-regulation custom and also under the pre-TGA Nevada grazing laws. If the TGA contained no preference system based upon existing rights, i.e., ownership of nearby land or water rights on or near the land to be grazed, it would very possibly have run afoul of the Takings Clause. A longer quotation from *Red Canyon Sheep Co.* is appropriate:

> We note that under the Taylor Grazing Act the Congress has vested discretion in the Secretary of the Interior to create grazing districts, to establish and modify the boundaries thereof, and from time to time to reclassify the lands therein for other purposes. And Section 3 of the Act does not expressly speak of rights to permits; it uses the terms authorized and entitled. Nevertheless, looking at the Act in the light of its purpose and of its provisions as a whole, we think that the Congress intended that under it livestock owners, who, with their flocks, have been for a substantial period of time bona fide occupants of certain parts of the public domain, and who are able to make the most economic and beneficial use thereof because of their ownership of lands, water rights, and other necessary facilities, and who can thus bring themselves within a preferred class under the regulations by which the Secretary is authorized to implement in more detail the general policy of the Act, are *entitled* to grazing permits not exceeding ten years in duration, should the Secretary create a grazing district including that portion of the range which such livestock owners have been occupying. By this we do not mean to rule upon the question whether the Secretary may be required, by grazers who have been using a particular

1
2
3
4
5
6
7
8
9
10
11
12

portion of the public domain, to establish a grazing district upon the lands so used. Conceivably under the Act the Secretary might in his discretion conclude that such lands were more valuable for homesteading or other public purposes than for grazing. But we do conclude that *if the Secretary determines to set up a grazing district including lands upon which grazing has been going on, then those who have been grazing their livestock upon these lands and who bring themselves within a preferred class set up by the statute and regulations, are entitled as of right to permits as against others who do not possess the same facilities for economic and beneficial use of the range. Therefore in view of the allegations of the bill that the appellants have such adjacent land holdings, water rights, and other facilities as to bring them within a preferred class under the regulations, we are of the view that the interim licenses which have been temporarily issued to them must, under the Act, ripen into permits,* provided that Grazing District No. 4, which has been set up so as to include the lands upon which the appellants have been running their sheep, continues to exist and to include such lands. The purpose of the Act seems to be at least twofold. First, it is designed to provide for the most beneficial use possible of the public range in the interest not only of the grazers themselves but also of the public at large. The livestock industry of the West is an important source of food supply for the people of the nation. In the arid regions of the West commercial success in the livestock industry requires that sheep and cattle be run upon the open range. This is a matter of common knowledge. Second, the Act is intended, in the interest of the stock growers themselves, to define their grazing rights and to protect those rights by regulation against interference.

13   *Id.* (emphases added). In other words, if the Government sets up a grazing permitting system,

14   e.g., under the TGA or the GTA, a person who has previously grazed in the area based upon

15   adjacent land, water rights on the land, etc., has a *right* to a grazing permit as against others who

16   apply for a permit to graze the area without having previously grazed in the area.

17       Mr. Williams testified that under 43 U.S.C. § 1905, Congress directed the USFS to

18   charge a grazing fee based upon a complex formula, which the USFS had then laid out in Title 43

19   of the CFR, and the authority for which President Reagan had purported to extend in 1986 via

20   executive order when Congress failed to renew the statute after it expired in 1985. *See supra*,

21   note 12. He testified that the grazing fees on federal land were higher than the fair market value

22   of grazing on private range land, even though private pastures are of better quality for grazing

23   and private grazing operations typically provide more services, such as water, etc. USFS Interim

24   Directive No. 2230-2004-1, setting the grazing fees for 2004, indicated that the authorized fee for

25   cattle grazing was $1.43 per HM, as calculated under E.O. 12548, and the unauthorized grazing

1    fee was $4.41 per HM, because of the efforts required to manage the land. (*See* Gov't's Ex. 77).

2    Exhibits 80–84 and 548 were similar interim directives for years 2006–2011. (*See* Gov't's Exs.

3    80–84, 548).   The Court admitted Exhibits 77, 80–84, and 548, but not to prove any facts outside

4    the scope of the allegations in the FAC.  Mr. Williams testified that E. Wayne Hage (and Jean N.

5    Hage) had received grazing permits within the Toiyabi National Forest in 1978 and 1984, (*see*

6    Gov't's Exs. 349, 351), and that "the Arcularius brothers" were the previous owners of the Pine

7    Creek Ranch and had their own grazing permits.  E. Wayne Hage had qualified to receive his

8    own permits by purchasing the Pine Creek Ranch at a time when there were existing permits

9    based upon the ownership of the ranch's land.  The 1984 permit specified that the permit could

10   be cancelled in whole or in part for failure to comply with applicable regulations, the permit

11   itself, or the instructions of USFS officers. (*See* Gov't's Ex. 351 at 1 ¶ 3).  E. Wayne Hage signed

12   the permit. (*See id.* at 1).  The permit expired by its own terms on December 31, 1994. (*See id.* at

13   2 ¶ 4).  After expiration, no new permit was issued to the Hages.  On February 13, 1991, the

14   USFS had sent the Hages a letter indicating that it would cancel 38% of their grazing permit on

15   the Meadow Canyon C&H Allotment (128 of 340 cattle), and would suspend all grazing on the

16   allotment for five years, for resource protection via non-use and due to the Hages' refusal to

17   remove all cattle from the allotment when previously commanded to do so. (*See* Gov't's Ex.

18   352).  The letter did not indicate that the Hages had originally been ordered to remove their cattle

19   for any infractions. (*See id.*).  The Court noted that the action seemed arbitrary and capricious.

20   Exhibit 914 is a similar letter concerning a cancellation of the Hages's grazing permit on the

21   Table Mountain, Monitor East, and Monitor West Allotments for failure to stock the allotments

22   (non-use) for three consecutive years and failure to restock at least 90% on the fourth year. (*See*

23   Gov't's Ex. 914).  On May 8, 1995, the USFS wrote to the Hages' attorney to inform them that if

24   they reapplied for grazing permits on the Meadow Canyon, Silver Creek, or McKinney

25   Allotments, they would not be granted a priority with respect to other applicants because they

1   had failed to comply with the terms and conditions of the expiring permit, i.e., failure to remove

2   cattle by the end of the grazing season, failure to notify the USFS before introducing cattle onto

3   the allotments, failure to notify the USFS of non-use, and failure to re-stock after three years of

4   personal-convenience non-use. (*See* Gov't's Ex. 916).  Mr. Williams testified that as opposed to

5   E. Wayne Hage, neither the Estate nor Hage had ever applied for or held grazing permits.  The

6   USFS had not granted permits to any other ranchers in the area because of the conflict that could

7   ensue with the Hages, though two ranchers had indicated an interest in obtaining grazing permits

8   in the area, e.g., the Stone Cabin Ranch, LLC. (*See* Gov't's Ex. 543).  If the USFS were to grant

9   permits to other ranchers in areas where the Hages had the water rights, those ranchers would

10  have to obtain permission from USFS to bring their own water or would have to obtain water

11  rights from the Hages.  Permittees are required to comply with state law, as well, so the use of

12  another's water would presumably be a violation of the grazing permit itself.  Mr. Williams

13  testified that he had experience performing range inspections, identifying, counting, and plotting

14  the location of cattle.  He had performed twenty-five such inspections since 2000, including eight

15  between 2004 and April 2008.  Other inspectors had conducted an additional eight inspections

16  without him between 2004 and April 2008.  He noted that his location estimations were accurate

17  within a few hundred yards.  He would count cattle by brand, using a "brand book" to identify

18  them if necessary, until they began to move, at which point he would list those he had not

19  identified as "unidentified."  He did not attempt to move cattle off of USFS land.  Mr. Williams,

20  on the advice of counsel, had not issued any misdemeanor citations for unauthorized grazing,

21  though he believed he was authorized to do so.  He was aware of the CFC Case recognizing a

22  fifty-foot forage right on either side of a ditch.  Exhibit 111, which the Court admitted, indicated

23  the results of three inspections by Mr. Williams. (*See* Gov't's Ex. 111).  On July 29, 2004, he

24  observed an unspecified number of cattle belonging to the Estate and Hage at an unspecified

25  distance from Antone Creek. (*See id.*).  On July 30, 2004, he observed thirty-four cattle

1   belonging to the Estate and two belonging to Hage 150 to 400 feet from Antone Creek. (*See id.*).

2   On August 3, 2004, he observed an unspecified number of cattle belonging to the Estate and

3   Hage in Antone Creek. (*See id.*).  The cattle were not supervised during these observations.  The

4   July 29, July 30, and August 3 observations relate to paragraphs 16(A)–(C) of the FAC,

5   respectively.  Due to the CFC decision recognizing a fifty-foot forage right on either side of an

6   1866 Ditch Act ditch, Mr. Williams did not count cattle that he believed were within fifty feet of

7   the creek.  Mr. Williams confirmed his observations via annotations on Exhibit 23a, Tile Map

8   #1.  Mr. Williams authenticated several dozen exhibits consisting of letters he sent, both to

9   Defendants and to non-parties, notifying the recipients of the unauthorized grazing of their cattle

10  on USFS land.  The Court admitted the exhibits, as well as Exhibit 547, the USFS handbook

11  covering the calculation of grazing fees, and Exhibit 543, the applications from Stone Cabin

12  Ranch, LLC and the Truckee River Ranch, LLC, for permits to graze on the Table Mountain,

13  McKinney, Silver Creek, Meadow Canyon C&H, Monitor Valley East, and Monitor Valley West

14  Allotments, upon which Defendants were allegedly grazing without permits.  Mr. Williams

15  testified as to an August 26, 2004 observation of cattle near Andrews Creek on the Meadow

16  Canyon C&H Allotment,[18] an observation that the Government had not pled in the FAC as a

17  trespass, though it had pled a nearby trespass of eight of the Estate's cattle on August 23, 2004.

18  (*See* First Am. Compl. ¶ 16(K)).  Mr. Williams testified that of the sixteen permit holders within

19  his jurisdiction during his tenure, he never had occasion to complain of, suspend, or cancel

20  permits due to non-use.  Nor did he ever deny priority to a renewal application due to the

21  violation of terms and conditions of a previous permit, though he had experienced violations of

22  the conditions of permits.  He had never suspended or terminated grazing permits for any reason,

23

24  [18]Andrews Creek flows generally westward onto BLM land and eventually onto the Pine Creek
    Ranch.  Appendix A to *Hage IV* indicates that the Hages have vested stock watering and/or
25  irrigation rights in "Andrews Pass Spring." *See Hage v. United States (Hage IV)*, 51 Fed. Cl. 570,
    631 (Fed. Cl. 2002).

1    because he had always received compliance after notifying a permit holder of a violation, at least

2    for the remainder of the applicable year.  He testified that the suspension or cancellation of

3    grazing permits for violations of the terms and conditions was a drastic remedy, but that he

4    believed it was appropriate where a permit holder had not complied after having been notified of

5    a violation and given a period of time within which to comply.  Remedies available to the USFS

6    included a $500 citation for a misdemeanor, a trespass action, or an impoundment of cattle.  On

7    August 9, 2004 and July 17, 2006, respectively, Mr. Williams observed cattle at Round Meadow

8    Canyon and Corcoran Canyon, both of which have creeks running through them.  At Round

9    Meadow Canyon, three cattle belonged to Estate and one to Hage.  At Corcoran Canyon, there

10   were ten cattle belonging to the Estate and three belonging to Hage.  Mr. Williams's observations

11   on these dates are not specified in the FAC.[19]  He testified that he observed some of these cattle

12   approximately 300 feet from Meadow Creek, and that he observed cattle an unspecified distance

13   from Corcoran Creek.  On June 6, 2007, Mr. Williams observed five cattle belonging to the

14   Estate and twenty-seven belonging to Hage in four separate locations in Corcoran Canyon near

15   Corcoran Creek. (*See* Gov't's Exs. 23a, 372).  These observations appear to correspond to

16   paragraph 16(Q) in the FAC.  The cattle were 0 to 100 feet from the water.  Mr. Williams only

17   included those cattle in his numbers that were further than fifty feet from any stream or spring.

18   In other words, the cattle he counted on June 6, 2007 were between 50 to 100 feet from Corcoran

19

20   [19]On the Tile Maps, (*see, e.g.*, Gov't's Ex. 23a), the Government indicates that several such
     observations correspond to paragraph 17 of the FAC.  However, paragraph 17 alleges no

21   trespass, but rather anticipates future trespasses.  Not only has the Court denied leave to amend to
     plead additional trespasses beyond the dates of the trespasses pled in the FAC, but the evidence

22   of unpled instances of trespass presented at trial do not in fact correspond to future trespasses,
     but rather alleged trespasses within the time frame of the FAC that are simply not pled.  The

23   Government noted during Mr. Williams's testimony that the observations labeled "paragraph 17"
     should in fact be labeled "paragraph 16," but they identified no subparagraphs (by which the

24   Government has identified particular trespasses under paragraph 16), and a comparison of the
     dates of the "paragraph 17" trespasses to the dates of the trespasses alleged in the subparagraphs

25   of paragraph 16 results in no matches, except where the Court has already matched and corrected
     the reference in the body of this Order on its own initiative.

Creek. The Court noted that the over twenty observations plotted in the Corcoran Canyon area very closely corresponded to streams in the area. On August 8, 2007, Mr. Williams observed thirteen of Hage's cattle inside a fenced USFS administrative pasture on Meadow Canyon, further than fifty feet from either Meadow Creek or Meadow Spring, which were nearby, as was part of the Pine Creek Ranch itself. (*See* Gov't's Exs. 23a, 114). Mr. Williams noted that the fence was broken in places. This observation appears to correspond to paragraph 16(R) of the FAC. The Government then introduced several dozen reports of trespass observations post-dating the FAC, which the Court admitted for the purpose of proving an ongoing trespass by Defendants. Mr. Williams testified that since April 2008 he had personally observed seventeen instances of trespass by Defendants' cattle onto USFS land through 2011. He had not yet witnessed trespasses in 2012 because it was not yet grazing season, but he believed based on his experience that the trespasses would continue in the absence of an injunction. Mr. Williams used the formulas in the USFS Handbook to calculate trespass damages in this case for the years 2004 through 2008.[20] He based his calculations on only the number of cows he witnessed and only the number of days he witnessed them. He did not assume a cow was there for an entire month, but only for the day he witnessed it. Mr. Williams's calculations are summarized in Exhibit 1225a. The total fees for Hage were $2.51, $3.62, and $6.89 for 2004, 2006, and 2007, respectively, and the total fees for the Estate were $19.05, $2.90, and $1.35 for those respective years. The total fees for both persons was $36.32. These fees represent only unauthorized use fees under E.O. 12548 and Title 36 of the Code of Federal Regulations, but not the actual administrative and management expenses incurred by the USFS, primarily for expenses incurred in making observations. Mr. Williams suspected based upon his expertise that most of the observed cattle probably remained on USFS land for larger periods of time, and perhaps during the entire grazing

---

[20]The Court notes that these calculations may include observations not testified about during trial or which were not pled in the FAC.

1    season, though he only calculated the fees based upon the days he actually observed them.  The

2    Court admitted Exhibit 1225a, not as a measure of damages for trespass under state law, and not

3    to prove that the $4.41 per HM is an authorized charge, but as evidence of how Mr. Williams

4    made his calculation.  The Court also admitted the declaration of Mr. Kyler McCarrel in lieu of

5    testimony, because his testimony would only relate to events later than the time frame of the

6    FAC.

7            On cross examination, Mr. Williams testified that he believed a water rights holder could

8    be made to obtain a permit to access USFS land to use his water rights, but that the USFS would

9    have to issue such a permit, at least to divert the water for use at another location.  He was aware

10    of the CFC's rulings concerning forage rights and the primacy of vested rights over a permit

11    system.  He believed that if the USFS denied a permit to a water rights holder on USFS land, that

12    another grazing permittee might use the water, but that the USFS simply did not purport to

13    regulate water.  Mr. Williams noted that he wasn't sure who at USFS actually calculated the use

14    fees for distribution via interim directives.  He testified that a permittee could cease using an area

15    for personal convenience without losing the permit to graze the area.  He testified that cattle often

16    wander off and that an owner may not know where his cattle are.  He noted that cattle may have

17    more than one brand, and one could not be sure how many brands a cow had or which brand was

18    the latest without seeing all sides of a cow.  Mr. Williams testified as to the growth and usage of

19    grass in various areas.  He testified that a grazing permit is usually issued to a subsequent owner,

20    so long as the new owner meets the requirements to graze as an owner of livestock.  It is possible

21    for a subsequent owner to obtain water rights that run with the land and still not obtain a grazing

22    permit.  It is possible to use water on an allotment without cattle eating forage, for example by

23    diverting the water via a pipe.  The USFS would require an authorization to bring cattle to water

24    in which a person had water rights.  It would be impossible for a cow not to consume some

25    forage if the cow were brought to the water over forage, however.  Mr. Williams knew that the

1    CFC had recognized a fifty-foot forage right on either side of the 1866 Ditch Act ditches.  Mr.

2    Williams had testified at his deposition that despite the right to use water, there was no right to

3    access it, so someone with water rights but no permit from the USFS would have to lower a cow

4    out of the air to use the water, for example, if there were no permit to access it.  The Court

5    admitted the evidence not as evidence of what the law was but as evidence of how the USFS

6    treated private water rights in the absence of a grazing permit.  Mr. Williams noted that cattle

7    might move towards or away from a water source when he approached them to obtain a GPS

8    reading during a range inspection.  He testified that he had sent a letter indicating unauthorized

9    cattle on USFS land to the registrant of a "double-helix" brand, though the allegedly trespassing

10   cattle in that instance also had another brand, and he could not be sure which brand was newer

11   without speaking to the registrants of both brands, though he could estimate which brand was

12   newer.  If a person had been notified of unauthorized use but denied it, the USFS could send

13   them a violation notice and bill.  A USFS officer issuing a violation does not thereby make a

14   final decision, and there is no internal USFS appeal process.  Rather, the USFS must bring a

15   citation before a federal magistrate judge.  Mr. Williams sent a bill in 2005 to Defendants for

16   unauthorized use occurring in 2004.  The amount on the bills was different from the amounts as

17   calculated in Exhibit 1225a, which Mr. Williams had authenticated earlier in the day.  Mr.

18   Williams was not sure if the Hages had any water rights in the administrative pasture on Meadow

19   Canyon.  He testified that he did not know what the director in 1994 aimed to do by suspending

20   all grazing in certain areas for five years except to the extent the then-District Ranger's language

21   was self-explanatory: to allow recovery of the ecology in riparian areas, to allow stream banks to

22   approach 80% stability, and to allow uplands to return to 60% ground cover.

23         On redirect examination, Mr. Williams testified that the amount in the bill for collection

24   he sent to Defendants was higher than the amount in the summary in Exhibit 1225a, because for

25   the bill he used more than one day per cow as a basis for his calculations, whereas in the

summary table he had presumed violations only on the day he actually observed the animals.

### 6.   Day 6 - April 10, 2012

On Day 6, the Government presented three witnesses: (1) Daniel Gallacher, a historian at Historical Research Associates, Inc. in Missoula, Montana; (2) Jeffrey Shinn, a former Tonopah Range Technician; and (3) John Rademacher, a Supervisory Natural Resource Specialist for the BLM, currently employed with the BLM in Oregon.

### a.   Mr. Gallacher

Mr. Gallacher indicated that he had prepared an expert report, Exhibit 1147. The report is about customary range practices in south-central Nevada prior to the TGA and the impact of the TGA on those practices from the Nineteenth Century to 1951. The conclusions therein are his own and were not suggested to him by the Government. He had personally evaluated the non-federal claims in the Monitor Valley Adjudication for the U.S. Department of Justice. He did some research for the CFC Case but was not heavily involved in the case. He testified that the first ranches in the Monitor Valley were established in the 1860s, and the first permanent ranch was probably in 1864 or 1865, i.e., the mining town of Belmont, Nevada. The first patent for land constituting any part of the modern-day Pine Creek Ranch was issued in 1876. These early ranchers permitted their cattle to roam freely. Forage grew in the mountain ranges and in flat areas in valleys. Mr. Gallacher testified that there had been problems with over-grazing on the public domain in the absence of any regulation. He noted that Table 1 on pages 12 and 13 of his report listing cattle, sheep, and other livestock included all of Nye County as it existed at the time, which included present-day Clark County to the south, including Las Vegas and the areas surrounding Mt. Charleston, not just Monitor Valley. He testified as to the conflicts between cattle and sheep ranchers in the 1890s. Mr. Gallacher noted that much of the area was still part of the public domain, and use of the public domain for grazing by cattle and sheep ranchers was essential for their success. There was overgrazing on the public domain, and there was intense

1   competition for grazing.  Some ranchers requested that the Government expand the national

2   forest boundaries in the area to control the situation.  In 1928, some cattlemen purporting to

3   represent all grazing permittees in certain areas, including Nye County, presented a petition to the

4   Government requesting the expansion of the national forest because 300,000 sheep were

5   wintered in the area and owned by people who owned no land in the area.  The petition identified

6   specific areas for the expansion, but Mr. Gallacher was not certain as to whether any portion of

7   Monitor Valley or the current forest lands on either side was identified.  Many addresses of the

8   petitioners, however, were from Tonopah.  The Court denied admission of the exhibit but noted

9   that some permittees in White Pine and Lincoln Counties, in the areas surrounding the Pine

10  Creek Ranch, and in other areas to the north, had made the petition, including some persons from

11  Tonopah in central Nye County.  The Government noted that it was not attempting to show

12  estoppel via the petition, and no party was able to identify any predecessor-in-interest to the Pine

13  Creek Ranch in any case.  Mr. Gallacher noted that only sheep ranchers, not any cattle ranchers,

14  opposed the creation of Grazing District 6 in 1951 pursuant to the TGA.  Mr. Gallacher had read

15  the minutes of all bi-weekly or monthly advisory board meetings from 1946 through the late

16  1950s.  Nothing in the minutes indicated any claim of forage rights attendant to water rights.  The

17  Court admitted Mr. Gallacher's expert report by stipulation, (*see* Gov't's Ex. 1147), though the

18  Court indicated it would not be comfortable admitting the report under *Daubert* if challenged,

19  because of the witness's ambiguous differentiation between primary and secondary or tertiary

20  sources.

21      On cross examination, Mr. Gallacher testified that he did not recall whether any of the

22  Hages' predecessors had purported to transfer grazing rights.

23      **b.     Mr. Shinn**

24      On direct examination, Mr. Shinn testified that he was not a forest ranger but had worked

25  on ranches in day-to-day operations, such as branding and fence mending.  In the present case, he

1   was involved with activities in the Meadow Canyon C&H Allotment between 2002 and 2004.

2   He made six inspection reports on six different days due to unauthorized grazing.  Inspection of

3   cattle involved in authorized grazing consisted of verifying the location of cattle, maintenance of

4   fences, and measuring utilization levels of forage.  For an inspection concerning unauthorized

5   grazing, an inspection focused on the location, identification, counting, and photographing of

6   cattle.  Range inspection reports were kept in "district files," and they did not conform to any

7   particular format.  Inspectors did not attempt to remove cattle from USFS lands.  Cattle were

8   identified by brand using the Nevada Brand Book.  Mr. Shinn conducted an inspection on August

9   7, 2004, apparently corresponding to paragraph 16(D) of the FAC.  (*See* Gov't's Ex. 112).  He

10  observed cattle at Antone Canyon (one group of forty-three and another group of eighty-two) and

11  Round Meadow (one group of three).  He observed cattle with the Estate's brand at all locations

12  and cattle with Hage's brand at the two Antone Canyon locations.  He took GPS measurements

13  variously from within groupings of cattle or from an outside vantage point.  Mr. Shinn testified

14  as to an inspection report he prepared concerning inspection he conducted on August 12, 13, 14,

15  and 15, 2004.  (*See* Gov't's Ex. 116).  The observations on the 13th, 14th, and 15th appear to

16  correspond to paragraphs 16(H)–(J) of the FAC, respectively.  On August 13, 2004, he observed

17  sixty-nine cattle in Antone Canyon, some of which had the Estate's or Hage's brands.  All of

18  these cattle were on hillsides more than fifty feet from any stream.  On August 14, 2004, he

19  observed seventy-three cattle in Andrews Basin, but no brands could be identified.  Later that

20  evening, he observed cattle in Antone Canyon, including ten with the Estate's brand, at an

21  unspecified distance from the nearest water source.  On August 15, 2004, he observed fifty-eight

22  cattle in Antone Canyon, some of which had the Estate's brands, well beyond fifty feet from any

23  stream.  He then observed forty-five cattle in Andrews Basin, including six belonging to the

24  Estate, at an unspecified distance from the nearest water source.  On August 23, 2004, Mr. Shinn

25  conducted another inspection in the Andrews Basin.  (*See* Gov't's Ex. 354).  He observed eight

cattle with the Estate's brand, more than fifty feet from any stream.  This observation appears to correspond to paragraph 16(K) of the FAC.  The cattle were not supervised.[21]

On cross examination, Mr. Shinn testified that "unauthorized use" meant grazing by cattle on USFS land where the owner of the cattle had no permit therefor.  It included the presence of cattle on USFS land near water sources in which the owner had a stock watering right.  He testified that water in water troughs he had noticed in Antone Canyon was coming from Antone Creek, which was nearby.

### c.    Mr. Rademacher

On direct examination, Mr. Rademacher testified that he had worked for the Park Service in Nevada since 1997 and on the Humboldt-Toiyabe National Forest from 2004 to 2008.  He had personally conducted rangeland inspections.  If he witnessed unauthorized grazing, he would identify the cattle by brand using the Nevada Brand Book and note the location by GPS or map.  He had performed inspections in Meadow Canyon.  He typically took GPS readings from the center of a grouping of livestock or sometimes from the edge of the grouping.  Exhibit 368 is a range inspection report indicating the results of inspections Mr. Rademacher and his colleagues conducted on June 28, June 29, and July 7, 2006, the first two of which correspond to no allegations in the FAC, but the latter of which corresponds to paragraph 16(P) of the FAC.  On July 7, 2006, Hage told Rademacher that the cattle in Corcoran Canyon were his after Mr. Rademacher had seen ranchers moving cattle from BLM land to the Pine Creek Ranch.  Mr. Rademacher later observed eleven cattle with Hage's brand in Corcoran Canyon up to 100 feet from Corcoran Creek.  There was heavy forage use in the area (60–80%).  In Andrews Basin, Rademacher observed five cattle with Hage's brand between twenty and sixty feet from Corcoran Creek.  Mr. Rademacher counted all cattle, no matter how close to a water source, and it is

---

[21]Unless otherwise noted in this Order, the witnesses have uniformly indicated that the cattle they observed were unsupervised.  Also, all of Mr. Shinn's observations were within the Meadow Canyon C&H Allotment.

1    possible Mr. Rademacher counted some cows twice, because the groupings were close to one

2    another.  The Court admitted Exhibit 368.  Mr. Rademacher also testified as to aerial inspections

3    he conducted. (*See* Gov't's Exs. 370, 373).  No identification of the cattle was made during these

4    inspections.  Exhibit 113 is an inspection report for an inspection made on July 21, 2006, which

5    date corresponds to no allegation in the FAC.

6          On cross examination, Mr. Rademacher testified concerning the techniques he used to

7    approach cattle to identify brands without "spooking" the cattle.  He confirmed that he was flying

8    at 500 feet or higher during aerial inspections, and that he could not identify brands from that

9    altitude.  He noted that forage utilization in some areas about which he testified was very light.

10                    **7.      Day 7 - April 11, 2012**

11         On Day 7, the Government presented two witnesses: (1) Lance Brown, a former Tonopah

12   Range Technician for the USFS; (2) and James Diez, a Range Technician at the BLM Tonopah

13   Field Office.

14                    **a.      Mr. Brown**

15         Mr. Brown testified that he worked in the Austin and Tonopah Ranger Districts in

16   Nevada from 2002 to 2006.  He was familiar with the Meadow Canyon C&H Allotment and had

17   visited it between fifteen and twenty times.  He had conducted approximately five unauthorized

18   grazing inspections in his eighteen-year career with the USFS.  He explained the methods of his

19   inspections, such as locating cattle, counting them, and identifying their brands.  He had made

20   two range inspections on the Meadow Canyon C&H Allotment.  While performing other work on

21   the allotment in July 2004, he noticed cattle on the allotment, which he knew was improper

22   because the allotment was supposed to be "vacant."  Exhibit 109 was the inspection report from

23   this observation on July 29, 2004.  This date corresponds to subparagraph 16(A) of the FAC, but

24   Mr. Williams had already testified about an observation corresponding to that date.  The number

25   and location of cattle (total of 118 in Antone Canyon) and brand registration (the Estate, Hage,

1  and others) indicated in Mr. Brown's report corresponded to paragraph 16(A). Upon further

2  examination, Mr. Williams's report only relayed the alleged July 29, 2004 trespass as a hearsay

3  declaration of Mr. Brown. (*See* Gov't's Ex. 111). Mr. Brown's direct testimony and report,

4  however, (*see* Gov't's Ex. 109), confirmed the information in Mr. Williams's report. Mr. Brown

5  did not testify as to the distance of the cattle from any water sources, nor does his report indicate

6  any distance, though the map annotations indicate the two groups of cattle observed were directly

7  along the north and south forks of Antone Creek, respectively. (*See* Gov't's Ex. 23a). Mr. Brown

8  also testified as to an inspection on August 3, 2004. (*See* Gov't's Ex. 110). This observation

9  corresponds to subparagraph 16(C) of the FAC. Again, Mr. Williams's report only relayed the

10  information concerning this alleged trespass via Mr. Brown's hearsay declaration. (*See* Gov't's

11  Ex. 111). Mr. Brown observed eight cattle with the Estate's brand, and one with Hage's brand,

12  on August 3, 2004, at unspecified distances from any water sources. (*See* Gov't's Ex. 110).

13        On cross examination, Mr. Brown testified that there was no standard protocol for range

14  inspections concerning unauthorized grazing. He noted that the cattle he witnessed were from

15  very close to the road he was on at the time to up to a quarter of a mile away. He testified that he

16  did not use a GPS to record locations. He used the odometer on his truck to estimate locations

17  on the map. He did not testify as to having used resection or any other traditional map-reading

18  technique to determine his locations on the map or as a starting point for his odometer readings,

19  but only that he used his odometer.

20        **b.**    **Mr. Diez**

21        The Government noted that Mr. Diez was the only BLM witness who could testify as to

22  alleged trespasses during the time frame of the FAC. Mr. Diez testified that he had been with the

23  BLM in Tonopah for ten years and had been a ranch hand since high school, first on an Indian

24  ranch in California, then on his relatives' ranch in Kansas, then on a ranch in Colorado. He was

25  also a Vietnam War veteran and had worked as a longshoreman, welder, and U.S. Customs

1   inspector.  He had learned map-reading and land navigation skills as an infantryman.  Mr. Diez

2   conducted range inspections on the BLM's Ralston and Monitor Allotments.  Exhibit 695 was a

3   July 29, 2011 report Mr. Diez prepared with photographic documentation of improvements made

4   by the Hages on the Ralston and Monitor Allotments, such as well pumps, pipelines, troughs,

5   water tanks, etc.  The Court admitted the exhibit.  Exhibit 1141 was a map with the

6   improvements plotted thereupon.  The Court admitted the exhibit.  Mr. Diez testified as to having

7   taken the approximately fifty photographs of various improvements.  He testified as to whether

8   he had seen certain wells in use, i.e., whether the pump was on, there was water in any tanks or

9   nearby troughs, or cattle were actually present and drinking.[22]  He testified that he did not know if

10  the mandated issuance of permits to the Hages consistent with the permits they previously held

11  would result in damage to the range.  He was aware that the BLM had alleged that the Hages

12  were grazing in those areas without a permit in any case.  He had noticed some damage to the

13  range in the Monitor Allotment and in parts of the Ralston Allotment.  Mr. Diez testified as to

14  Exhibit 1248, a livestock count of sixteen of the Estate's cattle, and Exhibit 108, a report called a

15  "Conversation Record," indicating that on January 5, 2004, an unspecified number of twenty-

16  eight cattle with the Estate's brand were on the Ralston Allotment without permission.  Mr. Diez

17  testified that the nearest water source was Henry's Well, approximately one to one-and-a-half

18  _____

19  [22]Although the Government insisted on presenting this evidence for the purpose of "background"
    and took two hours to do so despite the Court's admonition to be expeditious and to focus on
20  observations of unauthorized grazing in light of the Government's recent revelation of its failure
    accurately to estimate the number of days required to present its case-in-chief, the Court notes
21  that the conditions of these wells and other improvements, and their usage (or non-use), is simply
    not relevant to the trespass allegations before the Court.  An adjudication of Defendants' water
22  rights is not at issue in the present case.  Neither the FAC nor the Counterclaim include any
    claims for the determination of water rights.  Also, Mr. Diez's testimony as to the conditions of
23  these improvements was given completely separately from his later testimony as to observations
    of unauthorized grazing by Defendants' cattle.  Counsel for the Government argued that the
24  Hages had been maintaining some of these improvements and seeding grass in some areas
    despite not having permission to do so, though counsel admitted the FAC did not plead such
25  trespasses or violations.  The Court noted that such claims were not before the Court nor helpful
    to determining the trespass claims that were before the Court.

1    miles to the southeast, although the map, (*see* Gov't Ex. 19), indicates an intermittent stream

2    directly adjacent to the observation.  This observation corresponds to subparagraph 14(A) of the

3    FAC.  Exhibit 19 is the tile map of the area of the trespasses Mr. Diez observed.  The Court

4    admitted several dozen exhibits containing Mr. Diez's reports and observations, including

5    several notices of trespass admitted for the purposes of showing they were sent and that the

6    allegations therein were made.  Mr. Diez testified that the "hard pan" area of the Ralston

7    Allotment was in the southeast pasture of the Ralston Allotment, south-by-southeast of Tonapah

8    and south of the southern terminus of the Table Mountain Range.  The area was a flat "salt bed"

9    upon which water would accumulate in "a series of mud puddles" after precipitation.  It was not

10   an open area of standing water.  Mr. Diez testified as to a "Certificate of Livestock Count"

11   ("CLC") he filled out pursuant to an inspection he performed on January 13, 2004, (*see* Gov't

12   Ex. 894), indicating eighty-eight cattle observed on the Ralston Allotment, including some

13   branded to the Estate.  This observation corresponds to subparagraph 14(B) of the FAC.  The

14   closest water source was the terminal trough of the Baxter Spring Pipeline, although it appears

15   from the map that the closest water source is Henry's Well, several miles away, and that there are

16   intermittent streams in the area several hundred feet from the cattle observation.  Exhibit 703 was

17   a CLC Mr. Diez had completed on January 28, 2004, indicating twenty-four cattle branded to the

18   Estate in the Ralston Allotment.  There are nearby intermittent streams, but well over fifty feet

19   from the observation.  This observation corresponds to subparagraph 14(C) of the FAC.  Mr.

20   Diez testified as to a CLC created on February 24, 2004 based upon observations made on

21   February 19, 2004, and this corresponds to subparagraph 14(D) of the FAC.  Ten cattle branded

22   to the Estate were on the Ralston Allotment in the Baxter Spring area, an unspecified distance

23   from Baxter Spring though clearly further than fifty feet from the spring or the pipeline based

24   upon the map, but adjacent to intermittent streams.  During this observation, Mr. Diez was

25   closely followed by E. Wayne Hage and a female passenger during the inspection.  Because he

1   felt intimidated, a law enforcement officer was later assigned to accompany Mr. Diez on

2   subsequent investigations.  Mr. Diez testified as to an April 5, 2004 CLC he created

3   corresponding to subparagraph 14(E) of the FAC.  During this inspection, he observed three

4   cattle branded to the Estate on the Ralston Allotment immediately adjacent to "Middle Baxter,"

5   which appears to be a reservoir along the Baxter Spring Pipeline where the pipeline changes

6   directions.  Exhibit 164a was a CLC indicating fourteen cattle branded to the Estate observed on

7   the Ralston Allotment on November 14, 2005, and corresponding to subparagraph 14(O) of the

8   FAC.  Exhibit 886 was a CLC indicating several cattle branded to the Estate and Hage observed

9   on the Ralston Allotment on January 17, 2006, and corresponding to subparagraph 14(Q) of the

10  FAC.  Mr. Diez had observed over 100 unauthorized cattle on the Ralston Allotment in 2012.

11  Mr. Diez testified that if an animal had more than one brand, he would indicate the "freshest"

12  brand first, and this indicated that the registrant of the brand listed first had purchased the animal

13  from the other brand registrant.[23]  Mr. Diez testified that damage would in fact occur to the range

14  if the Court ordered the Hages to take their water and sell it elsewhere, for example, and not to

15  use it on the range, and that the land would not be damaged and the BLM's ability to manage the

16  land would not be harmed if the Court ordered the BLM to issue permits for the Hages to graze

17  commensurate with permits the Hages previously possessed.  He also testified that ordering or

18  permitting a seeding requirement in such permits would be helpful to the range.  He testified that

19  the land was better off with grazing thereupon than completely barren of use.

20       On cross examination, Mr. Diez testified as to his inspection, note-taking, and filing

21  practices.  He did not keep his handwritten notes after transcribing them to a CLC or other

22  inspection report.  When making inspections, no one had ever specifically ordered him to note

23  _____

24  [23]At this point, counsel noted that certain marks on the maps referring to paragraph 15 should in fact refer to paragraph 14. The Court notes that this does not amend the Complaint. *See supra* note 17.  The Court will consider specific observations beyond the scope of the FAC, not

25  to prove individual instances of trespass not pled, but to show continuing trespass for the purposes of injunctive relief.

1   the distance to any water sources.  He noted that he would typically only visit remote wells once

2   a year and would not know if they were in operation when he was not there.  He testified that a

3   "mud puddle" after precipitation in the "hard pan" area could vary from six feet to more than 500

4   feet in diameter.  Mr. Diez considered any animal on an allotment to be in trespass if there was

5   no privately owned land in the area.  He noted that he did not report brands on an animal unless

6   he was sure there were no additional brands on the animal that he could not see.  He testified that

7   he had only recently seen the observations he took between 2004 and 2008 plotted on maps.  He

8   testified that a Mr. Gary Snow had been given a permit on the Ralston Allotment to graze with

9   the condition that he haul his own water in for use of his cattle.

10          On redirect examination, Mr. Diez testified that only one of his observations between

11   2004 and 2008 concerned cattle on private land.

12          On re-cross examination, Mr. Diez testified that there was no way to ensure that cattle

13   drink only from certain water, such as the water that Mr. Snow had brought in.  He also testified

14   that crested wheat does not grow as well if not grazed and might tend to die off.

15          **8.     Day 8 - April 12, 2012**

16          On Day 8, the Government presented two witnesses: (1) Thomas J. Seley, Field Manager

17   of the BLM Tonopah Field Office; and (2) Marc Pointel, Rangeland Management Specialist at

18   the Tonopah Field Office of the BLM.

19          **a.     Mr. Seley**

20          On direct examination, Mr. Seley testified that he personally knew Hage and other

21   members of the Hage family but had never met E. Wayne Hage.  He was responsible for

22   managing the BLM lands in the area, e.g., the Ralston and Monitor Allotments.  He was an Air

23   Force veteran who had worked for the BLM, then moved to the USFS from 2004 to 2005, then

24   moved back to the BLM in Battle Mountain, Nevada in 2005.  He moved to Tonopah on or about

25   August 17, 2007.  He spent approximately 20% of his time on grazing issues.  He supervised Mr.

1   Marc Pointel, who worked on grazing issues.  He became familiar with the Hages' file when he

2   moved to the Tonopah office.  Exhibit 576 included E. Wayne Hage's ten-year grazing permit for

3   the Ralston and Monitor Allotments that expired on February 28, 1993.  E. Wayne Hage's June

4   14, 1978 grazing application was also attached to the exhibit.  The application included a column

5   where the applicant could apply for a permit in "non-use" status, meaning a person would receive

6   a permit but would purposefully not graze in that particular area for the time being.  E. Wayne

7   Hage had applied for non-use permits in some areas.  Under the regulations, non-use for more

8   than two years could result in revocation of the relevant portion of the permit.  The regulations

9   are designed to ensure enough grazing on the land to keep the forage healthy.  Exhibit 1266 was a

10  document with which Mr. Seley was familiar from the Hage permit file.  It was the offer of a new

11  permit to E. Wayne Hage for March 1, 1993 though February 28, 2003 in the Ralston and

12  Monitor Allotments.  The terms were identical to those of the previous permit.  E. Wayne Hage

13  returned the application signed, with the following additional language typed below his

14  signature: "without prejudice UCC 1-207."[24]  The BLM considered that he had not accepted the

15  terms and conditions of the offered permit because of the additional language.  Mr. Seley noted

16  that he was aware of no authority giving the BLM the right to deny an application if signed

17  "under protest," for example, and he had no direct knowledge of why the BLM denied the

18  application.  Exhibit 1251 was an April 21, 1997 "Notice of Proposed Decision" to E. Wayne

19  Hage from the BLM concerning another proposed ten-year permit.  Page three of the letter

20  indicated that the BLM had not received any response concerning the proposed terms and

21

22  [24]UCC 1-207(1) is the provision of the Uniform Commercial Code that reads "A party who, with explicit reservation of rights, performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved.

23  Such words as 'without prejudice', 'under protest' or the like are sufficient."  The Court notes that this language is totally irrelevant to the terms of the permit and creates no conditions

24  thereupon, because the UCC applies only to the sale of goods, not to services or licenses to use real property.  A grazing permit is not the sale of goods.  In summary, the additional text was a

25  nonsensical "inkblot" on the permit application creating no additional conditions or rights for either party and providing no legitimate basis for rejecting it.

1   conditions of the new permit.[25]  Exhibit 1999 was a May 6, 1997 letter from E. Wayne Hage's

2   counsel to the BLM as a "protest" of the proposed decision.  The letter also argued that a protest

3   directly to the BLM was futile, so the Hages would pursue their remedies through the CFC.

4   Exhibit 1237 was the May 16, 1997 "final decision" by the BLM, indicating that the BLM did

5   not consider the May 6, 1997 letter to constitute a protest, and that no permit would be issued to

6   E. Wayne Hage to graze on the Ralston and Monitor Allotments.  The BLM cited 43 C.F.R.

7   § 4130.2(f), which simply states that a permit is not valid unless signed by both the BLM and the

8   permittee.  It is undisputed that both the BLM and E. Wayne Hage had signed the offer of a

9   renewal permit shown in Exhibit 1266, but the Government contends that the BLM had not

10  signed it, because it did not sign it with the additional language.  Mr. Seley testified that he had

11  issued notices of trespass to both Defendants on December 10, 2007 for unauthorized grazing on

12  the Ralston Allotments. (*See* Gov't's Exs. 170, 518).  Those notices do not specify the dates of

13  trespass.  Wayne N. Hage responded with a letter claiming ownership of the Ralston and Monitor

14  Allotments by himself and the Estate as part of the Pine Creek Ranch and indicating his

15  responsibility for the cattle allegedly trespassing in the Ralston and Monitor Allotments.

16  (*See* Gov't's Ex. 410).  Mr. Seley testified that he had sent further notices and had received

17  additional similar responses. (*See, e.g.*, Gov't's Ex. 420).  Exhibit 48 was an August 19, 2009

18  letter from the BLM to Mr. Gary Snow indicating it would not be renewing any grazing permits

19  for the Ralston Allotment because of over use by unauthorized cattle in some areas and non-use

20  in other areas.  The BLM recommended that Mr. Snow withdraw his grazing permit application.

21  On October 6, 2009, Mr. Seley issued a decision to Hage cancelling the grazing preferences and

22  range improvement permits on the Ralston, Monitor, and Silver King Allotments. (*See* Gov't's

23

24  [25]The office had received no response to an October 1996 letter it sent E. Wayne Hage proposing
    the conditions of a new permit; however, it is undisputed that E. Wayne Hage responded to the
25  original 1993 offer of a new permit, so the broader claim that he never responded to the proposed
    ten-year renewal of his permit is flatly incorrect.

1    Ex. 162).  The letter indicated it would not take effect for thirty days, during which time Hage

2    could appeal.  Mr. Seley made the decision due to the continuous trespasses on the allotments

3    and the fact that despite E. Wayne Hage's death, Hage had not applied to have the permits

4    transferred to himself or to the Estate. (*See id.*).  Hage engaged a Mr. Hoffman to pursue an

5    appeal on behalf of the Estate, (*see* Gov't's Ex. 161), but Mr. Hoffman withdrew the appeal

6    before it was decided, (*see* Gov't's Ex. 472).  Mr. Seley testified that the United States had title

7    to the range improvements a permittee was permitted to construct, and that he had ordered Mr.

8    Hage to remove range improvements but he had not done so.  Mr. Seley had not taken further

9    action or attempted to remove them himself because he saw no value in doing so.  He testified as

10   to cooperative agreements between the BLM and private parties for range improvements, which

11   agreements include a provision that the BLM may order termination and removal of

12   improvements.  Termination required consent or due notice in writing of a violation of the

13   agreement.  Mr. Seley informed his staff to charge fines for unauthorized grazing according to

14   the regulations.  He would not seek damages if the cattle had drifted onto BLM land naturally

15   with no willful trespass but would seek damages if the trespass was willful based upon

16   intransigence of the owner after having been notified of the unauthorized presence of his cattle.

17   The BLM received annual "instruction memorandum[s]" similar to the interim directives issued

18   to local USFS offices indicating the amounts to charge under the regulation for unauthorized

19   grazing.  Exhibit 1140 contained instruction memoranda for 2004 through 2012, as well as a

20   summary table of the information therein.  The BLM appears to classify infractions as

21   "nonwillful unauthorized grazing," "willful unauthorized grazing," and "repeated willful

22   unauthorized grazing."  The Hages' cattle were classed into the third category.[26]  Mr. Seley

23

24   [26]The unauthorized use rates are double and triple, respectively, under 43 C.F.R. § 4150.3 (2005)
     for willful and repeated willful use than for nonwillful use, indicating a penalty component,

25   which cannot be part of state law trespass damages absent fraud, oppression, or malice. *See* Nev.
     Rev. Stat. § 42.005.

1   testified that an order requiring unlimited grazing use near water sites could result in damage

2   through overgrazing, but it would not be detrimental if the BLM could set limitations that users

3   respected.  The Court admitted several dozen notices of trespass by stipulation.

4          On cross examination, Mr. Seley confirmed his testimony that the BLM had not received

5   a response to its letter to Hage dated October 11, 1996 (*See* Gov't's Ex. 1250; *see also*

6   *supra* note 23).  Defendants' Exhibit 1997 was a letter from the Hages to Field Station Manager

7   Ron Huntsinger at the Tonopah BLM dated October 22, 1996, but Mr. Seley did not recall

8   having seen the latter in the Hages' file. (*See* Defs.' Ex. 1997).  The letter contained a "received"

9   stamp dated October 23, 1996 by the "Tonopah Field Station." (*See id.*).  The letter indicated that

10  the CFC Case was pending and that the Hages did not care to communicate with the BLM except

11  through counsel.[27]  Mr. Seley testified that if a person whose brand was observed on cattle

12  indicated that the cattle were under the control of another, he would still hold the brand registrant

13  liable for any trespass of that cattle in the absence of anything more than a verbal claim of lack of

14  control.  He testified that the estate of a permit holder had two years from the decedent's death to

15  apply for transfer of the permit to the estate under the regulations.  He testified that the BLM

16  would not grant a permit to a person it believed to be in trespass, and that there was therefore

17  "not a very high likelihood" the BLM would have granted a permit to Hage during the pendency

18  of the CFC Case.  Defendants' Exhibit 2693 was a November 8, 2011 letter from the Tonopah

19  Field Office of the BLM to a district-wide mailing list, soliciting applications to graze on the

20  Ralston Allotment.  The mailing list for the letter included all current District NV6 permittees,

21  whether or not the permittee owned lands adjacent to the Ralston Allotment.  Most persons on

22  the list did not have such property.  Mr. Seley testified that he had been made aware via an

23

24  [27]The letter is good evidence that the Hages did in fact respond to the October 11, 1996 letter to
    them from the BLM, contrary to the assertions of the BLM in its April 21, 1997 "Notice of
25  Proposed Decision."  The Hages requested the BLM to direct their communications to counsel in
    light of the pending litigation in the CFC.

1  August 2010 letter by Mr. Gary Snow that Mr. Snow indented to file for water rights within the

2  Ralston Allotment with the State Engineer.  He testified that after a trespass notice, he would

3  send a "trespass decision and demand for payment."  He had sent approximately nine of these,

4  and two or three recipients of such demands had paid them.  He had also received "a couple"

5  protests to such demands.  He had sent one such demand to a Mr. Dirk Pearson (phonetic), which

6  the parties settled for approximately $15,000.  He testified that in some areas, elk used a

7  significant portion of the forage.  He recalled having received responses to trespass notices from

8  the Hages and others denying that they were in trespass.

9          **b.     Mr. Pointel**

10         On direct examination, Mr. Pointel testified that he spent approximately half his time on

11 unauthorized grazing issues.  There were currently nineteen grazing permittees in the Tonopah

12 Field Office, but there had never been more than twenty-one during his tenure.  He maintained

13 spreadsheets for unauthorized use, including for the Hages' cattle.  He used these spreadsheets to

14 calculate fees and costs, and he used the instructional memorandums from the BLM's

15 Washington, D.C. office to determine the fees.  The Court refused to admit Exhibit 1140 as a

16 basis for proving damages under Nevada trespass law, *see supra* note 24, or as a basis for the

17 BLM charging fees after the expiration of 43 U.S.C. § 1905 in 1986, *see supra* note 12.  Mr.

18 Pointel testified as to the costs of dealing with unauthorized grazing, including fuel and other

19 costs incurred during inspections, such as the milage cost for the day and the prorated cost of the

20 vehicle itself for a day.  He testified that these costs were specified by BLM regulations. *See* 43

21 C.F.R. § 4150.3.[28]

22         On cross examination, Mr. Pointel testified that he did not have any idea what the fair

23 market value of the forage was but rather based his fees upon the instructional memoranda

24 ────────────────

25 [28]An examination of that regulation indicates that only one, two, or three times the value of the
   forage itself is authorized as a fee, not incidental damages.  *See id.*  The Court denied the
   admission of relevant evidence based thereupon.

1    received from Washington, D.C.

2          **9.    Day 9 - April 13, 2012**

3          On Day 9, the Government presented four witnesses: (1) adverse witness Irvin Dale

4    Plank, a ranch hand from Eureka, Nevada; (2) Mr. Pointel; (3) Mr. Raymond E. Kretschmer, a

5    rancher from Round Mountain, Nevada; and (4) Defendant Wayne N. Hage, owner/operator of

6    the Pine Creek Ranch and administrator of the Estate of E. Wayne Hage.

7          **a.    Mr. Plank**

8          On direct examination, Mr. Plank testified that he had worked at the Pine Creek Ranch in

9    2003–2004 and 2008–2010.  He had herded cattle by horseback for Hage.  He had not worked

10   directly for E. Wayne Hage.  He had also owned fifty to sixty cattle himself and had first bought

11   fourteen cattle in November 2007.  He had placed these cattle at the Pine Creek Well in an open

12   area east of Tonopah on the Ralston Allotment until May 2008, when they were moved north

13   across Highway 6 to near the Cornell Well (phonetic) in Rye Patch.  At this time he owned

14   approximately fifty cattle.  His brand was the "open A seven," consisting of a capital letter "A"

15   without the cross stroke, with a number "7" to the right of the "A."  He could not recall exactly

16   how many other cattle were with his cattle, but there were cattle belonging to others in the herd.

17   Cattlemen tended to the cattle at the Pine Creek Well once every three to four days during the

18   winter of 2007–2008.  Later, Mr. Plank moved the cattle to Henry's Well, an open, unfenced area

19   where they remained for two weeks until late May or early June, during which time nobody

20   tended them.  At Henry's Well, there were several hundred total cattle in the herd.  Mr. Plank

21   then moved the cattle to Baxter Spring Pipeline, an open area, where the cattle remained for two

22   weeks without supervision.  Mr. Plank then moved the cattle to the Spanish Spring Pipeline, an

23   open area, where they remained for two weeks without supervision.  Mr. Plank then moved the

24   cattle to Combination Springs, an open area, where they remained for two weeks without

25   supervision.  Mr. Plank then moved the cattle to Stonehouse Field to the north, after which a part

of the herd (more than fifty cattle), including some of Mr. Plank's cattle, were moved into

Corcoran Canyon, an open range.  There was no effort to segregate the cattle by brand.  Mr.

Plank, Mr. Hage, and two other persons owned cattle in the herd.  The remainder of the herd was

moved to the Pine Creek Ranch.  At this point it was mid-July.  The Corcoran Canyon herd

remained there for ten days without daily supervision, after which they were moved to Andrews

Basin, an open range, where they remained for approximately one month without supervision.  In

mid- or late-August, he moved the herd to a fenced-in pasture near Soldier Springs and Pipe

Organ Springs in Meadow Canyon, approximately four miles away.  Some cattle had wandered

this distance on their own since left at Andrews Basin.  They remained in that fenced-in pasture

unsupervised, after which they were moved in mid-October to Stonehouse Fields, where they

remained for one to two days before being brought to the Pine Creek Ranch headquarters.  The

portion of the herd that had been brought to the Pine Creek Ranch when the herd was split

remained there for one month before being moved to Mosquito Creek, which is on private Pine

Creek Ranch land, where they remained for several weeks.  Mr. Plank then moved the cattle to

open range on Table Mountain (USFS land) with Hage and another person, where they remained

unsupervised until mid-October, after which they were returned to Mosquito Creek for one to

two weeks before being returned to Pine Creek Ranch headquarters.  The entire herd then

remained at the ranch until mid-November, after which the herd was moved to Stonehouse Field.

After several days, the herd was moved to Combination Springs, where they remained for one

night before being moved to Silver Creek Well south of Belmont.  They remained there for one

night, then stayed at Stewart Springs for one night, both BLM lands, then to Spanish Springs and

Baxter Springs for a week, then to San Antone Well and Henry's Well for a week.  The cattle

were not supervised at night during these movements, and these areas were all open range.  The

cattle were then moved to Graham Homestead just north of Rye Patch, which is private, fenced-

in pasture, where they stayed for one night.  Then the herd was moved to Cornell Well for one

1    night, after which they were moved to Highway Well just south of Highway 6.  Thereafter, Mr.

2    Plank was no longer involved in moving the herd.  Mr. Plank had never applied for or held any

3    federal grazing permits.  He realized that some of the lands in the area were "allegedly" federally

4    owned.  While grazing, the cattle under his charge wandered one to two miles from water

5    sources.  He and Hage had placed "supplement" (supplemental minerals and salt for cattle) near

6    some of the wells.  Neither he nor any other ranchers made any effort to keep cattle within fifty

7    feet or any particular distance from water sources.  Hage paid Mr. Plank $180 per year per head

8    of Mr. Plank's cattle in the herd, Mr. Plank would retain the adult animals after the lease term,

9    and Mr. Hage would retain the proceeds of the eventual sale of any calves born to the cattle

10   during the term of the lease.  Exhibit 1253 was a signed lease agreement between Messrs. Plank

11   and Hage.  The agreement was to run for six years beginning in 2007, but the parties had

12   terminated the agreement in November of 2010 because of "different opportunities" that had

13   arisen for Mr. Plank.  Hage had sold between 100–200 calves born to Mr. Plank's cattle during

14   the term of the contract.  Hage managed the cattle under the agreement and was totally

15   responsible for them, and Mr. Plank's cattle were always kept within a larger herd.  He believed

16   that Hage would therefore be liable for any trespass damages.  The rotation of the herd described

17   above was an annual pattern followed by Hage.  Mr. Plank could not recall if he had given a copy

18   of the lease agreement to the BLM or the USFS before his deposition.  Exhibit 1254 was a letter

19   sent to Mr. Plank from the USFS, dated August 7, 2008, indicating that on August 5, 2008, Mr.

20   Plank had some of his cattle on USFS land.  Mr. Plank testified that Hage had put the cattle there.

21   He had received other similar letters from the USFS and the BLM but had never removed his

22   cattle because they were under Hage's care.  Mr. Plank responded to a similar letter from the

23   BLM dated November 9, 2009, (*see* Gov't's Ex. 1257), but had not paid any fines as claimed and

24   did not remove his cattle because they were under Hage's care.  He and Hage had sent a

25   December 7, 2009 letter to Mr. Seley at the BLM to indicate that Hage was in control of the

1 cattle.

2       On cross examination, Mr. Plank testified that he had maintained not only field fences but

3 also allotment-boundary fences to keep cattle in the proper allotment.  He testified that a rancher

4 could not change a cow's nature as to wandering.  He testified that the BLM had demanded

5 payments of $9000 and $5000 for trespass and that a debt collection agency was still attempting

6 to collect the money, with interest.  These demands for payment played no role in his leaving

7 Pine Creek Ranch.  He testified that the movements described on direct examination above was a

8 normal practice of driving cattle from water source to water source based upon his work on other

9 ranches, that to his knowledge the Hages had water rights in all the water sources noted, and that

10 he would not move cattle to a water source in which the owners had no water rights.  He testified

11 that cattle could be driven twelve miles a day without calves present.  A cow left at a water

12 source would only be expected to wander two to three miles if there were no other water source

13 in the area.  They may wander away looking for another water source, grass, or minerals.  Cows

14 remember where they have seen water and can smell water and nearby vegetation.  Cows could

15 remain away from water for two to three days.  He did not know how much they drank per day.

16 Cattle cannot be kept from drifting without active supervision or fences.  Cattle, while being

17 driven near a stream or ditch, will take the easiest route for walking, as on any other drive.

18 Customarily, cattle could be kept within several hundred feet of a ditch, maybe within 300–500

19 feet without stressing the cattle by forcing them to take uncomfortable routes, but the distance

20 would vary based upon the terrain.

21       On redirect examination, Mr. Plank testified that a trespass notice he had received from

22 the BLM referred to appeal provisions.  The Court noted that even if Mr. Plank had not appealed

23 formally, he and Hage had jointly notified the BLM of the fact that Hage was in control of his

24 cattle, and that this constituted an appeal in substance if not in form, despite Mr. Plank's later

25 letter of intent not to formally appeal, which letter again attacked the substantive basis of the

1  BLM's decision to charge him with trespass.  The Government noted that it was seeking in the

2  present case to hold Hage liable for the alleged trespass of Mr. Plank's cattle based upon the

3  agreement between them despite having referred the alleged trespass of Mr. Plank's cattle to the

4  Treasury Department for collection because Mr. Plank had not provided a copy of the

5  agreement.[29]

6  **b.  Mr. Pointel**

7  On redirect examination, Mr. Pointel testified that he had created several thousand

8  grazing bills for the BLM on the basis of AUM.  The cost of authorized grazing use in the areas

9  for which Defendants were alleged to have engaged in unauthorized grazing on the Ralston and

10  Monitor allotments between January 1, 2004 and April 10, 2008 (the scope of the FAC) would

11  have been $76,150.26, based upon the AUMs offered to E. Wayne Hage in the proposed renewal

12  permit in 1993, minus the suspended AUMs (because suspended AUMs are never billed).  Using

13  the AUMs authorized pursuant to the permit in place between 1983 and 1993, the cost of

14  authorized grazing use in the areas for which Defendants were alleged to have engaged in

15  unauthorized grazing on the Ralston and Monitor allotments between January 1, 2004 and April

16  10, 2008 (the scope of the FAC) would have been $82,899.39.  The Court admitted Exhibits

17  1279 (1983–1993 permit-based calculations) and 1280 (renewal permit offer-based calculations)

18  and noted that the latter calculation was probably a more accurate measure of trespass damages,

19  assuming a trespass.

20  On re-cross examination, Mr. Pointel testified that his calculations did not consider the

21  number of cattle for which the Government actually alleged a trespass in the FAC, i.e., as he

22  noted on redirect examination, he had assumed constant trespass by the total number of AUMs

23  _____

24  [29]It therefore appears that the Government is attempting to charge Plank for trespass via the notices and demands for payment sent to him personally, and also attempting to charge Hage with the same trespasses through the present action.  The Court finds that any trespass resulting

25  in demands for payment against Plank or others that were not withdrawn before the filing of the FAC cannot be at issue in the present case.

1   for which the Hages had held or been offered a permit for grazing, minus suspended AUMs.  The

2   calculations did not include AUMs allocated to any other person besides E. Wayne Hage.

3          c.      Mr. Kretschmer

4          On direct examination, Mr. Kretschmer testified that he lived in Round Mountain,

5   Nevada in Smokey Valley approximately sixty miles from the Pine Creek Ranch and had lived in

6   Tonopah since 1949.  He had a ranch in Peavine Valley.  He had owned livestock in the past but

7   leased them to Hage approximately eight years ago and eventually sold them.  The lease was

8   from 2002 to 2011.  He had owned between forty to over 100 cattle during this time frame.  He

9   had never had a BLM or USFS grazing permit and believed Hage may have put some of his

10  cattle onto BLM or USFS land.  He had also been a part time brand inspector with the Nevada

11  Department of Agriculture since 2004.  His agreement with Hage was an oral agreement.

12  Kretschmer would pay the Hages by the AUM in exchange for use of the Hages' pasture.  The

13  Hages had full control of the cattle.  He never indicated to the Hages that his cattle should be

14  placed only on private land.  He paid the Hages between $12 and $20 per AUM.  He would pay

15  the Hages out of the proceeds he received from selling the cattle.  He helped the Hages from time

16  to time with hay, branding, driving cattle, pumping water, etc.  He ran pumps on the Ralston

17  Allotment from time to time to provide water to the cattle.  He confirmed the rotation of cattle on

18  Pine Creek Ranch testified to by Mr. Plank.

19         On cross examination, Mr. Kretschmer testified that he was not positive whether the

20  Hages put any cattle on BLM or USFS land and never told the Hages where to put his cattle or

21  where not to put them.  He had notified the BLM and the USFS many times that his cattle was

22  under Hage's care, but they still charged Mr. Kretschmer with trespass. although they had not

23  collected any money from him or offset his social security benefits yet.

24         On redirect examination, Mr. Kretschmer testified that there were cattle with both his and

25  Hage's brands in herds he moved in the Ralston and Monitor Allotments in 2004–2008.

1    On re-cross examination, Mr. Kretschmer testified that the BLM and the Department of

2  the Interior or Department of the Treasury had tried to collect approximately $11,000 from him.

3  A collection agency from Texas then attempted to collect that amount, then later $15,000.  A

4  collection agency in Arizona was now trying to collect from him, but he had not heard anything

5  for several months since counsel for the Estate had written to that agency.

6        **d.    Mr. Hage**

7    On direct examination, Mr. Hage testified that he ran the Pine Creek Ranch by

8  authorization of the Estate, of which he was the executor.  He agreed that the magenta areas

9  annotated on the overview map (Defendants' Exhibit 2) accurately depicted the fee simple lands

10  of the Pine Creek Ranch, but noted that the two sets of maps in the Nye County records did not

11  match one another, and that neither of those maps matched the actual description of the lands in

12  the respective deeds perfectly, but that the map depicted in Exhibit 2 was "quite accurate."  He

13  testified that he made all decisions concerning the driving and grazing locations of the cattle on

14  the ranch, whether owned by the ranch or others.  He did not personally have any water or ditch

15  rights or grazing permits and had never applied for grazing permits.  If offered a grazing permit,

16  he would not have accepted it before the present litigation because he viewed such acceptance as

17  the "kiss of death" with respect to his claimed property rights, but in light of the present litigation

18  he would potentially accept such permits if his property rights, i.e., those of the Estate, were

19  respected and protected.  He would respect the conditions of a permit, which he viewed as a

20  contract.  He would not accept the standard permits the BLM and USFS issued because he had

21  seen what can happen pursuant to a permit, particularly what happened to his father.  He believed

22  he was exempt from the TGA permitting requirements because the Estate owned stock watering

23  and ditch rights in the area, as well as foraging rights appurtenant to watering rights, easements to

24  use all of these rights, and that all of these rights preexisted the establishment of the national

25  forests and the TGA.  Also, attempting to obtain a grazing permit would have been futile, and if

1    granted, the Government would have used the fact of a permit to further harass him and render

2    his property rights useless.  He believed the forage rights extended to the exterior boundary of the

3    ranch, as defined by range line and range boundary agreements, natural barriers, and agreements

4    in various deeds.  He noted that the exterior boundaries of the Pine Creek Ranch were depicted

5    on Exhibit 2, a large overview map.  He testified as to a second overview map he created with

6    some of the same information on Exhibit 2, but on which he had removed all annotations except

7    water rights, roads, patented land belonging to the Pine Creek Ranch, and the ranch boundaries.

8    The alleged boundaries on the map included large portions of the Ralston and Monitor

9    Allotments and the Meadow Canyon and Monitor Valley West Allotments within the Toiyabe

10   National Forest.  Generally speaking, the boundaries as drawn by Mr. Hage were large areas

11   surrounding any place in which the Estate had water rights.  The Court will refer to this area as

12   the "claimed grazing profit" or "CGP."[30]  The map was marked as Defendants' Exhibit 2698.

13   Mr. Hage clarified that he did not claim the "underlying title," i.e., fee simple absolute title, to

14   the CGP, but that he claimed a right to use the land for the purpose of "ranching or livestock

15   grazing."  He claimed these rights based upon a previous quiet title action to quiet title to the

16   boundaries of grazing rights as between neighboring ranchers.  Mr. Hage asserted that he could

17   graze his cattle at will within the CGP, subject to the availability of his water and the forage,

18   except: (1) near the town of Belmont, where there are people with preexisting water rights not

19   covered by the Hages' chain of title; and (2) another area within the McKinney-Tinks (phonetic)

20   Allotment.  The Estate owned only ten 1866 Mining Act ditches according to the CFC Case, but

21   Hage did not necessarily agree.  Also, the Estate owned additional ditches that were not part of

22

_____

23   [30]Hage refers to these lands as "ranch land," as distinguished from the fee simple "patented land"
     owned by the Pine Creek Ranch.  The Government refers to these lands as "federal land" or
24   "public land."  These lands are currently administered by the BLM and USFS and owned in fee
     simple by the United States but used for grazing by Hage, without a current permit.  Hage
25   indicated that in his case-in-chief he would attempt to show that he or the Estate owned "grazing
     rights" or "ranching rights" in these lands, but not that they owned these lands in fee simple.

1   the CFC Case.  Mr. Hage confirmed that the Government had plotted all asserted water rights on

2   its maps, although the Government did not agree with all of the claims.  The Government also

3   plotted all 1866 Mining Act ditches found to belong to the Hages in the CFC Case.  Mr. Hage

4   recognized Exhibit 162 as the October 6, 2009 denial of a grazing permit renewal.  He testified

5   that he directed his attorneys to appeal and then to later withdraw the appeal.  He testified that a

6   permit did not add value to the ranch the way a grazing right did, because a permit can be taken

7   away and a right stands on its own.  He testified as to the Estate's and his own brands (bar over

8   half circle, X-R, lazy W, and reverse lazy S over triangle).  He testified as to the lands the United

9   States considered to be USFS lands.  He recognized the United States' designated national forest

10  lands but believed that the Government could not regulate grazing on the lands if those rights

11  were preexisting both as a matter of common law and by "savings clauses" in the relevant

12  statutes.  Mr. Hage noted that no one could use his property right to the extent it caused harm to

13  somebody else, however.  So long as Mr. Hage did not interfere with any third person, the

14  Government could not restrict his right to graze where he had preexisting grazing rights.  Mr.

15  Hage believed that the BLM could not regulate grazing on the Ralston and Monitor Allotments

16  unless a person signed a permit.  He believed that the land was an open range in the sense that it

17  was not closely fenced in, but it was not a public commons.  He did not believe he had the right

18  to exclude hunters, hikers, or prospectors on the CGP like he could eject a trespasser from the fee

19  simple land of the ranch.  He believed that a mining company would not have to pay him for

20  extracting minerals from beneath the CGP.  Mr. Hage had stopped running other people's cattle

21  because they had been receiving trespassing notices but could not remember when he stopped.

22  His family's rights were part of the Monitor Valley Adjudication, and he was bound by the terms

23  of that decree.  The decree stated that it did not purport independently to create easements

24  appurtenant to the water rights adjudicated therein.  The decree, however, indicated that the

25  waters appropriated therein were appurtenant to the place of use therein designated.  Mr. Hage

1   confirmed that Mr. Plank's testimony about the practices of rotating cattle to water sources

2   throughout the year was very accurate.  In the summer, he would usually have two to four herds

3   of cattle off of his patented lands.  Mr. Hage testified that he had also driven cattle to places other

4   than those places Mr. Plank indicated.  He had tried to use every piece of the CGP that there is.

5   He had placed supplement on the CGP.  Mr. Hage had no reason to believe that he had no cattle

6   in the areas where previous witnesses had testified as to having seen some of his cattle on BLM

7   or USFS lands, though he didn't always agree with the numbers claimed.  He did not know

8   exactly where his cattle were from day to day or how far from water sources.

9        **10.    Day 10 - April 24, 2012**

10       On Day 10, the Government presented two witnesses: (1) Wayne N. Hage; and (2) Durk

11   John Pearson, a rancher from Tonapah, Nevada.

12       **a.    Mr. Hage**

13       On continuation of direct examination, Mr. Hage testified that he owned approximately

14   fifteen cows in 2004 but later purchased approximately seventy more from his father.  The cattle

15   were re-branded with Hage's "running 'W'" by the early winter of 2007, but the cows retained

16   his father's "bar over half-circle" brand.  Exhibit 1234 consisted of annual reports of livestock

17   owned by Hage required to be filed with the Nevada Department of Agriculture for tax purposes.

18   The records indicated that for fiscal year 2005, Hage owned seventy-four cattle, but that he only

19   owned fourteen cattle in fiscal year 2006.  Hage explained that his father likely paid the taxes on

20   much of his cattle in fiscal year 2006, because although he only paid taxes on fourteen of them,

21   he owned more.  In fiscal year 2008, he owned 208 cattle.  In fiscal year 2009, he owned 489

22   cattle.  In fiscal year 2010, he owned 568 cattle.  In fiscal year 2011, he owned 648 cattle.  Hage

23   had owned over 1000 cattle since 2004, though his herd constantly fluctuated in number and had

24   never been so large as 1000 at a single time.  The Court admitted Exhibit 1234.  In 2004, Hage

25   had placed cattle on federal land, i.e., land administered by the BLM or USFS and not owned in

fee simple by any private party, often unsupervised and with no effort to keep them within fifty feet of ditches or other water sources.  Hage had placed his own cattle in such places, as well as cattle belonging to Raymond E. and Raymond R. Kretschmer, Irvin Plank, Durk Pearson, and Messrs. Kilgore, Vankoven, Jensen, Agee, and Chambers, all pursuant to leasing arrangements. He had also placed the cattle of others on his own fee simple lands pursuant to leasing arrangements.  Hage and the Estate earned a profit from such leasing arrangements, being paid in cash, calves, or trade.  Hage and the Estate had charged up to $20 per AUM.  Hage explained that he placed cattle "on water," meaning he drove the cattle to a water source left them nearby.  After being so placed, Hage tried to keep the cattle within a certain distance of the water sources only by maintaining "range line fences," which were often miles from the water sources.  Exhibit 1201 was a Management and Pasture Agreement between Hage and Pearson signed on October 23, 2003.  The agreement provided that Hage would manage Pearson's cattle on the Pine Creek Ranch (meaning both fee simple lands and federal lands in the area) for a monthly AUM fee to be agreed upon monthly.  Hage testified that he always managed the cattle on his land and was responsible for selecting the locations and times of pasturing.  Pearson would receive the proceeds of the sale of the cattle, which Hage was responsible for marketing and selling.  Pearson was responsible for purchasing bulls chosen by Hage.  Hage charged Durk on the "high end" for AUM because Durk did not assist in transport or driving cattle, which was the hardest work, and Hage provided supplement and marketing.  The value of the forage was a part of the calculation for the AUM rate Hage charged Pearson and averaged approximately the BLM's authorized use rate, which was $1.43 or $1.35 per AUM.  In 2004, Hage's parents had received over $45,000 in pasture rent for the year according to their tax return.  In 2005, 2006, 2007, and 2008, the amounts were $77,912, $67,657, $73,217, and $63,632, respectively.  Mr. Hage's own tax returns for 2006, 2007, and 2008 indicated $41,480, $0, and $33,190 in income from pasture rent, respectively.  The reported pasture rent for 2004 through 2008 for Hage and the Estate

1   totaled nearly $400,000.  Hage could not estimate how much of the rent was related to pasturing

2   cattle on federal land versus fee simple land, though most of the cattle were kept on fee simple

3   land.  The Court admitted the relevant pages of the tax returns.  Hage testified that a way to

4   calculate an average AUM rate for a given pasturage customer during a given year would be to

5   take the total charged for the year for pasturage divided by the average number of cattle per

6   month divided by twelve.  Although forage value would be a factor in an AUM rate, Hage could

7   not recall how he calculated the value, though he estimated that the value would be

8   approximately the same as the authorized grazing fee rate charged by the BLM or USFS, i.e.,

9   approximately $1.40.  Hage did not know whether that was a reasonable market value for the

10  forage on federal lands.  Hage had never attempted to calculate the actual value of forage in-and-

11  of-itself.  He testified that the amount of cattle that the fee simple land of the Pine Creek Ranch

12  could support, not considering drought years, is approximately 500.  He currently managed

13  approximately 400 cattle belonging to other people year-round on the Pine Creek Ranch's fee

14  simple lands.  Mr. Hage had sent letters to the BLM and USFS informing them that he had full

15  control and legal responsibility for certain other cattle, including copies of leasing agreements in

16  some cases.  The BLM had never sent Mr. Hage a bill for unauthorized grazing, though they had

17  sent him notices of trespass, and the USFS had only sent him a single bill in 2004.  The

18  Government at this point noted that it was not seeking damages from Defendants for

19  unauthorized grazing by cattle with other persons' brands.  Mr. Hage had never complied with a

20  USFS request to remove cattle, except in 2004 when the aforementioned bill was received, but

21  this was done not by Mr. Hage's choice, but at the request of the cattle's owner, Ms. Agee,

22  because she had been frightened by threats made to her at her place of business by an armed

23  USFS agent.  Mr. Hage had never received a demand for payment or any bill from the BLM.

24      Mr. Hage was not permitted to ask himself questions or present an uninterrupted

25  statement on cross examination, however the Court permitted Mr. Hage and counsel for the

1    Estate to confer as to questions that counsel for the Estate would ask him.  On cross examination,

2    Mr. Hage testified that his father, E. Wayne Hage had authorized him to manage the Pine Creek

3    Ranch first in 1997, and then later in his will.  Mr. Hage explained that cattle familiar with water

4    sources in an area might be driven to some distance from a water source, and they would travel

5    the remaining distance by themselves and drink, whereas cattle new to a water source would have

6    to be taken directly to the source and watched until they actually drank form the source the first

7    time.  After a cow had drunk from a water source once, it would not wander too far away and

8    need only be driven to the general area of the water source, but a cow that had never drunk from

9    a particular source might stare at the water and wander away without drinking.  He testified that

10   there is no practical way to keep livestock from drifting from a water source short of tying a cow

11   to a tree or a stake with rope, a practice that was impractical and which was only done in certain

12   foreign countries to Mr. Hage's knowledge.  The only thing keeping cattle near water sources are

13   the limits of their natural propensity to drift, manmade barriers such as fences, and natural

14   barriers.  At the time of E. Wayne Hage's death, E. Wayne Hage owned no cattle, and the Estate

15   has never owned any cattle.  The Government had been apprised of this many times both orally

16   and in writing by Hage and one of his attorneys, yet the Estate had received trespass notices.  Mr.

17   Hage had for a time hesitated to re-brand his father's cattle with his own "running 'W'" brand

18   because it would have been easier to re-brand his own cattle with his father's "bar over half

19   circle."  The more common practice of selling cattle in Nevada was to conduct a "range sale,"

20   where the transferred cattle were in the range and would not be re-branded until they were

21   corralled back onto the ranch up to eight months later.  He was aware of no law requiring re-

22   branding after purchase.  Re-branding was the better practice, although some people never re-

23   branded if the animals were to remain permanently in an enclosed area.  He testified that "herd"

24   could be used to describe either the total number of cattle a person owned or a distinct

25   geographical grouping constituting a subset of the total number.  A "pasture" typically consisted

1  of a fenced-in meadow with grass.  He testified that the "pasture income" on the tax returns

2  included the cost of hay taken from his fee simple lands and other costs, and was not purely

3  attributable to the value of forage.  He testified that neighbors would usually return neighbors'

4  cattle if they drifted onto one's land, and that such drift did not constitute a trespass.

5      On redirect examination, Mr. Hage testified that if one had a stock watering right on

6  another's land, under state law one could place cattle near that water to drink without the serviant

7  owner's permission.  He noted that Judge Smith in the CFC Case had ruled that the fifty-foot

8  forage right attendant to 1866 Ditch Act ditches did not apply to other water sources, though the

9  Government was required to provide access to all water sources in which the Hages had rights,

10  for use and diversion. (*See* CFC Order 2, Sept. 3, 2002, ECF No. 198).  He noted that Nevada

11  Revised Statutes section 564.025 required cattle grazing on the open range to be branded.  He

12  reconciled his testimony that re-branding was not necessary with the statute by concluding that so

13  long as there was some brand on the animal, the statute was satisfied.  Mr. Hage had authorized

14  the Estate's filing of the Counterclaim.  The Estate had been created in or about early July 2006,

15  a month after E. Wayne Hage passed away.  The Government noted that the Court previously

16  denied a motion to dismiss the declaratory relief counterclaim based only upon the fact that the

17  Government had taken final agency action by suing for trespass.  However, during trial, it had

18  already become clear that the BLM, if not the USFS,[31] had also issued "final decisions" sufficient

19  to sustain judicial review even if the Government had filed no action. (*See* Exhibit 1237 (May 16,

20  1997 "final decision" by the BLM)).

21      **b.    Mr. Pearson**

22      On direct examination, Mr. Pearson testified that he had lived in Tonopah, Nevada since

23

24  [31]Mr. Williams testified that the USFS did not issue final decisions except by charging an alleged
   trespasser before a U.S. Magistrate Judge, which had not been done in this case.  A "final

25  decision" with respect to the alleged trespasses on USFS land in this case must be based upon the
   present trespass suit itself, a claim that may be viable under state law.

1   1991 and was currently self-employed as a scientist, landlord, and rancher.  He and his wife

2   studied the mitochondrial DNA of cattle for breeding purposes.  Hage selected bulls for breeding,

3   but Pearson selected heifers.  The Hages had managed Pearson's cattle since 1998.  Exhibit 1201

4   was a Management and Pasture Agreement between Hage and Pearson dated October 23, 2003.

5   A superseding agreement to which Mr. Pearson testified was different only in that the cattle

6   could only be placed on Hage's fee simple land.  Mr. Pearson understood the "Pine Creek

7   Ranch" under the agreement to consist of both the 7000 acres of fee simple land and the 700,000-

8   acre CGP.  Mr. Pearson did not know what portion of the AUM rate he paid Hage was

9   attributable to the value of the forage.  The rate had increased from approximately $8 to $25

10  dollars over time.  Hage made all decisions over where cattle would graze, and Mr. Pearson did

11  not know where his cattle were at any given time.  His cattle were originally branded "XR," but

12  he re-branded them with his own "double helix" brand within a year of registering that brand in

13  2000.  Mr. Pearson made approximately $600–800 per calf from the sale of the forty-six calves

14  produced from his cattle on the Pine Creek Ranch.  He testified that grazing around water rights

15  extended beyond fee simple land.  His understanding was that grazing rights were provided

16  through "Article IV of the Treaty of Ruby Valley."

17          On cross examination, Mr. Pearson testified that one could not expect cattle not to

18  wander up to six miles to forage while watering, and that there was no reason to believe they had

19  acted differently in the past.  You could not stop them without fencing or chaining them.  He

20  testified that under-grazed land could become less productive, because long grass would fall over

21  into "thatch," creating shade for nearby grass.  After he had heard that E. Wayne Hage had over-

22  grazed Meadow Canyon, he visited the canyon and found it *under*-grazed.  E. Wayne Hage

23  explained to him that it was under-grazed because armed federal agents had impounded his cattle

24  from the canyon.  Mr. Pearson testified that he had graduated from the Massachusetts Institute of

25  Technology in 1965 with a triple major in physics, biology, and psychology, as well as three

1    minors.  He had worked as a rocket scientist on the Minuteman, Trident, and Polaris missiles, as

2    well as the Viking space program, cruise missiles, etc.  He had bred and sold heifers for breeding

3    based upon his breeding theories concerning the mitochondrial genome, though he had published

4    no papers relating to his theory.

5            **c.    Mr. Williams**

6            The Government recalled Mr. Williams, who testified that had the Hages been issued a

7    BLM grazing permit consistent with their previous permit issued in 1983, and had they fully

8    utilized the 340 AUM permitted in the Meadow Canyon C&H Allotment between 2004 through

9    2007, the authorized grazing fees would have totaled $9385.03 based upon the AUM rates

10   provided in the respective interim directives.  (*See* Gov't's Ex. 1281).  The Court admitted

11   Exhibit 1281.

12           On cross-examination, Mr. Williams testified that he did not know how many animals

13   any of the Hages' predecessors-in-interest had permits to graze, except that the Arcularius

14   brothers' permit immediately prior to the Hages' was for the same number of cattle as the Hages'

15   1978 permit.

16           The Government then rested its case-in-chief.

17           **11.    Day 12[32] - May 8, 2012**

18           The Estate called one witness: Ramona Hage Morrison.  On direct examination, Ms.

19   Morrison testified that during college she had conducted a research project into "split estate

20   rights" on federal land.  She had also researched the title history of the Pine Creek Ranch, during

21   which research she gained knowledge of the historic and customary use of the range, particularly

22   the customs concerning the appropriation of water for livestock grazing.  She had updated the

23   title history based upon the rulings in the CFC Case and the Monitor Valley Adjudication from

24   Nevada's Fifth Judicial District Court.  She had no expertise in title researching but used her

25   _____

[32]On Day 11, April 25, 2012, counsel was not prepared to proceed due to a medical condition.

1    mother's previous work as a guide.  She had done research at the national archives.  She testified

2    as to her other research projects and employment in the areas of mining laws and property rights.

3    She had worked for the Nevada Livestock Association for five years and had taken other paid

4    and unpaid positions.  The Nevada Livestock Association had been created to bring attention to

5    the confiscation of livestock by federal authorities.  She was a current board member of the

6    Nevada Department of Agriculture.  She testified as to previous cattle confiscations not at issue

7    in the present case as "background."  She testified that she had also worked at Pine Creek Ranch

8    and as to the movement of cattle on the ranch, noting that cattle may "drift" between water

9    sources, or that ranchers may move them to the water sources.  They would never move cattle to

10   places where there was no water or to places where water rights were held only by others.  Cattle

11   would drift as far as five miles away or further on their own.  Prior to the development of wells in

12   the area, cattle on Pine Creek Ranch had been historically moved to, or drifted on their own, to

13   various areas of snowfall.  Fences were the only way to prevent drift.  She testified that a

14   previous confiscation of her father's cattle was based upon allegations that cattle had over-grazed

15   the allotments.  The Hages had attempted to sell the Pine Creek Ranch in the early 1990s, but

16   they could not sell the ranch due to the problems with the BLM and USFS.  Ms. Morrison was

17   not present at the confiscation of her father's cattle in the 1990s.  She testified that she had used

18   Exhibit 1547, a 1942 state court decree (the "1942 Decree"), in preparing her abstract of title

19   relating to the Pine Creek Ranch (the "Morrison Abstract").  She testified that the 1942 Decree

20   accurately described the boundaries of the Pine Creek Ranch, minus the portion of the ranch later

21   sold to the Meadow Canyon Sheep Co.  Defendants' Exhibit 2700 was a graphical illustration of

22   each separable parcel of land comprising the modern-day Pine Creek Ranch since 1866, when the

23   Treaty of Ruby Valley between the United States and the Shoshone Indian Tribe was ratified.

24   The parcels are referred to by names such as "Mosquito Creek" and "Stone House."  Ms.

25   Morrison explained that the Hages did not own each of these parcels in fee simple but claimed

1   indistinct rights in the land due to their water rights and historical use of the lands for grazing.

2   Exhibit 2703 was a map of the area annotated, with several of the parcels' boundaries.  The titles

3   at issue were issued under state law.  The Court admitted Exhibit 2700 as a summary exhibit

4   under Rule 1006, but noted it would require Defendants to prove the underlying documents.

5   Exhibit 2183a was the Morrison Abstract that Ms. Morrison had prepared for the Estate based

6   upon her mother's previous abstract of title, the conclusions of which Ms. Morrison had

7   confirmed by viewing the underlying documents.  The Morrison Abstract contained a column

8   referring to exhibit numbers in the CFC Case.  The Court admitted Exhibits 2183a and 1587.

9   Ms. Morrison further testified as to the contents of the 1942 Decree.[33]  She then testified as to

10  underlying tax, property, and judicial records underlying the chain of title of each separable

11  parcel of the Pine Creek Ranch, as identified in the Morrison Abstract.  She did not testify as to

12  any Defendant's fee simple title to any of the disputed lands.

13         **12.     Day 13 - May 9, 2012**

14         Continuing her testimony on direct examination, Ms. Morrison continued to testify as to

15  the underlying records supporting the Morrison Abstract.  Again, she did not testify as to any

16  Defendant's fee simple title to any of the disputed lands, though she testified that some relevant

17  deeds purported to convey certain rights, e.g., water rights or "range rights," in extended areas of

18

19

20  [33]The 1942 Decree referred to "range rights" in addition to "range water rights," but the Nevada
21  Supreme Court has ruled that to whatever extent Nevada law had created or implied grazing
    rights on the public domain, it had been superseded by the TGA. *See Ansolabehere*, 310 P.2d at
22  842.  The Court of Claims cited that case and others in ruling in favor of the Government that the
    Hages had no "property interest in the rangeland." *See Hage I*, 35 Fed. Cl. at 175.  The 1942
23  Decree is therefore no evidence that Defendants have a property interest, i.e., a grazing profit, on
    federal lands.  The only potential right to graze on federal lands—i.e., those lands that
24  Defendants do not own in fee simple and to which the United States has never issued a patent to
    a private person or the State of Nevada—must be independently supportable as coming within
25  the scope of Defendants' water rights, *see id.*, which rights Congress protected by carve-outs in
    the relevant statutes.

the range.[34]

On cross examination, Ms. Morrison testified that she could not say from memory whether Defendants owned parcels in any particular townships by number.  She testified that she did not know what the "split ownership" language on the diagram constituting the Morrison Abstract meant.  She noted that the Morrison Abstract accounted for the complete chain of title from original patents to Defendants as to each parcel of land constituting the Pine Creek Ranch, insofar as relevant records were available.

### 13.     Day 14 - May 10, 2012

The Estate recalled Ms. Morrison and Mr. Hage.

### a.     Ms. Morrison

On continuation of cross examination, Ms. Morrison further testified as to the documents in the chain of title.  Certain deeds referred only to transfer of water rights and other appurtenant rights, with no specific mention of grazing.  She noted that she was a beneficiary of the Estate and had a personal interest in the outcome of the present case.

On redirect examination, Ms. Morrison noted that her research had identified no individual Shoshone Indians in the chain of title of the Pine Creek Ranch who held their lands under individual aboriginal tile, as opposed to allotments under the Dawes Act of 1887 (General Allotment Act).[35]  She had only census records, USFS records, and historical records, but no

---

[34]A deed does not create any right the grantor does not possess and is itself no evidence of such a right anywhere in the chain of title.  Provisions in deeds purporting to do so essentially operate as quitclaims to any such rights as between grantor and grantee.

[35]The tribal aboriginal title of the Western Shoshone lands was extinguished in 1979 by the payment of a claim made in the Indian Claims Court based upon the taking of those lands. *See United States v. Dann*, 873 F.2d 1189, 1193–95 (9th Cir. 1989).  It is possible for one to prove individual aboriginal title and even an individual right to graze on federal lands, by proving that a predecessor in interest had an individual aboriginal right to graze that vested before the lands at issue were withdrawn from the public under the TGA, *id.* at 1195–96, 1199–1200, but Defendants here have not proved any such right.  They have not identified any particular Indians in the chain of title.  Presumably, the alleged Indian predecessors owned the land under tribal

1   deeds.

2       **b.    Mr. Hage**

3       On direct examination, Mr. Hage testified as to more documents concerning the chain of

4   title or various rights in the area.

5       **14.    Day 15 - May 11, 2012**

6       The Estate presented two witnesses: George L. Parmen and Joseph B. Fallini, Jr.

7       **a.    Mr. Parmen**

8       On direct examination, Mr. Parmen testified that he was a lifelong rancher in Nevada.

9   His father and grandfather had also been prominent ranchers but lost everything in the Great

10  Depression.  He testified as to the ranches he had lived on near the Pine Creek Ranch and his

11  knowledge of water rights in the area during the time period when the Arcularius brothers owned

12  the Pine Creek Ranch.  He testified that for a century prior to the interference of the BLM, it was

13  customary that persons would graze their cattle near water sources.  He noted that Nevada law

14  prohibited a rancher from grazing animals within three miles of a water source in which another

15  person had stock watering rights.

16      On cross examination, Mr. Parmen testified that he had participated in previous range use

17  adjudications in the area when the grazing district was first established.  He testified that those

18  ranchers on the Advisory Board believed they had rights to graze, and that the Government did

19  not use the word "privileges" until a later date.  It was the custom of ranchers in the area to

20  consider grazing rights as "rights," against which they had even borrowed money from banks.

21  ────────────────

22  aboriginal title, which was extinguished in 1872. *See id.* at 1196, 1198.  If the alleged Indian
    predecessors owned land or grazing rights under individual aboriginal title prior to the date the
23  lands at issue were put under the TGA, Defendants could prove grazing rights limited to the
    usage that existed at that time, as the Danns did, *see id.* at 1200, but Defendants have not made
24  such a showing.  Hage argues in his post-trial brief that Article IV of the Treaty of Ruby Valley
    constituted the transfer of such rights in the chain of title, but that article simply represents a
25  general agreement by the Shoshone that the lands at issue were thereafter open for ranching and
    other purposes by non-Indians.

1    They understood the adjudications under the TGA as a means of confirming existing rights via

2    what the Government called "preferences," not as the granting of privileges.  He testified that

3    grazing permits had concrete value because a rancher would not buy a ranch without them.  He

4    testified that his family had always paid the permit fees, however, because it was the law.

5         On redirect examination, Mr. Parmen testified that it was not the ranchers' choice to

6    participate in the initial TGA range adjudications.  He noted that at the time, the term "privilege"

7    would have had no special meaning to the ranchers as opposed to the term "right."

8         **b.    Mr. Fallini**

9         On direct examination, Mr. Fallini testified that he had been a lifelong rancher in Nevada.

10   His ranch had been established in the 1860s.  It now consisted of 663,000 acres, approximately

11   2300 acres of which was owned in fee simple, plus another parcel of unspecified size acquired at

12   an auction.  It was an open range cattle and hay operation.  He noted that only one rancher was in

13   favor of the adoption of federal regulation of the range during the Advisory Board meetings.  Mr.

14   Fallini testified generally that the BLM's various actions over the years had harmed cooperation

15   between ranchers and had deprived ranchers of what they viewed to be their long-settled rights to

16   graze.

17        On cross examination, Mr. Fallini testified that ranching practices varied slightly from

18   ranch to ranch, but practices were generally consistent.  He had been a member of both the

19   BLM's Battle Mountain District Advisory Board and the Nevada State Grazing Board.  He noted

20   that he had been present at a 1972 BLM Advisory Board meeting when the Government showed

21   him a copy of the minutes.  He noted that the minutes included the language of "privilege," but

22   noted that none of the Board members thought that meant they had anything less than a right to

23   graze.[36]  He testified that one reason cooperation on the range had degraded was because the

24   ───────────────

25   [36]Black's defines a "privilege" as "[a] special legal right, exemption, or immunity granted to a
     person or class of persons; an exception to a duty.  A privilege grants someone the legal freedom
     to do or not to do a given act.  It immunizes conduct that, under ordinary circumstances, would

1   federal regulation did not encourage cooperation between ranchers to settle conflicts.  He

2   testified that it would not be possible for a cattleman to graze his cattle on land where the water

3   rights belonged to another if he had to bring his own water to the cattle.  The cattle would go to

4   the water on the land and could not be prevented from doing so.

5       On redirect examination, Mr. Fallini testified that state water law prevented grazing near

6   water sources in which others had stock watering rights.

7       On re-cross examination, Mr. Fallini testified that a Mr. Gary Snow had hauled water to

8   cattle in order to graze them in an area where he had no water rights.  He also noted that wells

9   and pipelines could be turned off, but springs could not be.

10      **15.    Day 16 - May 21, 2012**

11      The Estate recalled Mr. Hage.  Mr. Hage testified about boundaries of land near the Pine

12  Creek Ranch.  The Court noted that it would not entertain any argument for a free-standing

13  grazing right in the area based upon the testimony, though the testimony would be relevant to

14  grazing customs in the area.  The Court noted that it would not second-guess the Advisory

15  Board's determinations of customary usage by certain parties in certain areas.  It noted that

16  Defendants could argue an entitlement to the maximum number of AUM or HM ever permitted

17  by the USFS or BLM on the relevant lands, but it would not allow Defendants to argue based

18  upon evidence predating the recommendations of the Advisory Board.

19      **16.    Day 17 - May 22, 2012**

20      The Estate recalled Ms. Morrison and Mr. Hage.

21      Ms. Morrison testified as to boundaries of the Pine Creek Ranch.  She testified that the

22  Indians living in the area of the Pine Creek Ranch, from whom the Hages' predecessors obtained

23  their respective titles, obtained their individual titles to their respective lands under the General

24

25  _____

subject the actor to liability." Black's Law Dictionary 1316 (9th ed. 2009).

1  Allotment Act.[37]

2      Mr. Hage testified as to his duties managing the Pine Creek Ranch, including the

3  maintenance of waters essential to the ranch.  He testified that the Estate had never itself owned

4  cattle.  He also further testified as to the forage in the area.  He testified that he did not believe a

5  permit was required to move cattle to water in which one had rights.  He testified that in his view

6  because water rights were usufructory, denial of access to the water was denial of the right.

7      **17.    Day 18 - May 23, 2012**

8      The Estate called: (1) Hage; (2) Raymond Jensen; and (3) Kretschmer.

9      **a.    Mr. Hage**

10     Mr. Hage testified as to water rights and "range rights"  in the area.  On cross-

11 examination, he testified as to his understanding of the initial adjudication of grazing preferences

12 in the area.  He testified that he believed he had more expertise in managing the range than did

13 the Government's bureaucrats in the BLM and USFS, and that he had a more powerful

14 motivation to properly manage the range because mismanagement would affect him and his

15 family financially, whereas mismanagement by a federal official would visit no necessary

16 adverse effects upon the official.  He testified that it would be impossible to support a herd of

17 cattle of more than 450 on the patented lands of Pine Creek Ranch alone, just considering forage

18 needs.  The limiting factor was feed.  He testified that he was currently leasing his patented lands

19 to other cattlemen to support 130 cattle.  He testified again that although he believed he had a

20 right to graze on the CGP and that he did not want a permit because it would subject him to

21 federal control, if a permit were the only alternative to being denied his right to graze altogether,

22

23 [37]Where lands were given to Indians under the General Allotment Act and later sold to non-
   Indians, a loss of tribal sovereignty over the lands results where the lands lose their Indian
   character, i.e., where the tribe loses its practical ability to exclude persons form the land. *See*
24 *Brendale v. Confederated Tribes of Yakima Indian Nation*, 492 U.S. 408, 436 (1989).  This
   doctrine almost certainly applies to the Pine Creek Ranch, because the Shoshone could not have
25 practically or legally ejected the Hages' predecessors at or after the time the U.S. patents were
   issued.

1    he would accept it.  The Court noted that although there appeared to be no freestanding right to

2    graze in this case, there is a property interest in a grazing permit sufficient to require procedural

3    due process before its denial.[38]

4          **b.    Mr. Jensen**

5          Mr. Jensen testified that he had lived in Tonopah since 1949 and that he had business

6    relationships with Defendants.  His father had owned a ranch approximately thirty-five miles

7    from Pine Creek Ranch.  He had owned and did own cattle.  His cattle had been entrusted to

8    Hage for approximately ten years pursuant to an oral agreement.  He did not feel a written

9    agreement was necessary.  He had in the past received several trespass notices from the BLM and

10   the USFS.  He had notified those agencies several times that the cattle at issue were entrusted to

11   Hage.

12         **c.    Mr. Kretschmer**

13         Mr. Kretschmer testified similarly to Mr. Jensen as to trespass notices he had received

14   based upon alleged trespasses of his cattle that he had entrusted to Hage and that he had informed

15   the agencies of the situation.  His son and his grandson had also received trespass notices, even

16   though his grandson had sold his cattle.

17         **18.    Day 19 - May 30, 2012**

18         The Estate called three witnesses: (1) Angus McIntosh; (2) Jerry Elkins; and (3) Daniel

19   Berg.

20         **a.    Mr. McIntosh**

21         Mr. McIntosh had experience working on ranches in Arizona.  He had worked

22   temporarily for the BLM as a range technician working with grazing allotments.  He became

23

24   _____

     [38]The Court of Appeals has confirmed that there is a property interest in a grazing permit
     sufficient to invoke the procedural due process protections of *Matthews v. Eldridge*, 424 U.S.
25   319 (1976), though it has declined to delineate the "exact nature of that property interest." *See
     Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1081–82 (9th Cir. 2010).

1    familiar with the Pine Creek Ranch based upon his doctoral dissertation for his Ph.D. on range

2    management.  The Court noted that Mr. McIntosh could testify that property to which a grazing

3    permit or certain property rights were attached would be worth less without such attached

4    interests, but he could not testify as to property law.  In the CFC Case, he had performed an

5    appraisal that concluded that the "highest and best use" of the Pine Creek Ranch (including the

6    disputed areas, not only the land owned in fee simple by Defendants) would be to supply water to

7    the Southern Nevada Water Authority as opposed to cattle ranching.  He testified that without the

8    grazing allotments, the Pine Creek Ranch was worth much less and would not be economically

9    feasible as a cattle ranch such that one could pay one's debts and raise a family.

10           **b.    Mr. Elkins**

11           Mr. Elkins testified that he had prepared some maps concerning the lawsuit.  He had

12   worked as an accountant, analyst, and mapping company.  He testified as to the locations of

13   water sources on the maps.

14           **c.    Mr. Berg**

15           Mr. Berg was a rancher who was raised on the Slash Four Ranch in Nevada.  He had

16   worked on the Pine Creek Ranch intermittently since 1988.  He testified as to cattle on the Pine

17   Creek Ranch and trespass notices he had received based upon his cattle on the Pine Creek Ranch.

18   He testified that ranchers did not need the BLM to manage their lands.  A rancher would go out

19   of business if he did not manage water and grass use well.

20           **19.    Day 20 - May 31, 2012**

21           The Government called two rebuttal witnesses: (1) Sarah Peterson; and (2) Mark Muir.

22           **a.    Ms. Peterson**

23           Ms. Peterson testified that she was a hydrologist working for the State of Nevada and that

24   she had determined since giving her previous testimony that the Government itself had potential

25   water rights claims to nine sources in which Defendants also had rights.  Those potential claims

1   were known as "public water reserves" or "PWRs."  She did not testify that the Government had

2   any water rights to prior use superior to Defendants' rights in any of these sources.

3          **b.     Mr. Muir**

4          Mr. Muir was a fifteen year hydrologist for the USFS.  He reviewed the water rights in

5   the area to assist in creating maps and tables.  He was also asked to examine any potential water

6   rights claims by the Government in the area.

7          **20.    Day 21 - June 6, 2012**

8          Defendants resumed their defense and called Thomas J. Seley.  The parties agreed not to

9   question Mr. Seley as to his motivations for issuing trespass notices against witnesses during the

10   course of the present trial.  The Court noted that the Government could still object if it believed

11   the answer to a question might incriminate Mr. Seley.  Mr. Seley testified as to the locations of

12   Mr. Hages' and others' cattle with respect to water sources and the behavior of cattle while

13   watering.  He also testified as to trespass notices and demands for payments he had issued

14   concerning witnesses in the present case since he started in his current position in 2007.  He had

15   solicited others to petition for grazing permits in areas where the Hages had water rights, and he

16   had issued demands for payment to Hage and those whose cattle were entrusted to him, on the

17   order of tens of thousands of dollars.  He had never attempted to pursue a criminal misdemeanor

18   citation before a magistrate judge, however.

19          Eventually, the Court noted that there was enough evidence to infer that Mr. Seley, after

20   the filing of the present case and with knowledge of the case and the separate civil case pending

21   before the CFC, took actions to interfere with the defense of the present trespass action by

22   intimidating witnesses via trespass notices and demands for payment in cases where he knew Mr.

23   Hage had control of those witnesses' cattle.  The Court then noted it would stop questioning of

24   Mr. Seley so that he could consult with counsel, and that the Court would refer the case to the

25   U.S. Attorney for potential prosecution for obstruction of justice.  The Court also ordered Mr.

1   Seley to show cause why he should not be held in civil contempt.[39]

2        The Court noted that the fees paid to the Government by Mr. Snow could be used to

3   offset any unauthorized grazing fees based upon Defendants' grazing in the same areas during

4   times when Mr. Snow was paying the fees.

5        The defense rested and the Government indicated it would not hear further rebuttal

6   witnesses.  The parties gave their closing arguments on June 6, 2012.

7   **III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW**

8        **A.    Issues Previously Determined in the CFC Case**

9        Although the CFC's judgment was vacated in part by the Federal Circuit on jurisdictional

10  grounds after the trial in this case concluded, *see generally Estate of Hage v. United States*, 687

11  F.3d 1281 (Fed. Cir. 2012), the Court finds those findings persuasive insofar as they are relevant

12  to the issues in the present case.

13       1.    Defendants have vested stock watering rights that may not be countermanded

14  even by the State Engineer in the following sources of water, with the following priority dates:

15  Andrews Creek, 1874; Barley Creek, 1874 and 1915; Combination Springs 1866; Meadow

16  Canyon Creek, 1874 and 1911; Mosquito Creek; 1874 and 1917; Pasco Creek, 1869 and 1911;

17  Pine Creek, 1874 and 1972; Smith Creek, 1874; and White Sage Ditch, 1878. *See Hage v. United*

18  *States (Hage IV)*, 51 Fed. Cl. 570, 578–79 (Fed. Cl. 2002).

19       2.  Defendants have stock watering rights as adjudicated by the State Engineer in the

20  following sources of water, with the following priority dates: AEC Well, December 26, 1980;

21  Airport Well, March 19, 1981; Baxter Spring, October 5, 1917; Black Rock Well, July 23, 1982;

22  Cornell Well, December 26, 1980; Frazier Spring, February 17, 1927; Henry's Well, April 27,

23  1981; Humphrey Spring, December 17, 1917; Pine Creek Well, January 11, 1950; Ray's Well,

24

25  [39]The Court later found Messrs. Seley and Williams in contempt after a three-day hearing held after conclusion of the trial.

1   February 17, 1927; Rye Patch Channel, November 12, 1926; Saulsbury Well, April 27, 1981;

2   Silver Creek Well, February 10, 1950; Snow Bird Spring, June 7, 1918; Spanish Spring,

3   December 17, 1917; Stewart Spring, November 25, 1931; Well No. 2, December 26, 1980; Well

4   No. 3, December 26, 1980; Caine Springs, October 8, 1919; Cedar Corral Springs, February 10,

5   1920; Mud Springs, October 8, 1919; and Perotte Springs: February 10, 1920. *See id.* at 578–80.

6       3.    Defendants have stock watering rights in the following water sources, which

7   constitute ditches under the 1866 Ditch Act: Andrew's Creek Ditch, June 30, 1876 (the

8   Government conceded that the Andrews Creek Ditch was such a ditch); Barley Creek Ditch,

9   1877; Borrego Ditches, 1866; Combination Pipeline, 1866; Corcoran Ditch, no later than

10  September 28, 1912; Meadow Creek Ditch: no later than 1912; Pasco or Tucker Ditch, 1869 and

11  1878; Pine Creek Irrigating Ditch, April 29, 1876; Spanish Spring Pipeline, not later than 1959;

12  and White Sage Irrigation Ditch, April 29, 1878. *See id.* at 583.

13      4.    The Baxter Spring Pipeline, Corcoran Pipeline, Desert Entry Ditch, Hot Well

14  Ditch, Mount Jefferson Spring and Pipeline, and Salisbury Well Pipeline, although Defendants

15  had rights in these water sources, were not 1866 Act ditches. *See id.* at 584.

16      5.    The Court of Claims did not adjudicate water rights in **Antone Creek**. *See*

17  *generally id.*

18      **B.**    **Findings of Fact**

19      1.    The "cattle-to-water" distance estimations of percipient witnesses conducting

20  range inspections related to this case are reliable without reference to GPS recordings.  Lay

21  witnesses may testify as to their perceptions of distances, a skill that is within common

22  experience.  The witnesses in the present case were generally credible in this regard.

23      2.    The identifications of cattle brands by the percipient witnesses in this case were

24  also credible, and the Court finds that the cattle seen bearing Defendants' brands were in fact

25  their cattle, except where witnesses indicated that Defendants' brands were older than a newer

1   brand on the same animal indicating ownership by a non-party.

2        3.      There is no evidence of "hard pan" water rights within the Ralston Allotment

3   having been vested, adjudicated, certificated, or otherwise established.

4        4.      The Estate has not had a grazing permit on any USFS or BLM Allotments near the

5   Pine Creek Ranch since 1994.  Hage himself has never had a grazing permit.

6        5.      Cattle tend to congregate together, but a group of  fifty cattle may easily cover a

7   diameter of 100 or more feet in such a grouping.

8        6.      Defendants have not shown that any persons, American, Mexican, Indian, or

9   otherwise, were engaged in any ranching operations on the lands of the present-day Pine Creek

10  Ranch in 1848, i.e., the date of the TGH, or that the Hages' predecessors-in-interest include any

11  persons who had received patents to any parcel of the Hages' land from Mexico or Spain, or held

12  aboriginal title, but only that they received their patents from the United States after the TGH

13  was signed and the relevant lands had thereby become federal land.  The evidence tends to show

14  that there was no ranching in the area until the 1860s.

15       7.      None of the Government's witnesses testified that they directly witnessed any of

16  Defendants' cattle actually grazing, i.e., eating grass, on federal lands.  Several witnesses,

17  however, witnessed Defendants' cattle gathered on federal land.  Many witnesses testified as to

18  heavy usage of the forage in the areas where they observed Defendants' cattle.  The Government

19  also provided photographs of utilization cages indicating heavy usage of the forage in the

20  surrounding areas.  It is an unavoidable inference that the cattle grazed in the areas where they

21  were observed, particularly in light of consistent testimony from multiple witnesses that it is

22  impossible to prevent cattle from grazing wherever there is grass.  The Court finds that the

23  Government has proved by a preponderance of the evidence that Defendants' cattle grazed in the

24  areas where they were observed.

25       8.      Any cattle bearing the brand of E. Wayne Hage (or others) grazing on federal land

during the relevant time periods were controlled by Defendant Wayne N. Hage, and it is Mr. Hage, not the Estate or these other persons, that is liable (or not) for such grazing.

9.    Cattle bearing the brand of Defendant Wayne N. Hage or of E. Wayne Hage grazed on federal land on the following occasions:

(a)    On January 5, 2004, James Diez witnessed twenty-eight of Hage's cattle on BLM land approximately a mile and a half from the nearest water source, Henry's Well. This observation corresponds to paragraph 14(A) of the FAC. The Court finds that the damages for this trespass under state law are $40.04.

(b)    On January 13, 2004, James Diez witnessed eighty-eight of Hage's cattle on BLM land several miles from the nearest water source. This observation corresponds to paragraph 14(B) of the FAC. The Court finds that the damages for this trespass under state law are $125.84.

(c)    On January 28, 2004, James Diez witnessed twenty-four of Hage's cattle on BLM land well over fifty feet from any identifiable water source or even the nearest intermittent stream. The Court finds no trespass in this instance, because the Government has not proved that the cattle were further than half a mile from water sources in which Defendants had water rights.

(d)    On February 19, 2004, James Diez witnessed ten of Hage's cattle on BLM land well over fifty feet from any identifiable water source, though adjacent to intermittent streams. This observation corresponds to paragraph 14(D) of the FAC. The Court finds no trespass in this instance, because the Government has not proved that the cattle were further than half a mile from water sources in which Defendants had water rights.

(e)    On April 5, 2004, James Diez witnessed three of Hage's cattle on BLM land adjacent to Middle Baxter, a reservoir along the Baxter Spring Pipeline. This

observation corresponds to paragraph 14(E) of the FAC.  The Court finds no trespass in this instance, because Hage had stock watering rights to the water in the Baxter Spring Pipeline, which had been lawfully diverted from Baxter Spring, and the cattle were observed immediately adjacent to the water, as diverted.

(f)     On November 14, 2005, James Diez witnessed fourteen of Hage's cattle on BLM land an unspecified distance from any water sources.  This observation corresponds to paragraph 14(O) of the FAC.  The Court finds no trespass in this instance, because the Government presented no testimony as to the distance of these cattle from any water sources.

(g)     On January 17, 2006, James Diez witnessed several of Hage's cattle on BLM land an unspecified distance from any water sources.  This observation corresponds to paragraph 14(Q) of the FAC.  The Court finds no trespass in this instance, because the Government presented no testimony as to the distance of these cattle from any water sources.

(h)     On July 29, 2004, Lance Brown witnessed several of Hage's cattle on USFS land an unspecified distance from Antone Creek.  This observation corresponds to paragraph 16(A) of the FAC.  The Court finds no trespass in this instance, because the Government presented no testimony as to the distance of these cattle from any water sources.

(i)     On July 30, 2004, Steven Williams observed thirty-four of Hage's cattle on USFS land between 150–400 feet from Antone Creek.  The Court finds no trespass in this instance, because the Government has not proved that the cattle were further than half a mile from water sources in which Defendants had water rights.

(j)     On August 3, 2004, Lance Brown witnessed nine of Hage's cattle on USFS land an unspecified distance from any water sources.  This observation corresponds to

1    paragraph 16(C) of the FAC.  The Court finds no trespass in this instance, because

2    the Government presented no testimony as to the distance of these cattle from any

3    water sources.

4    (k)    On August 7, 2004, Jeffrey Shinn witnessed an unspecified number of Hage's

5    cattle on USFS land in Antone Canyon and Round Meadow at unspecified

6    distances from any water sources.  This observation corresponds to paragraph

7    16(D) of the FAC.  The Court finds no trespass in this instance, because the

8    Government presented no testimony as to the distance of these cattle from any

9    water sources.

10   (l)    On August 9, 2004, Diane Weaver witnessed twenty-nine of Hage's cattle grazing

11   near Antone Creek on USFS land, some of which cattle were more than fifty feet

12   from the creek, but all of which moved to within fifty feet of the creek upon her

13   approach.  This observation corresponds to paragraph 16(E) of the FAC.  The

14   Court finds no trespass in this instance, because the Government has not proved

15   that the cattle were further than half a mile from water sources in which

16   Defendants had water rights.

17   (m)   On August 13, 2004, Jeffrey Shinn witnessed an unspecified number of Hage's

18   cattle on USFS land more than fifty feet from Antone Creek in Antone Canyon.

19   This observation corresponds to paragraph 16(H) of the FAC.  The Court finds no

20   trespass in this instance, because the Government has not proved that the cattle

21   were further than half a mile from water sources in which Defendants had water

22   rights.

23   (n)    On August 14, 2004, Jeffrey Shinn witnessed seventy-three cattle on USFS land

24   in Andrews Basin but could not identify any brands.  Later that evening, he

25   witnessed ten of Hage's cattle at an unspecified distance from any watered

1   sources.  These observations correspond to paragraph 16(I) of the FAC.  The

2   Court finds no trespass in these instances, because the Government presented no

3   testimony as to the identification of the cattle in the first instance or as to the

4   distance to any water sources in the second instance.

5   (o)   On August 15, 2004, Jeffrey Shinn witnessed an unspecified number of Hage's

6   cattle on USFS land more than fifty feet from Antone Creek in Antone Canyon.

7   This observation corresponds to paragraph 16(J) of the FAC.  The Court finds no

8   trespass in this instance, because the Government has not proved that the cattle

9   were further than half a mile from water sources in which Defendants had water

10   rights.

11   (p)   On August 23, 2004, Jeffrey Shinn witnessed eight of Hage's cattle on USFS land

12   in Andrews Basin more than fifty feet from any stream.  This observation

13   corresponds to paragraph 16(K) of the FAC.  The Court finds no trespass in this

14   instance, because the Government has not proved that the cattle were further than

15   half a mile from water sources in which Defendants had water rights.

16   (q)   On July 7, 2006, John Rademacher witnessed eleven of Hage's cattle on USFS

17   land in Corcoran Canyon up to 100 feet from Corcoran Creek.  There was heavy

18   forage use in the area.  He also witnessed five of Hage's cattle in Andrews Basin

19   between twenty and sixty feet from Corcoran Creek..  These observations

20   correspond to paragraph 16(P) of the FAC.  The Court finds no trespass in these

21   instances because the Government has not proven that the masses of the cattle

22   groupings were beyond half a mile from Corcoran Creek in either instance, and

23   Hage has stock watering rights in Corcoran Creek.

24   (r)   On June 6, 2007, Steven Williams observed thirty-two of Hage's cattle on USFS

25   land in four separate locations in Corcoran Canyon near Corcoran Creek.  The

1   cattle were from "immediately adjacent to the water" to 100 feet from the water.

2   Mr. Williams only counted those cattle that were further than fifty feet from any

3   stream or spring.  In other words, the cattle he counted were between 50 to 100

4   feet from Corcoran Creek.  These observations appear to correspond to paragraph

5   16(Q) in the FAC.  The Court finds no trespass in these instances because the

6   Government has not proven that the masses of the cattle groupings were beyond

7   half a mile from Corcoran Creek in either instance, and Hage has stock watering

8   rights in Corcoran Creek.

9   (s)   On August 8, 2007, Steven Williams observed thirteen of Hage's cattle inside a

10         fenced USFS administrative pasture on Meadow Canyon further than fifty feet

11         from either Meadow Creek or Meadow Spring.  The Court finds no trespass in

12         this instance, because the Government has not proved that the cattle were further

13         than half a mile from water sources in which Defendants had water rights.

14   11.   The Court finds that the total damages for the two proven instances of trespass

15         under state law are $165.88.

16   **C.    Conclusions of Law**

17   **1.    Grazing Rights on Federal Land**

18   **a.    Property Rights in Grazing on Federal Land**

19   **i.    Generally**

20   Just as there is no right to graze on the land of another private person without permission,

21   there is no right to graze on federal land without permission, *United States v. West*, 232 F.2d 694,

22   698 (9th Cir. 1956) (quoting *Camfield v. United States*, 167 U.S. 518, 524 (1897)); *see also*

23   *Colvin Cattle Co., Inc. v. United States*, 468 F.3d 803, 807 (Fed. Cir. 2006) (citing U.S. Const.

24   art. IV, § 3, cl. 2; *Light v. United States*, 220 U.S. 523, 536 (1911) ("The United States can

25   prohibit absolutely or fix the terms on which its property may be used.")), and no such right is

created by the previous issuance of a permit to graze, *Swim v. Bergland*, 696 F.2d 712, 719–20

(9th Cir. 1983).  The Government previously permitted open grazing on public lands throughout

the western United States under a century-long implied license, but Congress validly withdrew

federal lands from open grazing in the disputed areas via the TGA (and the GTA). *West*, 232 F.2d

at 697–98 (citations omitted).  A licensee does not possess land "adversely" for the purposes of

an adverse possession claim. *25 Corp., Inc. v. Eisenman Chem. Co.*, 709 P.2d 164, 171 (Nev.

1985).

Despite a lack of federal regulation, from 1931 until the passage of the TGA in 1934, the

State of Nevada regulated grazing on public lands (both state and federal), but those laws have

been superseded by the TGA with respect to federal lands. *See Ansolabehere*, 310 P.2d at 842.

Because the Nevada Supreme Court has itself ruled that the State's own grazing laws have been

superseded by the TGA, *see id.*, the Court need not engage in any Supremacy Clause–Tenth

Amendment analysis of Nevada's grazing laws and the TGA.

Nevada's statutes appear to view grazing preferences granted under the TGA as creating

rights under state law, but only as against other persons who interfere with the use of the

federally-granted grazing preference, *see* Nev. Rev. Stat. § 568.225(2), not as against the

Government itself.  The Nevada statute uses the hybrid phrase "grazing preference right," i.e., a

right against another private party based upon the possession of a federally granted grazing

preference under the TGA. *See id.* § 568.225(3)(a)–(b) (defining a "grazing preference right" as

"a right . . . conferred upon a person pursuant to [the TGA, entitling] the person to priority in the

issuance of a permit to graze livestock in accordance with [the TGA]").  The 1931 Act prohibited

grazing on public lands of the United States within Nevada:

> when grazing will or does prevent, restrict or interfere with the customary use of the
> land for grazing livestock by any person who, by himself or herself or the person's
> grantors or predecessors, has become established, either exclusively or in common
> with others, in the grazing use of the land by operation of law or under and in
> accordance with the customs of the graziers of the region involved.

1    *See id.* § 568.230(1) (West 1931).  In other words, the 1931 Act established state control over

2    grazing rights on public lands under a prior-appropriation-type system similar to the way water

3    rights are acquired in the western states.  However, the Nevada Supreme Court has ruled that this

4    statute, which appears to have created a state law right to graze on yet-unregulated federal land

5    (as against other grazers), was superseded by the TGA as to federal lands. *Ansolabehere*, 310

6    P.2d at 842.  Still, there is a federal property right to a preference for a permit as against other

7    grazers based upon prior use where the Government has determined to revoke its long-standing

8    implied license to graze openly in favor of a permit system. *Red Canyon Sheep Co.*, 98 F.2d at

9    313–14.

10           **ii.       Rights Under the Treaty of Guadalupe-Hidalgo**

11           If Defendants' predecessors-in-interest had vested grazing rights in the disputed areas

12   prior to the TGH, the United States may be bound to respect these rights.  The TGH required the

13   United States to honor the property rights of Mexicans in the ceded territories, and Indians were

14   apparently viewed by the Mexican government to be full Mexican citizens under the Mexican

15   Constitution of 1824 in effect when the TGH was signed.  If there had been some right to graze

16   upon land owned by the Mexican government vested in the owners of the lands constituting the

17   Pine Creek Ranch under Mexican private property law, such rights would potentially be

18   protected even in succession as against the United States under the TGH.  However, because

19   there was no evidence presented that any of Defendants' predecessors-in-interest engaged in

20   ranching operations on the lands that eventually became the Pine Creek Ranch prior to the

21   signing of the TGH, there is no need to determine whether any such predecessors were

22   "Mexicans" under the TGH and *Ritchie*, or whether as Indians such predecessors inherently

23   lacked the property rights protections of the TGH under *Sandoval* regardless of whether the

24   Mexican government considered them to be Mexicans.

25           The Court concludes that Defendants do not have a general right to graze their cattle on

federal lands without a permit:

> the permit system [is] an administrative method employed by the government to allow parties the exclusive right to graze based upon historical grazing practices. All the courts which have considered this issue have held or assumed such agreements to be licenses which confer certain privileges to the permittee, revokable at the government's discretion.

*Hage I*, 35 Fed. Cl. at 167 (citing *United States v. Fuller*, 409 U.S. 488 (1973); *Swim v. Bergland*, 696 F.2d 712 (9th Cir. 1983); *Diamond Ring Ranch, Inc. v. Morton*, 531 F.2d 1397 (10th Cir. 1976); *Fulton v. United States*, 825 F. Supp. 261 (D. Nev. 1993)).  Article IV of the Treaty of Ruby Valley simply opened the Shoshone lands for ranching and other purposes to non-Indians as a general matter but did not plausibly transfer any particular vested rights from Mexican fee holders to any American who ended up on the ceded lands:

> It is further agreed by the parties hereto, that the Shoshone country may be explored and prospected for gold and silver, or other minerals; and when mines are discovered, they may be worked, and mining and agricultural settlements formed, and ranches established wherever they be required.

Treaty of Ruby Valley, art. IV (1866).  The language of "and ranches *established*" indicates the contemplation of the establishment of new endeavors by non-Indian settlers, not the transfer of existing private land in fee simple previously issued under Mexican or Spanish patents, or the Shoshone legal equivalent, which transfer might transfer attendant rights. *See id.* (emphasis added).  The Treaty was entered into in order to permit settlers to pass through and live on the land without being subject to violence from the Indians, not to transfer any title.  Defendants' Exhibit 2700 itself illustrates the gap in title between aboriginal title and private fee simple title, using the phrase "multiple claimants of possessory rights" to describe the ownership during the period between 1866 and the year the United States issued patents for the various parcels of land comprising the modern-day Pine Creek Ranch.  Those "multiple claimants" are not alleged to have held the land under color of title and are not even identified.  But even assuming they could be identified, it would not prove a grazing easement on nearby federal lands.  During this period, the Shoshone held title to the land at the pleasure of Congress.  Congress had the right to take

1  title to the land from the conquered Shoshone explicitly or implicitly, which it did through

2  various acts and omissions, eventually settling the taking with a cash payment of $26 million by

3  the Indian Claims Commission and extinguishing aboriginal title to the entire area in 1979. *See*

4  *generally United States v. Dann*, 470 U.S. 39 (1985).

5      Defendants argue that because they had title to the land before aboriginal title was

6  formally extinguished, they retain aboriginal rights.  There are two problems with this argument.

7  First, Defendants' predecessors-in-interest obtained their titles via patents from the United States.

8  The issuance of a patent from the United States to a private owner does not transfer aboriginal

9  title, but rather implicitly extinguishes any such title that might otherwise exist.  A patent is an

10  original alienation of land from sovereign to subject or citizen ownership.  Sovereign aboriginal

11  title is extinguished implicitly when the United States grants a patent, because the grant of a

12  patent presumes that the issuing sovereign (here, the United States) has sovereign title, and not

13  some other sovereign such as the Shoshone.  The issuance of a patent is therefore a denial of

14  aboriginal title by the Congress, which the Congress has plenary power to do as to the Indian

15  tribes' land.  For the purposes of easements and the like, therefore, aboriginal title to the lands at

16  issue was extinguished when the United States issued patents to them, not when it compensated

17  the Shoshone for the taking in 1979.  The compensation of the Shoshone has nothing to do with

18  Defendants' rights on federal land.  Indians do not have the ability to transfer their treaty rights,

19  whatever they may be, to non-Indians living on U.S.-patented lands.

20      Second, Defendants have provided no evidence that the lands constituting the CGP were

21  servient to the lands now constituting the Pine Creek Ranch under any Shoshone system of

22  grazing easements.

23      **b.     Due Process in Grazing Permit Applications**

24      Although there is no right to graze on federal land, and Defendants have not shown a

25  right protected under the TGH or the Treaty of Ruby Valley, the Government may not abuse its

1   discretion in refusing to renew, or in revoking, such a privilege under the APA.

2       Although there is no property interest in a grazing permit for the purpose of the Takings

3   Clause, there is a property interest in a grazing permit for the purpose of the Due Process Clause,

4   both procedural and substantive.  That is, certain procedural safeguards may be required before

5   denying, altering, suspending, or terminating a permit, and certain adverse actions affecting

6   permits are not permitted regardless of the procedural safeguards.  The TGA and the National

7   Forest Organic Act of 1897 require that permits be granted or not based upon preferences arising

8   out of existing custom and usage.  Substantively, there must be a reasonable relationship between

9   denial, suspension, or termination of a permit, based upon historical custom and usage and the

10  need to preserve the range for future use.  Although, for example, reasonable orders to remove

11  cattle temporarily where a range has been over-grazed or where the range is in a drought

12  condition would be within the realm of reason, a due process violation could occur in this context

13  if a permit were reduced or terminated for other reasons, such as to reserve use of the range for

14  non-grazing purposes, or to transfer the permit to another applicant notwithstanding the first

15  user's right to a preference under TGA and the custom and usage standards underlying the

16  preference system.

17      The Government may not revoke exclusive grazing permits arbitrarily or deny initial or

18  renewal exclusive grazing permits where an applicant has applied for a permit for appropriate use

19  and consistent with the historical grazing practices of himself and his predecessors-in-interest.

20  The Government has abused its discretion in the present case through a series of actions designed

21  to strip the Estate of its grazing permits, and ultimately to strip Defendants of their ability to use

22  their water rights, for reasons unrelated to the appropriate use of the range or ensuring that

23  historical grazing use is respected.

24      "Substantive due process protects individuals from arbitrary deprivation of their liberty by

25  government," *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (citing *Cnty. of Sacramento*

1    *v. Lewis*, 523 U.S. 833, 845–49 (1998)), although "only the most egregious official conduct can

2    be said to be arbitrary in a constitutional sense," *Lewis*, 523 U.S. at 846.  Regardless of whether

3    the grazing permits in this case were only "privileges," and not rights, the Government cannot

4    withdraw them or refuse to renew them vindictively or for reasons totally unrelated to the merits

5    of the application as governed by published laws and regulations, lest the Government abuse its

6    executive power in a way that shocks the conscience. *See id.*  Furthermore, permit applications

7    are subject to procedural due process. *See Buckingham*, 603 F.3d at 1081–82.  A court

8         must balance: (1) the private interest that will be affected by the action, (2) the risk
          of an erroneous deprivation of that interest through the procedures used and the value
9         of additional or alternative safeguards, and (3) the government's interest, including
          the additional costs and administrative burdens that additional procedures would
10        entail.

11    *Id.* (quoting *Mathews*, 424 U.S. at 335 (1976)).

12         In the present case, the Government's actions over the past two decades shocks the

13   conscience of the Court, and the burden on the Government of taking a few minutes to realize

14   that the reference to the UCC on the Estate's application was nonsensical and would not affect

15   the terms of the permit was minuscule compared to the private interest affected.  The risk of

16   erroneous deprivation is great in such a case, because unless the Government analyzes such a

17   note in the margin, it cannot know if the note would affect the terms of the permit such that the

18   acceptance is in fact a counteroffer.

19         The Government revoked E. Wayne Hage's grazing permit, despite his signature on a

20   renewal application form, because he had added a reference to the UCC to his signature

21   indicating that he was not waiving any rights thereby.  Based upon E. Wayne Hage's declaration

22   that he refused to waive his rights—a declaration that did not purport to change the substance of

23   the grazing permit renewal for which he was applying, and which had no plausible legal effect

24   other than to superfluously assert non-waiver of rights—the Government denied him a renewal

25   grazing permit based upon its frankly nonsensical position that such an assertion of rights meant

1   that the application had not been properly completed.  After the BLM denied his renewal grazing

2   permit for this reason by letter, the Hages indicated that they would take the issue to court, and

3   they sued the Government in the CFC.  The Government, having already denied the renewal

4   grazing permit arbitrarily, then chose to interpret the initiation of the CFC Case as a refusal to

5   appeal its administrative decision, despite the issuance of further protests by the Estate's

6   attorneys.  The Government refuses to consider any applications from Hage at this point.  The

7   entire chain of events is the result of the Government's arbitrary denial of E. Wayne Hage's

8   renewal permit for 1993–2003, and the effects of this due process violation are continuing.

9        In 2007, unsatisfied with the outcome thus far in the CFC, the Government brought the

10  present civil trespass action against Hage and the Estate.  The Government did not bring criminal

11  misdemeanor trespass claims, perhaps because it believed it could not satisfy the burden of proof

12  in a criminal trespass action, as a previous criminal action against E. Wayne Hage had been

13  reversed by the Court of Appeals.  During the course of the present trial, the Government has: (1)

14  invited others, including Mr. Gary Snow, to apply for grazing permits on allotments where the

15  Hages previously had permits, indicating that Mr. Snow could use water sources on such land in

16  which Hage had water rights, or at least knowing that he would use such sources; (2) applied

17  with the Nevada State Engineer for its own stock watering rights in waters on the land despite

18  that fact that the Government owns no cattle nearby and has never intended to obtain any, but

19  rather for the purpose of obtaining rights for third parties other than Hage in order to interfere

20  with Hage's rights; and (3) issued trespass notices and demands for payment against persons who

21  had cattle pastured with Hage, despite having been notified by these persons and Hage himself

22  that Hage was responsible for these cattle and even issuing such demands for payment to

23  witnesses soon after they testified in this case.

24       By filing for a public water reserve, the Government in this case sought specifically to

25  transfer to others water rights belonging to the Hages.  The Government also explicitly solicited

1    and granted temporary grazing rights to parties who had no preferences under the TGA, such as

2    Mr. Snow, in areas where the Hages had preferences under the TGA.  After the filing of this

3    action, the Government sent trespass notices to people who leased or sold cattle to the Hages,

4    notwithstanding the Hages' admitted and known control over that cattle, in order to pressure

5    other parties not to do business with the Hages, and even to discourage or punish testimony in the

6    present case.  For this reason, the Court has held certain government officials in contempt and

7    referred the matter to the U.S. Attorney's Office.  In summary, government officials, and perhaps

8    also Mr. Snow, entered into a literal, intentional conspiracy to deprive the Hages not only of their

9    permits but also of their vested water rights.  This behavior shocks the conscience of the Court

10   and provides a sufficient basis for a finding of irreparable harm to support the injunction

11   described at the end of this Order.

12             **2.      Easements on Federal Land Generally**

13             A private party may have an easement on federal land, but "federal law governs a claim

14   of easement over lands owned by the United States." *McFarland v. Kempthorne*, 545 F.3d 1106,

15   1110 (9th Cir. 2008).  In that case McFarland contended that he had an easement over federal

16   land to access his property, either by necessity, implied from the Homestead Act, or expressed in

17   the land patent issued to his predecessors-in-interest. *See id.*  A private party can have, for

18   example, an easement by necessity against the United States. *Id.* at 1111 (citing *Mont. Wilderness

19   Ass'n v. U.S. Forest Serv.*, 496 F. Supp. 880, 885 (D. Mont. 1980); *United States v. Dunn*, 478

20   F.2d 443, 444 & n.2 (9th Cir. 1973)).  Such an easement arises if "(1) the title to two parcels of

21   land was held by a single owner; (2) the unity of title was severed by a conveyance of one of the

22   parcels; and (3) at the time of severance, the easement was necessary for the owner of the severed

23   parcel to use his property." *Id.* (quoting *Fitzgerald Living Trust v. United States*, 460 F.3d 1259,

24   1266 (9th Cir. 2006)).  These all appear to be satisfied here.  The parcels of land upon which

25   Hage claims water rights, like the parcels of land comprising the Pine Creek Ranch, all

1    previously belonged to the United States via the Mexican Cession or the Treaty of Ruby Valley.

2    The unity of title was severed by issuance of various patents to Hage's predecessors-in-interest,

3    and it was necessary for those predecessors in interest to cross the federal lands to use their

4    respective water rights at the time.  Hage therefore has an easement by necessity to access the

5    water sources in which he has rights.  And the patents at issue included express easements to

6    make use of water rights, in any case.  The Government may reasonably regulate the use of such

7    an easement, but a reasonable regulation of an easement to access water rights is a regulation that

8    neither prohibits nor prohibitively restricts the use of water rights.

9            **3.      Grazing Easements or Forage Rights Attendant to Water Rights**

10                   **a.      Grazing Easements**

11           The Court of Appeals has in the past ruled that individual Indians' rights vesting before

12   the TGA can support grazing rights on federal land despite the TGA where aboriginal title has

13   not been extinguished. *See United States v. Dann*, 873 F.2d 1189, 1199 (9th Cir. 1989) ("Any

14   such aboriginal right, however, must have been acquired prior to the withdrawal of the lands

15   from open grazing and their subjection to the regime of the Taylor Grazing Act.").  But

16   Defendants provided evidence showing only that their title originated in various land patents

17   from the United States dating from no earlier than 1874.  They traced no portion of their title to

18   any individual Indian.  Whether any aboriginal title in the lands survived the TGH, Congress

19   impliedly extinguished such title when it issued patents to the land to the State of Nevada or

20   private owners.

21           If the original land patents from the United States included express easements to graze,

22   Defendants could still claim this right as against the United States notwithstanding the TGA or

23   other legislation o the contrary.  But the land patents adduced at trial do not contain language

24   indicating any express easement to graze in the nearby areas.  The patents refer to "water rights"

25   and "appurtenances."  Defendants in their case-in-chief noted only the stock "appurtenances"

1   language in the relevant land patents, and no language using the language of "grazing."

2       The Court of Appeals has held that there is no grazing easement appurtenant to a water

3   right, because it is not necessary to graze in order to utilize water, though there is an easement to

4   divert water for stock watering. *See Hunter v. United States*, 388 F.2d 148, 153–54 (9th Cir.

5   1967) ("[A]lthough Hunter is not entitled to an easement to graze livestock on the lands within

6   the boundaries of the Monument, he should be allowed a right of way over those lands to divert

7   the water by one of the methods contemplated by the [1866 Ditch Act]").

8           **b.     Forage Rights**

9       There is no historical evidence for a right to forage superior to the United States' right to

10  refuse permission to graze on federal lands.  But even in the absence of a forage right, cattle

11  grazing while watering pursuant to a water right do not cause a trespass simply because they

12  graze near the water source to the extent that it is their natural behavior that cannot reasonably be

13  prevented.  As the Estate notes, "[t]he practical difficulty is in determining how long livestock

14  must be left on the water in order to achieve the appropriate beneficial use without converting

15  that presence into something more than beneficial use of the water." (Estate's Br. 17, Sept. 7,

16  2012, ECF No. 389).  To conclude that a trespass results from attendant activity that cannot

17  reasonably be prevented in the course of the use of a valid water right would be to put a

18  restriction on the use of the water right that destroys the ability reasonably to utilize the water

19  right itself.  Such a restriction would vitiate the principle that an easement must be (and may be)

20  used *reasonably*.  For example, an easement to cross the land of another by automobile is not

21  violated by the deposit on the servient owner's land of small particles of carbon or water from the

22  exhaust of the vehicle, or even drops of fluids from the vehicle, to the extent these substances

23  cannot reasonably be prevented from escaping.  Likewise, incidental grazing of cattle while

24  watering, to the extent it cannot reasonably be prevented, cannot be the basis of a trespass

25  without more if the cattle are legally on the servient land in the exercise of the dominant owner's

1    stock watering rights.

2          But such grazing must be incidental, not by design.  As noted, *infra*, the willful grazing of

3    cattle on the land of another without permission constitutes a trespass in Nevada.  There is no

4    unlimited right to graze near water in which one has stock watering rights.  But it is a reasonable

5    use of the stock watering right that cattle may wander within a half mile of such a water source

6    while watering.  Although any numerical limitation will necessarily be arbitrary, the Court must

7    determine some limitation.  The Court finds that based upon the expert testimony at trial, beyond

8    half a mile cattle are more immediately intent on grazing than drinking.  A half a mile of

9    wandering, while grazing incidentally, is a reasonable use of a stock watering right, because the

10   expert testimony at trial clearly indicated that cattle simply cannot be made to sit still and drink at

11   a water source; nor can they be prevented from incidentally grazing while watering.  The half-

12   mile distance from a water source in which a person has a stock watering right is not a right to

13   graze as such, but it is a defense to a trespass action.  Beyond that distance, a purposely placed

14   cow trespasses (though under Nevada law, a cow that wanders from an owner's own land onto

15   the unfenced land of another does not cause a trespass no matter where it grazes).

16         The Government argues for a no tolerance rule, and Defendants argue for three miles or

17   more (based upon the State of Nevada's 1931 grazing law) or, in the alternative, for a flexible

18   rule tied to the behavior of cattle.  The Court opts for Defendants' alternative and adopts the half-

19   mile rule, which is consistent with the behavior of cattle.  The question here is the reasonable use

20   of water rights and an easement to access the rights.  The Court finds that half a mile is a

21   reasonable distance.  Although a large group of cattle cannot apparently be kept in a tiny

22   grouping without constant herding, and may reasonably be allowed to roam while drinking, cattle

23   roaming further than a half mile from a water source is a good indication that the cattleman

24   intends for the cow to graze where he is not authorized to do so.  It is not fair to say that cattle

25   must be taken to the shore of a stream, kept there and watched constantly until they drink, and

1    then taken off of the land.  The testimony at trial was uncontroverted that cattle cannot be made

2    to drink on command in this way.  Therefore, in order to make reasonable use of a stockwatering

3    right, a cattleman may have to leave the cattle at the water for some time.  In the meantime, he

4    may not simply permit his cattle purposely to graze on land where he has no right to do so.  He

5    may have to bring hay or other food supplement to satiate his cattle at the point of the water

6    source until they are finished drinking.  But he cannot simply permit them, after purposely

7    placing them on the land of another, to roam and graze beyond what cannot reasonably be

8    prevented while they are drinking.  He need not supervise the cattle on the water source, but he

9    bears the risk of a trespass if a cow wanders more than half a mile therefrom and grazes.

10            **5.     Trespass of Cattle**

11            **a.     Nevada Law**

12            Trespass of cattle as a tort is a question of state law. *Allied Props. v. Jacobsen*, 43 P.2d

13    1016, 1021 (Nev. 1959).  Nevada is an "open range" state.  That is, in Nevada, the natural

14    drifting of cattle onto the unfenced land of another is not a trespass without more. *See Northam*

15    *Range Ass'n v. Casey*, 39 P.2d 384, 386 (Nev. 1959) (remanding to the trial court for a

16    determination of facts on the question of natural drift versus intentional trespass); *Williams*

17    *Estate Co. v. Nev. Wonder Mining Co.*, 196 P. 844, 846 (Nev. 1921) ("It was a lawful act for the

18    respondent to turn its cattle loose upon the range unattended by any herder, and if the stock,

19    following the bent of their propensities, wandered upon the uninclosed lands of another, the

20    respondent would not be liable for trespass.").  However, "where there is a willful trespass, the

21    trespasser will be liable for compensation, as damages, for all loss actually sustained as a direct

22    result of the trespass, and, if the trespass is committed willfully, wantonly, or maliciously,

23    exemplary damages may be recovered." *Gerlach Live Stock Co. v. Laxalt*, 284 P. 310, 311 (Nev.

24    1930).  It is a trespass willfully to herd or graze cattle upon the land of another, even if unfenced.

25    *See Williams Estate Co.*, 196 P. at 846 ("By reason of the general policy of the law of this state

1  permitting cattle and horses to run at large on uninclosed land, he cannot maintain an action for

2  such a trespass, except when the animals are herded or grazed upon his land . . . ."). In other

3  words, in Nevada there is no affirmative duty to restrain livestock from wandering onto the land

4  of another, even if they graze there, and, conversely, the owner of the land will not be liable if the

5  cattle are accidentally harmed, unless he has created an attractive nuisance causing them to enter

6  the land. *See id.* at 846–47.

7       In the present context, this means that Defendants are not liable for trespass except where

8  Defendants have willfully placed cattle on federal land for the purpose of grazing. Defendants

9  are not liable for trespass where they have willfully placed cattle on federal land for the purpose

10 of watering in places where Defendants have stock watering rights, so long as Defendants did not

11 intend for their cattle to graze more than incidentally.

12      Damages in a trespass action are measured by the loss actually sustained, *Gerlach Live*

13 *Stock Co.*, 284 P. at 311, not by the fees the Government determines to charge for unauthorized

14 grazing or other use. The CFR sets fees for non-willful, willful, and repeated willful

15 unauthorized grazing, the latter two commanding fees of twice and thrice the fees for non-willful

16 unauthorized grazing, respectively. *See* 43 C.F.R. § 4150.3(a)–(c). The damages for non-willful

17 unauthorized grazing are based upon a calculation of the value of the forage. The Court finds

18 that this is an appropriate measure of damages in the present case. Although the alleged

19 unauthorized grazing in this case is best characterized as repeated and willful, the measure of

20 damages for this kind of unauthorized grazing under the CFR are punitive. Such a measure of

21 damages may be appropriate as a fine in a misdemeanor criminal prosecution, but the

22 Government has declined such a prosecution, bringing only a civil trespass action. Although

23 only actual damages are permitted, the Court will accept the Government's calculation of the

24 value of forage under the regulations. *See* § 4150.3(a) ("The value of forage consumed as

25 determined by the average monthly rate per AUM for pasturing livestock on privately owned

1    land (excluding irrigated land) in each State as published annually by the Department of

2    Agriculture.").  The Government's witnesses testified that they did not know the fair market

3    value of the forage, but rather referred only to the public AUM rates, which are published by the

4    Department of Agriculture pursuant to the National Forest Organic Act of 1897 (authorizing the

5    USFS to charge grazing fees), the Taylor Grazing Act of 1934 (authorizing the BLM to charge

6    grazing fees), and E.O. 12548 (instructing the Secretary of Agriculture as to how he should

7    calculate such fees).  The Court finds that the current authorized use rate of $1.43 per animal per

8    month is a fair measure of actual damages in the present trespass action.  The Court will not

9    divide this amount by thirty in each case, because although it is clear from the evidence that

10   cattle wander and that they were observed in locations indicating a trespass only for a fraction of

11   a day in each instance, Irvin Plank testified that Hage's cattle were typically pastured at a given

12   location for approximately two weeks to a month.  The Court can infer that the cattle's behavior

13   as observed was similar over the course of the month.  The Court will not infer, however, that

14   cattle always stray more than half a mile from water sources while watering, because in many, if

15   not most, instances the cattle were observed congregated immediately adjacent to water sources.

16   The Court will not award punitive damages under state law, because there is not "clear and

17   convincing" evidence of "oppression, fraud, or malice, express or implied" on behalf of

18   Defendants. *See* Nev. Rev. Stat. § 42.005(1).  Defendants clearly had a good faith belief in their

19   right to use the land as they did and had no intention to disregard the right of others.  This does

20   not prevent a trespass claim, but it does prevent punitive damages.

21          **b.     Federal Law**

22          The Government has invoked no federal statute governing a civil trespass, but only

23   statutes and regulations governing range management, including fees and fines for unauthorized

24   use.  The Government may bring an action to collect fees and fines for unauthorized grazing as a

25   misdemeanor offense, but it has not done so here.  Mr. Williams testified that normally, a rancher

1    refusing to pay a fee imposed for unauthorized grazing would be charged before a magistrate

2    judge, but that had not happened in the present case.  The present case therefore is a civil action

3    for trespass and an injunction.  There is federal jurisdiction over the present case despite the

4    small amount of damages claimed only because the United States is the plaintiff. *See* 28 U.S.C.

5    §§ 1332(a), 1345.

6         **c.    The Present Case**

7         Of the approximately fifty instances of trespass alleged in the FAC, the Government

8    presented evidence at trial of seventeen instances, corresponding to paragraphs 14(A)–(E) and

9    16(A)–(E), (H)–(K), and (P)–(R) of the FAC.

10        It is clear that Defendants willfully permitted their cattle to wander onto USFS and BLM

11   lands in some instances, and that those cattle grazed upon those lands.  In any instances where

12   the cattle were more than half a mile from water sources in which Defendants have stock

13   watering rights, these instances would constitute trespasses, though not trespasses supporting

14   punitive damages, because there is no evidence that Defendants committed the trespasses

15   oppressively, fraudulently, or maliciously, as required by the superseding statute. *See* Nev. Rev.

16   Stat. § 42.001–.002 (superseding *Gerlach Live Stock Co.*, 284 P. at 311).  Defendants committed

17   trespass by willfully permitting their cattle to graze upon the land of another without permission,

18   i.e., federal land under control of the USFS or BLM, in those two instances alleged in

19   subparagraphs 14(A) and 14(B) of the FAC.  The Court finds that the damages for these

20   trespasses totals $165.88.

21        In the other instances for which the Government has both pled a trespass and provided

22   evidence of a trespass, the Government has either presented no evidence tending to prove the

23   identity of the observed cattle, has presented no evidence of the distance of the cattle from the

24   water sources, or has presented evidence of the identity of the cattle and distance from the water

25   sources but has not proved by a preponderance of the evidence that the groupings of cattle were

1   more than half a mile from a water source in which Defendants had stock watering rights or that

2   the cattle were in fact grazing.

3       **6.    Injunctive Relief**

4       The Government has sufficiently proved an ongoing trespass to warrant a permanent

5   injunction, although not so broad an injunction as the Government desires.  Defendants are also

6   entitled to an injunction, as outlined, *infra*.  There is a great probability that the Government will

7   continue to cite Defendants and potentially impound Defendants' cattle in the future in

8   derogation of their water rights and those statutory privileges of which the Government has

9   arbitrarily and vindictively stripped them.  There is also a probability that Defendants will

10  continue to permit their cattle to graze in excess of the incidental grazing permitted during stock

11  watering that cannot reasonably be prevented.  The Court will therefore enjoin all parties in

12  certain respects and will require Hage to apply for a permit and the Government to grant it.

13                              **CONCLUSION**

14      THE COURT HEREBY FINDS Defendant Wayne N. Hage LIABLE for trespass under

15  Nevada law in the two instances identified above, corresponding to paragraphs 14(A) and 14(B)

16  of the First Amended Complaint.  The Court finds that the damages caused by these trespasses is

17  $165.88, and THE COURT HEREBY ENTERS JUDGMENT in favor of the United States of

18  America and against Wayne N. Hage in this amount.

19      THE COURT FURTHER FINDS that the United States has not proved trespass by a

20  preponderance of the evidence in the remaining instances alleged in the First Amended

21  Complaint.  Defendants are NOT LIABLE for those remaining alleged trespasses, and THE

22  COURT HEREBY ENTERS JUDGMENT in favor of Defendants and against the United States

23  as to all other claims of trespass made in the First Amended Complaint.

24      THE COURT FURTHER FINDS that all allegedly trespassing cattle were under the

25  control of Wayne N. Hage during the relevant time periods, and THE COURT HEREBY

1   ENTERS JUDGMENT in favor of the Estate of E. Wayne Hage and against the United States as

2   to the United States' claims of trespass against the Estate.

3           THE COURT FURTHER FINDS that the denial of E. Wayne Hage's renewal grazing

4   application for the years 1993–2003 was an abuse of discretion, as well as a violation of due

5   process, as the only reason given for the denial was that the applicant noted near his signature

6   that he did not thereby relinquish certain unidentified rights under the UCC, a superfluous

7   condition that cannot possibly have affected the terms of the permit.  It is this violation that has

8   led to all of the allegedly un-permitted grazing to date and the BLM's refusal to offer any permit

9   to Hage himself.

10          IT IS HEREBY ORDERED that the Government is enjoined from unreasonably

11  interfering with the ability of Defendants Wayne N. Hage and the Estate of E. Wayne Hage to

12  bring cattle to those water sources and attendant ditches in which these Defendants have vested

13  rights to water their cattle as identified herein.  The Government may impose reasonable

14  regulations upon access to these water sources, such as specifying which routes shall be used for

15  ingress and egress, if it is necessary to impose such restrictions for legitimate purposes.

16  Reasonable regulations are those that neither prohibit access to the water nor restrict access to the

17  water in a way that unreasonably burdens the ability to access and use the water.

18          IT IS FURTHER ORDERED that cattle drinking from these water sources need not be

19  supervised during ingress onto federal land, while watering, or during egress from federal land.

20  Unsupervised entry of cattle onto another's unfenced land is not a trespass for which the owner

21  of cattle is liable without more in Nevada.  Whether supervised or not, however, wherever there

22  is no grazing permit, the cattle must not be willfully placed on or near federal land for the

23  purpose of grazing thereupon except to the extent incidental grazing cannot reasonably be

24  prevented while the cattle are watering.  Defendants are enjoined in this regard.  It shall not

25  constitute a trespass if cattle graze within half a mile of a water source in which Defendants have

1    stock watering rights, or attendant ditches or other diversions in which Defendants have stock

2    watering rights, to the extent it cannot reasonably be prevented while the cattle are corralled on

3    federal land for the purposes of watering.  This is the extent of the "forage right."  The "forage

4    right" is not a right to graze qua grazing while cattle are near water sources in which one has

5    stock watering rights but is essentially a defense to a trespass action.  An easement over the land

6    of another must be and may be used reasonably, and it is not unreasonable that some cattle may

7    graze while drinking.  The uncontroverted evidence indicates that cattle cannot be watered

8    efficiently if they must be continually corralled while drinking.  The number of cattlemen

9    required for such supervision would be prohibitively expensive, such that a requirement of

10   constant supervision would not be a reasonable regulation of the right.  Still, if cattle wander

11   more than half a mile away from a water source and graze on the land of another where cattleman

12   have purposely placed the cattle onto or near another's land, there is a trespass whether the

13   grazed land is owned by the United States, the State of Nevada, or a private owner, and whether

14   the cattle are supervised or not.

15          IT IS FURTHER ORDERED that the Government is enjoined from issuing trespass or

16   impound notices to Hage or anyone leasing cattle to him where the third party provides evidence

17   of lease or transfer and Hage admits responsibility for that cattle.  The Government must request

18   permission from this Court to issue such notices until further notice.  Furthermore, without

19   Hage's consent or this Court's permission, the Government shall not—after Hage applies for

20   permits as noted, *infra*, and the BLM and USFS issue them—reduce the permits by more than

21   25% for any period of time.  Beyond that, the Government's normal discretion is restricted under

22   the present injunction.  This structural injunction is required in this extreme case because of the

23   conspiracy noted *supra*, the history of violations of the Hages' due process rights in their permits

24   and vested property rights in the use of water, and the obvious continuing animus against Hage

25   by the government officials charged with administering his permits and the government land on

1   which he has water rights.

2       IT IS FURTHER ORDERED that Hage shall apply for renewal grazing permits

3   consistent with those possessed by E. Wayne Hage before the refusal of the BLM and USFS to

4   renew them, using standard application forms, and without attempting to add any conditions or

5   commentary not provided for on the standard forms.  The BLM and USFS must consider and

6   grant the application(s) in accordance with statute and regulation, i.e., in accordance with those

7   historical usages and preferences in the relevant areas existing as of the last date E. Wayne Hage

8   or Jean Hage had such permits in good standing, and Hage shall pay the required standard fees.

9   To the extent Hage applies to graze in new areas or applies for AUMs or HMs in excess of those

10  allocated under the previous permits, the BLM and USFS shall consider such additional

11  application(s) just as it would consider any new such application by Hage if he had so applied on

12  the last date E. Wayne Hage or Jean Hage had their permits in good standing and without regard

13  to previous allegations of bad behavior by Defendants related to the present case or the CFC

14  Case.

15      IT IS FURTHER ORDERED that to the extent not inconsistent with this Order, the Court

16  adopts Defendants' Proposed Findings of Fact and Conclusions of Law (ECF No. 392).

17      IT IS FURTHER ORDERED that the Motion to Reconsider (ECF No. 400) and Motion

18  to Set Hearing (ECF No. 406) are DENIED.

19      IT IS FURTHER ORDERED that the Motion to File Amended Amicus Brief (ECF No.

20  409) is GRANTED.

21      IT IS FURTHER ORDERED that the Clerk shall enter Judgment and close the case.  The

22  Court has continuing jurisdiction to enforce this Order and Injunction.

23      IT IS SO ORDERED.

24  Dated this 23rd day of May, 2013.

25                                  ROBERT E. JONES
                                    United States District Judge